CV- 08-4137 PJH (PR)

**FILED**

AUG 2 9 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

# EXHIBIT   "A"

COURT OF CALIFORNIA, COUNTY OF _____ LOS ANGELES

□ JUSTICE

*160-5200*

COURT (I.D.) 19 0 0 1 3

BRANCH OR JUDICIAL DISTRICT: _____ SOUTH CENTRAL

**PEOPLE OF THE STATE OF CALIFORNIA**, versus

**DEFENDANT:** CALLOWAY, PAUL

AKA:

☒ PRESENT
□ NOT PRESENT

CASE NUMBER (S): TA001416

- A
- B

**REPORT OF:**
- □ DEATH SENTENCE
- ☒ INDETERMINATE SENTENCE
- □ OTHER SENTENCE CHOICE

AMENDED REPORT □

- C
- D
- E

| DATE OF HEARING (MO) (DAY) (YR) 9-1-93 | DEPT. NO SCB | JUDGE VICTORIA CHAVEZ | CLERK M GALLUP |

| REPORTER C ROAM | COUNSEL FOR PEOPLE A GRAY | COUNSEL FOR DEFENDANT J DOTLE 987.2 | PROBATION NO. OR PROBATION OFF X-01503228 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS):

□ ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES):

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION | | | CONVICTED BY | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | MO | DAY | YEAR | JURY | COURT TRIAL | PLEA | TRANSFER |
| 1 | PC | 187(a)** | 2ND DEGREE MURDER | 89 | 4 | 20 | 93 | X | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

2. ENHANCEMENTS (charged and found true) TIED TO SPECIFIC COUNTS (mainly in the § 12022 series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.. For each count list enhancements horizontally. DO NOT LIST enhancements charged but not found true or stricken under § 1385. DO NOT LIST TIME imposed. For indeterminate terms, report enhancements and time imposed for them in the abstract.

| Count | Enhancement | Y/N or S | Enhancement | Y/N or S | Enhancement | Y/N or S | Enhancement | Y/N or S | Enhancement | Y/N or S |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12022.5 | Y | | | | | | | | |
| | | | | | | | | | | |
| | | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667 series) and OTHER. List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g. if 2 non-violent prior prison terms under §667.5(b) list 667.5(b) 2 times. DO NOT LIST enhancements not found true. Also note here any enhancement not provided for in space 2. DO NOT LIST TIME imposed. For indeterminate term, report enhancements and time for them in the abstract.

| Enhancement | Y/N or S | Enhancement | Y/N or S | Enhancement | Y/N or S | Enhancement | Y/N or S | Enhancement | Y/N or S |
|---|---|---|---|---|---|---|---|---|---|
| Enhancement | | Enhancement | | Enhancement | | Enhancement | | Enhancement | |

4. □ Defendant was sentenced TO DEATH on counts _____

5. ☒ Defendant was sentenced to State Prison for an indeterminate term

   A. ☒ For LIFE, or a term such as 15 or 25 years to life, WITH POSSIBILITY OF PAROLE on counts _____ 1

   B. □ For LIFE WITHOUT the possibility of parole on counts _____

   C. □ For other term prescribed by law on counts _____ (Life Terms are on "A" and "B.")

6. □ Counts _____ are alternate felony/misdemeanors and were DEEMED MISDEMEANORS.

   A term in jail □ was □ was not ordered

7. □ For counts _____ the defendant was placed on FELONY probation.

   A. (1) □ Sentence pronounced and execution of sentence was suspended; or

      (2) □ Imposition of sentence was suspended.

   B. Conditions of probation included     □ Jail Time     □ Fine

8. □ Other dispositions

   A. □ Defendant was committed to California Youth Authority.

   B. □ Proceedings suspended, and defendant was committed to California Rehabilitation Center.

   C. □ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender

   D. □ Proceedings suspended, and defendant was committed as mentally incompetent

**NOTE 1:** PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT CODE, THE CHIEF JUSTICE REQUIRES THAT EACH COURT SHALL COMPLETE THIS FORM FOR EACH INDETERMINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON.

**NOTE 2:** FOR DEATH SENTENCE OR INDETERMINATE SENTENCE, ABSTRACT OF JUDGMENT MUST ALSO BE PREPARED. IT IS NOT SENT TO THE ADMINISTRATIVE OFFICE OF THE (AOC).

SUPERIOR COURT OF CALIFORNIA, COUNTY OF

| COURT | | BRANCH | SOUTH | CA | | CASE NUMBER (S) | |
|---|---|---|---|---|---|---|---|
| 19 0 0 3 | | | | | | TA001416 | - A |

PEOPLE OF THE STATE OF CALIFORNIA versus
DEFENDANT: CALLOWAY, PAUL
AKA:

| | | | |
|---|---|---|---|
| [X] PRESENT | | | - A |
| | | | - B |
| [ ] NOT PRESENT | | | - C |

COMMITMENT TO STATE PRISON
ABSTRACT OF JUDGMENT

| AMENDED ABSTRACT [ ] | |
|---|---|
| | - D |
| | - E |

| DATE OF HEARING (MO) (DAY) (YR) | DEPT. NO | JUDGE | CLERK |
|---|---|---|---|
| 9-1-93 | SCB | VICTORIA CHAVEZ | M GALLUP |

| REPORTER | COUNSEL FOR PEOPLE | COUNSEL FOR DEFENDANT | PROBATION NO. OR PROBATION OFFICER |
|---|---|---|---|
| C ROAM | A GRAY | J DOYLE 987.2 | X-01503228 |

1. DEFENDANT WAS CONVICTED OF THE COMMISSION OF THE FOLLOWING FELONIES (OR ALTERNATE FELONY/MISDEMEANORS):

[ ] ADDITIONAL COUNTS ARE LISTED ON ATTACHMENT _____ (NUMBER OF PAGES) _____

SENTENCE RELATION

| COUNT | CODE | SECTION NUMBER | CRIME | YEAR CRIME COMMITTED | DATE OF CONVICTION | | | CONVICTED BY | | | | | | | | | | PRINCIPAL CONSEC. TIME IN |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | MO | DAY | YEAR | COURT | JURY | PLEA | | | | | | | YEARS |
| 3 | PC | 192(a) | VOLUNTARY MANSLGTR | 89 | 9 | 1 | 93 | | | X | M | X | | | | | (6) |

2. ENHANCEMENTS charged and found true TIED TO SPECIFIC COUNTS (mainly in the § 12022-series) including WEAPONS, INJURY, LARGE AMOUNTS OF CONTROLLED SUBSTANCES, BAIL STATUS, ETC.:
For each count list enhancements horizontally. Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385.
Add up term for enhancements on each line and enter line total in right hand column.

| Count | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Tot |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 3 | 12022.5 | S | | | | | | | | | |

3. ENHANCEMENTS charged and found true FOR PRIOR CONVICTIONS OR PRIOR PRISON TERMS (mainly § 667-series) and OTHERS.
List all enhancements based on prior convictions or prior prison terms charged and found true. If 2 or more under the same section, repeat it for each enhancement (e.g., if 2 prior prison terms under § 667.5(b) list § 667-series). Enter time imposed for each or "S" for stayed or stricken. DO NOT LIST enhancements charged but not found true or stricken under § 1385. Add time for these enhancements and enter total in right-hand column. Also enter any other enhancement not provided for in space 2.

| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Tot |
|---|---|---|---|---|---|---|---|---|---|---|
| Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Enhancement | Yrs or "S" | Tot |

4. INCOMPLETED SENTENCE(S) CONSECUTIVE

| COUNTY | CASE NUMBER | CREDIT FOR TIME SERVED |
|---|---|---|
| | | |

5. OTHER ORDERS  ALLEGATION RE PURS. TO SEC 12022.5P
STAYED RE PURS. TO SECTION 1170.1(h) OF THE 1989 P

Use additional sheets of plain paper if necessary

6. TOTAL TIME IMPOSED ON ALL ATTACHMENT PAGES (FORM DSL 290-A):
7. TIME STAYED TO COMPLY WITH 5-YEAR LIMIT OR 10-YEAR LIMIT ON SUBORDINATE TERMS, DOUBLE BASED-TERM LIMIT, ETC. (Do not include § 654 stays or discretionary stays of term for enhancements):
8. TOTAL TERM IMPOSED:  0

9. EXECUTION OF SENTENCE IMPOSED:

| A. [X] AT INITIAL SENTENCING HEARING | B. [ ] AT RESENTENCING PURSUANT TO DECISION ON APPEAL | C. [ ] AFTER REVOCATION OF PROBATION | D. [ ] AT RESENTENCING PURSUANT TO RECALL OF COMMITMENT (PC § 1170(d)) | E. [ ] OTHER _____ |
|---|---|---|---|---|

| 10. DATE OF SENTENCE PRONOUNCED (MO) (DAY) (YR) | CREDIT FOR TIME SPENT IN CUSTODY | TOTAL DAYS | INCLUDING: | ACTUAL LOCAL TIME | LOCAL CONDUCT CREDITS | STATE INSTITUTIONS | |
|---|---|---|---|---|---|---|---|
| 9-1-93 | 2187 | | | 1458 | 729 | [ ] DMH | [ ] CDC |

11. DEFENDANT IS REMANDED TO THE CUSTODY OF THE SHERIFF, TO BE DELIVERED

| [X] FORTHWITH | INTO THE CUSTODY OF THE DIRECTOR OF CORRECTIONS AT THE RECEPTION-GUIDANCE CENTER LOCATED AT: | [ ] CALIF. INSTITUTION FOR WOMEN – FRONTERA | [ ] CALIF. MEDICAL FACILITY – VACAVILLE | [X] CALIF. INSTITUTION FOR MEN – CHINO | [ ] DEUEL VOC. INS |
|---|---|---|---|---|---|
| [ ] AFTER 48 HOURS, EXCLUDING SATURDAYS, SUNDAYS AND HOLIDAYS | | | [ ] SAN QUENTIN | | |
| | | [ ] OTHER (SPECIFY) | | | |

**CLERK OF THE COURT**

*I hereby certify the foregoing to be a correct abstract of the judgment made in this action.*

| DEPUTY'S SIGNATURE | DATE |
|---|---|
| | |

CHARGE

A OCT; 192.A CICT

[BOX CHECKED IF ORDER APPLIC

| | RE-CALC CXUT | |
|---|---|---|

CLERK OF PROCEEDINGS: M.S.C. RE-CALC CXUT REG. 166-5.2CC

101 ☐ PUBLIC DEFENDER APPOINTED O.P.D ................................. IS SWORN AS THE ENGLISH/ ................................. ☐ OATH FILED PER SECTION 68560 GOVERNMENT CODE. ........................ IN TE

☐ — DUE TO CONFLICT OF INTERESTS, PUBLIC DEFENDER RELIEVED PURSUANT TO PENAL CODE SECTION 987.2/GOVERNMENT CODE SECTIC

ALTERNATE DEFENSE COUNSEL .................................................................................. IS APPOINTED

102 ☐ — CRIMINAL PROCEEDINGS ADJOURNED/RESUMED

103 ☐ DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PER SECTION 1203.03 PENAL CODE.

104 ☐ — DEFENDANT IS ADVISED OF RIGHTS RE HEARING ON VIOLATION. DEFENDANT ADMITS VIOLATION OF PROBATION AND WAIVES RIGHTS TO RE
HEARING.

105 ☐ DEFENDANT IS FOUND TO BE/NOT TO BE IN VIOLATION OF PROBATION.

106 ☒ — PROBATION IS REVOKED / REMAINS REVOKED. SENTENCE IMPOSED AS FOLLOWS:

☒ SENTENCE PREVIOUSLY IMPOSED PLACED IN FULL FORCE AND EFFECT

☐ IMPRISONED IN STATE PRISON / LOS ANGELES COUNTY JAIL FOR ................................. TERM OF ................................. AS TO COUNT ................

107 ☐ PROBATION REINSTATED / CONTINUED ON SAME TERMS AND CONDITIONS, EXCEPT FOR MODIFICATION (SEE BOX 113)

108 ☐ PROBATION IS EXTENDED TO .....................................................................................................................

109 ☐ — ON ................................. MOTION, FURTHER PROCEEDINGS CONTINUED TO .....................................................

................................. AT ................................. A.M. IN DEPT ................................. ( ) NON-APPEARANCE CALENDAR

110 ☐ DEFENDANT INSTRUCTED TO RETURN ON ABOVE DATE ...................................................................................

111 ☐ SUPPLEMENTAL PROBATION REPORT IS ORDERED ........................................................................................

112 ☐ DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR ........................................................................

113 ☒ — FURTHER ORDERS AS FOLLOWS: ...................................................................................................................

☐ SERVE ................. DAYS IN COUNTY JAIL .....................................................................................................

*The Court orders the Credit for the Defendant be
amended to reflect as below.*

114 ☒ DEFENDANT GIVEN TOTAL CREDIT FOR 2,187 DAYS IN CUSTODY: 1,458 DAYS ACTUAL CUSTODY AND 729 DAYS GOOD TIME/WK

115 ☐ SENTENCE/COUNTS TO RUN CONSECUTIVELY TO/CONCURRENTLY WITH .............................................................

116 ☐ COURT ADVISES DEFENDANT OF HIS APPEAL/PAROLE RIGHTS ........................................................................

117 ☐ — SHERIFF IS ORDERED TO ALLOW DEFENDANT ................................. PHONE CALLS AT DEFENDANT'S EXPENSE

118 ☐ — CRIMINAL PROCEEDINGS ADJOURNED.

119 ☐ DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PURSUANT TO SECTION 1203.03 PENAL CODE.

120 ☐ — FURTHER PROCEEDINGS CONTINUED TO ................................. AT ................................. A.M. IN DEPT ...................

121 ☐ — EXECUTION OF SENTENCE IS SUSPENDED. PETITION ORDERED FILED IN DEPARTMENT 95 PURSUANT TO SECTION 3051 WELFARE AND INST
CODE. FURTHER PROCEEDINGS CONTINUED TO ................................. AT 10:00 A.M. IN DEPART

122 ☐ — COUNSEL AND DEFENDANT ARE ORDERED TO APPEAR IN DEPARTMENT 95 ON THE ABOVE DATE.

123 ☐ FURTHER PROCEEDINGS CONTINUED TO ................................. AT 8:00 A.M. IN THIS DEPARTMENT

124 ☐ — DEFENDANT HAVING BEEN COMMITTED BY DEPARTMENT 95 PURSUANT TO SECTION 3051 WELFARE AND INSTITUTIONS CODE, N.D.A. NUMBER
................................. MATTER IS ORDERED OFF CALENDAR.

125 ☐ — PURSUANT TO SECTION 17 PENAL CODE, OFFENSE IS DEEMED TO BE A MISDEMEANOR.

126 ☐ PROBATION IS ORDERED TERMINATED PURSUANT TO SECTION 1203.3 PENAL CODE.

127 ☐ — PLEA OF GUILTY OR CONVICTION IS SET ASIDE; A PLEA OF NOT GUILTY IS ENTERED; CASE IS DISMISSED PURSUANT TO SECTION 1203.4 PENAL COD

128 ☐ ORDER OF ................................. GRANTING ................................. DAYS GOOD TIME/WORK TIME CREDITS IS ORDERED \
DEFENDANT NOTIFIED BY U.S. MAIL.

129 ☐ — DEFENDANT'S EX PARTE REQUEST / MOTION FOR .........................................................................................
................................. IS DENIED/GRANTED. DEFENDANT NOTIFIED BY U

130 ☐ — DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE.

131 ☐ BAIL, IF POSTED, FORFEITED/O.R. REVOKED, BENCH WARRANT ORDERED ISSUED/REISSUED/AND HELD UNTIL .............................
NO BAIL / BAIL FIXED AT $ .................................

132 ☐ PERSON IN CUSTODY: NOT BEING THE DEFENDANT, ORDERED RELEASED ON THIS CASE ONLY. BENCH WARRANT ORDERED REACTIVATED.

133 ☐ — BENCH WARRANT RECALLED/QUASHED ( ) RECALL # ................................. ISSUED ( ) WARRANT / ABSTRACT FILED

134 ☐ UPON PAYMENT OF $ ................................. COSTS BEFORE ................................. /$ ................................. COSTS HAVING BEEN PAID
(RECEIPT # ................................. ) ORDER OF ................................. FORFEITING BAIL IS / IS TO BE VACATED AND BAIL REIN
STATED AND EXONERATED. ☐ CERTIFICATE OF MAILING EXECUTED AND FILED/ NOTICE WAIVED

135 ☐ — DEFENDANT'S MOTION FOR RELEASE ON O.R. REDUCTION OF BAIL IS GRANTED/DENIED

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date: 09-01-93
HONORABLE: VICTORIA M. CHAVEZ     JUDGE                     M. GALLUP   Deputy C:
      J. KNAPP        Deputy Sheriff                   C. ROAM #8064   Repo:

TA001416-01                  (Parties and counsel checked if present)

PEOPLE OF THE STATE OF CALIFORNIA         Counsel for People:
               VS                DEPUTY DISTRICT ATTY:   A. GRAY   (XX)

01-CALLOWAY, PAUL   (XX)       Counsel for Defendant:    J. DOYLE 987.2   (XX)
187.A 02CTS

NATURE OF PROCEEDINGS    P & S                 REM#1605200                 2-28-9

PROBATION IS DENIED.   SENTENCE IMPOSED AS FOLLOWS:

AS TO COUNT 1:

THE COURT SELECTS THE TERM PRESCRIBED BY LAW WHICH IS 15 YEARS TO LIFE WITH POSSIBILIT OF PAROLE.

PLUS 2 YEARS PURSUANT TO SECTION 12022.5 OF THE PENAL CODE TO RUN CONSECUTIVELY T COUNT 1.

TOTAL OF 17 YEARS TO LIFE WITH POSSIBILTY OF PAROLE.

AS TO COUNT 3:

THE COURT SELECTS THE MID TERM OF 6 YEARS TO RUN CONCURRENTLY WITH COUNT 1.
PLUS: ALLEGATION PURSUANT TO SECTION 12022.5 OF THE PENAL CODE IS STAYED PURSUANT T SECTION 1170.1(h) OF THE 1989 PENAL CODE.

DEFENDANT GIVEN TOTAL CREDIT FOR 3,195 DAYS IN CUSTODY(2,130 DAYS ACTUAL CUSTODY AN 1,065 DAYS GOOD TIME/WORK TIME).

PAY $1,000.00 RESTITUTION FINE PURSUANT TO SECTION 13967(A) G.C. TO THE STATE VICTIN RESTITUTION FUND.

COURT ADVISES DEFENDANT OF HIS APPEAL/PAROLE RIGHTS.

ON MOTION OF THE PEOPLE, COUNT 2 IS DISMISSED IN THE FURHTERANCE OF JUSTICE.

14,34                            REM                     SC-B        09-01-93
                            MINUTE ORDER                   MINUTESENTERI

**DEPT.** SC B

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

Date: 9-1-93

HONORABLE: VICTORIA CHAVEZ                    JUDGE
           J KNAPP                    Deputy Sheriff

M GALLUP                                    , Deputy
C ROAM                                      , Report
                              (Parties and counsel checked if p

| TA001416 | Counsel for | , DISTRICT ATTY. B |
| PEOPLE OF THE STATE OF CALIFORNIA | Plaintiff | A GRAY            DEPUTY |
| VS | | |
| | Counsel for | , PUBLIC DEFENDER B' |
| CALLOWAY, PAUL | Defendant | J DOYLE 987.2 |
| | | DEPUTY |

NATURE OF PROCEEDINGS PROBATION AND SENTENCE

(Boxes checked if order applic

PROBATION DENIED. SENTENCE AS INDICATED BELOW.        FOUND
Whereas the said defendant having.................................duly............................................
guilty in this court of the crime of MURDER, IN VIOLATION OF PENAL CODE SECTION 187(a), A FELONY,
CHARGED IN COUNT 1 OF THE INFORMATION AND FIND IT TO BE MURDER OF THE SECOND DEGREE.
WE FURTHER FIND THE ALLEGATION THAT IN THE COMMISSION AND ATTEMPTED COMMISSION OF THE
ABOVE OFFENSE, WITHIN THE MEANING OF PENAL CODE SECTION 12022.5 TO BE TRUE.

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
State Prison. COUNT 1(15 YEARS TO LIFE WITH POSSIBILITY OF PAROLE)
12022.5(PLUS 2 YEARS, TO RUN CONSECUTIVELY TO COUNT 1)

TOTAL-17 YEARS TO LIFE WITH THE POSSIBILITY OF PAROLE.

X Defendant is given credit for.......2,187...........days in custody (includes....729....days good time/work time).
It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles
and delivered by him into the custody of the Director of Corrections at the California State Institution

☒ for Men at Chino, California
☐ for Women at Frontera, California
☐ ..........................................................................................

ENTERED

9-2-93

☒ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.

                                                                    COUNTY CLERK
                                                                    CLERK OF THE
                                                                    SUPERIOR COURT

2     762465A (REV. 7-82) 7-82
      C-109

**JUDGMENT**

# EXHIBIT   "B"

LEGAL STATUS SUMMARY  TYPE-  D    CTF-N   ** DISCREPANT **11/23/1999 18:5

| CDC NUMBER | NAME | [ETHNIC] | BIRTHDATE |
|---|---|---|---|
| H92909 | CALLOWAY,PAUL | BLA | 10/13/1964 |

| TERM STARTS | LIFE TERM STARTS | MIN ELIGIBLE PAROLE DTE |
|---|---|---|
| 09/16/1993 | 09/16/1993 | 04/04/2001 |

|  | PAROLE PERIOD |
|---|---|
BASE TERM 15/00 + ENHCMNTS   2/00 = TOT TERM  17/00 TO LIFE  |LIFE

PRE-PRISON + POST SENTENCE CREDITS
CASE    P2900-S P1203-3 P3900-1 CRC-CRED MH-CRED P4019  P2931 POST-SENT  TO

| TA001416 | 1450 | | | | 729 | | 14 | 220 |
|---|---|---|---|---|---|---|---|---|

NOTIFICATION REQUIRED PER PC296
NOTIFICATION REQUIRED PER PC3058.6

DOC. HEARING:  --/----   DEFENSE ATTORNEY:  GRAY, .
1417. HEARING: 00,2000   INVESTIGATING AGENCY:  LOS ANGELES PD

| RECV DT/ CURT/ | CASE | SENTENCE DATE | CREDIT | OFFENSE |
|---|---|---|---|---|
| CNT | OFF-CODE | DESCRIPTION | CODE | DATE |

CONTROLLING PRINCIPAL & CONSECUTIVE  (INCLUDES ENHANCEMENTS/OFFENSES):

- CONTROLLING CASE -
9/16/1993  LA   TA001416      9/01/1993
 01 P187 2ND   MURDER 2ND                                    32  07/09/19
           (6)WPN
           P12022.5(A)   01 USE F'ARM                    1

NON-CONTROLLING OFFENSES:
9/16/1993  LA   TA001416      9/01/1993
 03 P192(A)   VOLUNTARY MANSLAUGHTER                   1  08/02/19
           (6)WPN

| TRAN | | | | RULE | | D A Y S | | |
|---|---|---|---|---|---|---|---|---|
| TYPE | DATE | END DATE LOG NUMBER | | NUMBER | ASSESS | LOST | REST | DEAD |

BEG 09/16/1993           *******BEG BAL*******
BCL 08/29/1996           A96080063 3005(C)       90 . 90 ...
   CURRENT PC BALANCE:   334              CURRENT BC BALANCE:   910

DISCREPANCY AND WARNING ERRORS                                      11-23-1999

        HPC309   CALLOWAY, PAUL

CASE=         ID=
   END DATE FOR CREDIT CODE 1 IS 09/16/1993.

# EXHIBIT   "C"

INITIAL PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PRISON TERMS

In the matter of the Life )
Term Parole Consideration )       CDC Number H-92309
Hearing of:                )
                           )
PAUL CALLOWAY              )
_____)



CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

APRIL 25, 2001

1:30 P.M.

PANEL PRESENT:

BRETT GRANLUND, Presiding Commissioner
AL ANGELE, Commissioner
R. SCHAUFEL, Deputy Commissioner

OTHERS PRESENT:

PAUL CALLOWAY, Inmate
RHONDA SKIPPER-DOTTA, Attorney for Inmate
DEBORAH KASS, Deputy District Attorney

CORRECTIONS TO THE DECISION HAVE BEEN MADE

    ✓    No
         Yes          See Errata Sheet

Karin R. Lewis, Capitol Electronic Reporting

INMATE COPY

ii

## INDEX

|  | Page |
|---|---|
| Proceedings | 1 |
| Case Factors | 8 |
| Pre-Commitment Factors | 12 |
| Post-Commitment Factors | 26 |
| Parole Plans | 35 |
| Closing Statements | 57 |
| Recess | 61 |
| Decision | 62 |
| Adjournment | 66 |
| Transcriber Certification | 67 |

--oOo--

1.

1        P R O C E E D I N G S

2        **PRESIDING COMMISSIONER GRANLUND:**  Okay, are

3   we on record?

4        **DEPUTY COMMISSIONER SCHAUFEL:**  Yes.

5        **PRESIDING COMMISSIONER GRANLUND:**  Good

6   afternoon.  This is an initial parole consideration

7   hearing for Paul Calloway, CDC number H-92309.  It

8   is Wednesday, April 25th, 2001.  We are located at

9   CTF, Soledad.  The inmate was received 9/16/93, from

10  the County of Los Angeles, case number TA001416.

11  The offense is murder second with use of a firearm,

12  count number one PC 187, with 12022.5(a).  The term

13  is 15 years to life, plus two years, with a minimum

14  eligible parole date of 4/4, 2001.  Other commitment

15  offenses include voluntary manslaughter, 192(a) of

16  the Penal Code, County of Los Angeles, case number

17  TA001416, count number three, with a six-year

18  concurrent sentence.  And a stayed offense of use of

19  a firearm, 12022.5(a) of the Penal Code, Los

20  Angeles, case number TA001416, count number three.

21  The time is 1:30 p.m. and we will be recording this

22  hearing, so for the purposes of voice

23  identification, I'm going to ask each person in the

24  room to state their name, spelling their last name.

25  When we get to the prisoner, please include your CDC

26  number.  My name is Brett Granlund, G-R-A-N-L-U-N-D,

27  Commissioner.

2

1       **DEPUTY COMMISSIONER SCHAUFEL:** And my name

2   is Schaufel, that's S-C-H-A-U-F-E-L, Deputy

3   Commissioner.

4       **DEPUTY DISTRICT ATTORNEY KASS:** My name is

5   Deborah Kass, K-A-S-S. I'm a Deputy District

6   Attorney for LA County.

7       **ATTORNEY SKIPPER-DOTTA:** Rhonda Skipper-

8   Dotta, S-K-I-P-P-E-R hyphen D-O-T-T-A, legal counsel

9   for Paul Calloway.

10      **INMATE CALLOWAY:** Paul Calloway, H-92309.

11      **PRESIDING COMMISSIONER GRANLUND:** Spell your

12  last name.

13      **INMATE CALLOWAY:** C-A-L-L-O-W-A-Y.

14      **COMMISSIONER ANGELE:** Al Angele, A-N-G-E-L-

15  E, Commissioner.

16      **PRESIDING COMMISSIONER GRANLUND:** That

17  identifies all parties in the room with the

18  exception of one Correction Officer who is here for

19  the purposes of security. This hearing is being

20  conducted pursuant to Penal Code Sections 3041 and

21  3042 and the regulations of the Board of Prison

22  Terms' governing parole consideration hearings for

23  life prisoners. The purpose of today's hearing is

24  to consider your suitability for parole. We will

25  consider the number and nature of the crimes you

26  were committed for, your prior criminal and social

27  history, and your behavior since your commitment.

3

1    We will reach a decision today and inform you
2    whether we find you suitable for parole or not and
3    the specific factors for our decision. If we find
4    you suitable for parole, the length of your
5    confinement and the specific factors leading to our
6    decision will be explained to you. The process,
7    basically, I will Chair the hearing. We will go
8    over your commitment offense, any prior criminal
9    history and any prior family history that we want to
10   get on the record. And then Mr. Schaufel will do
11   your post-conviction factors, discussing your
12   performance and so forth in prison, what you've done
13   since you've been here, positive, and if there are
14   any negatives. Mr. Angele will discuss your parole
15   plans, where you would live and work, in the event
16   you were to receive a parole date today. And then
17   before we recess for deliberations, the District
18   Attorney, your attorney and yourself will be given
19   the opportunity to make a statement regarding your
20   suitability and length of confinement. After this
21   is done, we will recess, clear the room, and
22   deliberate. Once we have completed our
23   deliberations, we will resume the hearing and
24   announce our decision. The Board of Prison Terms'
25   rules and the law state that a parole date shall be
26   denied if your release would pose an unreasonable
27   risk of danger to others. You have the right to a

4

1    timely notice of this hearing, a right to review
2    your Central File and the right to present relevant
3    documents.  Ms. Skipper-Dotta, have your prisoner's
4    rights been met?

5    **ATTORNEY SKIPPER-DOTTA:**  Mr. Calloway's
6    procedural due right -- process rights to a timely
7    hearing have not been met.  His MEPD is April 4th of
8    2001.  The law says that he should come before the
9    Board a year prior to his initial hearing and that's
10   a year and three weeks ago.  So I would enter an
11   objection to the timeliness of this hearing and that
12   it is about -- it is a year and three months (sic)
13   late.

14   **PRESIDING COMMISSIONER GRANLUND:**  Okay.  We
15   will note your -- your objection and of course, as
16   you're aware, the remedy is to hold the hearing and
17   that's what we're doing today.  So, we are going to
18   conduct a hearing today for your client.

19   **ATTORNEY SKIPPER-DOTTA:**  I just want to put
20   that on record.

21   **PRESIDING COMMISSIONER GRANLUND:**  And I
22   would apologize for the delays.  As you know, the
23   entire system is behind approximately one year right
24   now, in the backlog of hearings.  Okay?  Sir, you
25   have the right to be heard by an impartial Panel.
26   Having seen the Panel you're seated before, do you
27   have any objections to any member of this Panel?

5

1            **INMATE CALLOWAY:** No, Sir.

2            **PRESIDING COMMISSIONER GRANLUND:** Ms.

3     Skipper-Dotta, any objection to any Panel member?

4            **ATTORNEY SKIPPER-DOTTA:** No.

5            **PRESIDING COMMISSIONER GRANLUND:** You signed

6     BPT form 1073 on March 19th, 2001, stating you have

7     no disability as defined in the Americans with

8     Disabilities Act. Do you suffer from any disability

9     that would prevent your from participating in

10    today's hearing. Do you need any special assistance

11    in order to participate?

12           **INMATE CALLOWAY:** No, Sir.

13           **PRESIDING COMMISSIONER GRANLUND:** Okay, and

14    Ms. Skipper -- I will ask you, Sir, you will have to

15    speak up. We are tape-recording this hearing so

16    that you will have a written transcript of what --

17    what transpires here today.

18           **INMATE CALLOWAY:** Yes.

19           **PRESIDING COMMISSIONER GRANLUND:** And I --

20    it does get very difficult for the transcribers if

21    we don't speak up and they're trying to listen and

22    -- and make their notes. So, please speak as loudly

23    and clearly as you can for the -- for the

24    convenience of the transcribers to get an accurate,

25    written summary of today's proceedings. And so you

26    stated, no, you do not have any disabilities?

27           **INMATE CALLOWAY:** No, Sir.

1          **PRESIDING COMMISSIONER GRANLUND:** Okay. And
2     Ms. Skipper-Dotta, do you -- are you satisfied that
3     your client's ADA rights have been met?

4          **ATTORNEY SKIPPER-DOTTA:** Yes, I am.

5          **PRESIDING COMMISSIONER GRANLUND:** Okay.
6     Sir, you will receive a copy of our written,
7     tentative decision. The decision becomes effective
8     90 days after review. You will then receive a copy
9     of the decision and a copy of the transcript and you
10    will have 90 days from the date that the decision
11    became effective, if you so desire. You're not
12    required to discuss your offense, nor are you
13    required to admit to your offense. However, the
14    Panel does accept as true the findings of the court.
15    Do you understand that?

16         **INMATE CALLOWAY:** Yes.

17         **PRESIDING COMMISSIONER GRANLUND:** Will any
18    confidential information be used today?

19         **DEPUTY COMMISSIONER SCHAUFEL:** There is one
20    confidential memo that I'd like to refer to for the
21    record.

22         **PRESIDING COMMISSIONER GRANLUND:** Okay.
23    Thank you. I've passed the hearing checklist,
24    marked Exhibit I, to your attorney and to the DA to
25    assure that we're all working off of the same set of
26    documents. Do you concur we have those same
27    documents?

7

1              **ATTORNEY SKIPPER-DOTTA:**  I'm sorry, yes, I

2  have those documents, thank you.

3              **DEPUTY DISTRICT ATTORNEY KASS:**  Yes.

4              **PRESIDING COMMISSIONER GRANLUND:**  The

5  District Attorney has them, okay.  Will there be any

6  additional documents submitted at this time?

7              **ATTORNEY SKIPPER-DOTTA:**  No, there is no

8  further documentation.

9              **PRESIDING COMMISSIONER GRANLUND:**  Okay.  Are

10  there any preliminary objections?

11              **ATTORNEY SKIPPER-DOTTA:**  No.

12              **PRESIDING COMMISSIONER GRANLUND:**  Will the

13  prisoner be speaking with us today?

14              **ATTORNEY SKIPPER-DOTTA:**  Yes, he will.

15              **PRESIDING COMMISSIONER GRANLUND:**  Okay, Sir,

16  if you'll raise your right hand.  Do you solemnly

17  swear or affirm that the testimony you give at this

18  hearing will be the truth, the whole truth and

19  nothing but the truth?

20              **INMATE CALLOWAY:**  I do.

21              **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

22  I would just take a moment to -- to remind you that

23  this is your initial parole consideration hearing.

24  In the event that you wouldn't get a date today, you

25  would have subsequent hearings until you do get a

26  date, at some point.  Each time you come before the

27  Board, they will review the transcript from today's

8

 1   hearing.  So this is really the -- this is the
 2   hearing that will establish the base for any future
 3   hearings that you -- that you may have.  You want to
 4   make sure that you are absolutely truthful, because
 5   it can be hard to keep that story straight, in the
 6   event that you chose not to be.  So I would really
 7   just request that you keep that in mind, as we go
 8   through this process.

 9            **INMATE CALLOWAY:**  Yes, Sir.

10            **PRESIDING COMMISSIONER GRANLUND:**  Without
11   objection, I am going to be quoting the Statement of
12   Facts from the Probation Officer's report, pages two
13   and three.

14            **ATTORNEY SKIPPER-DOTTA:**  I have no
15   objection.

16            **PRESIDING COMMISSIONER GRANLUND:**  Okay.  On
17   July 9th, 1989, at about 10:30 p.m., three male
18   blacks chased down Dennis Rogers, R-O-G-E-R-S, in
19   the Imperial Courts Housing Projects, Weasel, from
20   PJ Watts, and that's W-E-A-S-E-L, from PJ Watts, and
21   shot him, killing him.  On August 2nd, 1989, at about
22   8:30 p.m., male blacks drove by Imperial Courts
23   Housing Projects.  One of them got out of the car
24   and shot at Donelle (phonetic) Jones Duke, from PJ
25   Watts.  Duke dove to the ground and a seven-year-old
26   girl, Kanita, K-A-N-I-T-A, Hailey, H-A-I-L-E-Y, was
27   shot in the head and killed.  Inmate was the shooter

```
 1    in both incidents.  It is believed a contract was

 2    put out on Duke and Weasel by Cedric, C-E-D-R-I-C,

 3    Miguel, M-I-G-U-E-L, a big time dope dealer, because

 4    Duke and Weasel robbed Cedric's wife of her car.

 5    Defendant is from Grape Street.  On September 14ᵗʰ,

 6    1989, Detectives responded to 2110 East 113ᵗʰ Street

 7    where they served a search warrant.  Detectives

 8    recovered two guns and a box of ammunition.

 9    Defendant Calloway was also at the residence.  At

10    that would end the reading of the Statement of

11    Facts.  Mr. Calloway, is that what happened?

12          √ INMATE CALLOWAY:  No, that's not what

13    happened.

14            PRESIDING COMMISSIONER GRANLUND:  Tell us

15    what happened that night?

16            INMATE CALLOWAY:  I wasn't there, so I can't

17    -- I can't tell you what happened.

18            PRESIDING COMMISSIONER GRANLUND:  Okay.  You

19    had nothing to do with either of these shootings?

20            INMATE CALLOWAY:  No, I did not.

21            PRESIDING COMMISSIONER GRANLUND:  And you

22    did -- you originally had a jury trial?

23            INMATE CALLOWAY:  Yes.

24            PRESIDING COMMISSIONER GRANLUND:  And you

25    had an -- an appeal?

26            INMATE CALLOWAY:  Yes.

27            PRESIDING COMMISSIONER GRANLUND:  On appeal,
```

10

1   did you accept a plea bargain in your appeal or how

2   -- how did that work on there?  You pled guilty to

3   the manslaughter?

4          **INMATE CALLOWAY:**  Yeah, I was advised by my

5   counsel.

6          **PRESIDING COMMISSIONER GRANLUND:**  And the

7   appeal court did affirm your conviction on the -- on

8   the murder?

9          **INMATE CALLOWAY:**  Yes.

10         **PRESIDING COMMISSIONER GRANLUND:**  Okay.

11  Were you -- were you in a gang at that time?

12         **INMATE CALLOWAY:**  No, no.  No.

13         **PRESIDING COMMISSIONER GRANLUND:**  You were

14  not part of the Grape Street gang?

15         **INMATE CALLOWAY:**  No.

16         **PRESIDING COMMISSIONER GRANLUND:**  Well, as

17  you know, we're not here to retry your case.  We --

18  we don't attempt to -- to try to prove or disprove

19  guilt or innocence.  We do, as -- as I said earlier,

20  accept the findings of the court as fact.  And that

21  is the basis from which we work.  So I think the --

22  do you have any idea who -- who killed Mr. Rogers?

23         **INMATE CALLOWAY:**  As I say, I was -- was not

24  there.  It just -- it happened down the street from

25  my house, you know.  We knew a few days later what

26  happened.  It didn't really bother me, because I

27  knew I wasn't there.

11

1          **PRESIDING COMMISSIONER GRANLUND:**    There were

2     several witnesses, I think, that testified that you

3     were, in your trial.  And -- and you had no

4     knowledge, outside of what you heard happened?

5          **INMATE CALLOWAY:**    Not until a few days

6     later.   We heard the boy, Weasel, had got killed.

7          **PRESIDING COMMISSIONER GRANLUND:**   Okay,

8     well, it is -- it is certainly a little more

9     difficult, but you have every right to -- to

10    maintain your innocence and maintain that you had no

11    knowledge of the crime.  You -- you don't know who

12    -- who the shooter was?

13         **INMATE CALLOWAY:**    No, I do not.

14         **PRESIDING COMMISSIONER GRANLUND:**    And you've

15    had no knowledge of Cedric?  Do you know who Cedric

16    is?

17         **INMATE CALLOWAY:**    Yes, I know him.

18         **PRESIDING COMMISSIONER GRANLUND:**    And was he

19    a dope dealer?

20         **INMATE CALLOWAY:**    Yes, he is.

21         **PRESIDING COMMISSIONER GRANLUND:**    Okay.  He

22    is a dope dealer and did you know the victim?  Did

23    you know Weasel?

24         **INMATE CALLOWAY:**    Yes, I know Weasel.

25         **PRESIDING COMMISSIONER GRANLUND:**    We you

26    aware that Mr. Cedric had put out a contract on

27  . Weasel?

12

1        **INMATE CALLOWAY:**  No, I did not.

2        **PRESIDING COMMISSIONER GRANLUND:**  Okay.

3   Well, we will accept your statement and your

4   position that you did not commit the crime.  We --

5   we accept that as your statement.

6        **INMATE CALLOWAY:**  Uh-hmm.

7        **PRESIDING COMMISSIONER GRANLUND:**  We don't -

8   - we don't accept that as fact, of course.  Let's

9   talk, move on to your prior criminal history.  When

10  is the first time you were arrested?

11       **INMATE CALLOWAY:**  I think -- I can't

12  remember.  I don't remember.

13       **PRESIDING COMMISSIONER GRANLUND:**  You don't

14  remember?  Do you remember being arrested at all as

15  a juvenile?

16       **INMATE CALLOWAY:**  Yes.  Yeah.

17       **PRESIDING COMMISSIONER GRANLUND:**  And what

18  were you arrested for?

19       **INMATE CALLOWAY:**  I think concealed with a

20  deadly weapon.

21       **PRESIDING COMMISSIONER GRANLUND:**  Assault

22  with a deadly weapon?

23       **INMATE CALLOWAY:**  Concealed.  Concealed.

24       **PRESIDING COMMISSIONER GRANLUND:**  Concealed

25  -- concealing a deadly weapon?

26       **INMATE CALLOWAY:**  Yes.

27       **PRESIDING COMMISSIONER GRANLUND:**  And what

13

1    was the disposition of that?

2           **INMATE CALLOWAY:**  They put me on probation

3    for a year.

4           **PRESIDING COMMISSIONER GRANLUND:**  One-year

5    probation?

6           **INMATE CALLOWAY:**  Yes.

7           **PRESIDING COMMISSIONER GRANLUND:**  Okay.  Do

8    you remember when that was, what year?

9           **INMATE CALLOWAY:**  I can't recall what year.

10           **PRESIDING COMMISSIONER GRANLUND:**  Okay.  How

11    about 1981, assault with a deadly weapon.  You were

12    arrested for that.

13           **INMATE CALLOWAY:**  Yes.

14           **PRESIDING COMMISSIONER GRANLUND:**  Tell us

15    about that.

16           **INMATE CALLOWAY:**  Assault with a deadly

17    weapon --

18           **ATTORNEY SKIPPER-DOTTA:**  It's right here.

19    It was in Los Angeles, disposition, a petition was

20    obtained June of '81.  (Inaudible.)  Is that what

21    you were talking about before?

22           **INMATE CALLOWAY:**  Yes, I think that's the

23    one.  That's assault with a deadly weapon.  I can't

24    -- I can't recall, just when it happened though --

25    what happened, rather.

26           **PRESIDING COMMISSIONER GRANLUND:**  Did you

27    assault anyone?

14

1          **INMATE CALLOWAY:** No, not that I know of.

2          **PRESIDING COMMISSIONER GRANLUND:** You were

3    just -- just arrested for it?

4          **INMATE CALLOWAY:** Yes.

5          **PRESIDING COMMISSIONER GRANLUND:** Okay.  Any

6    other arrests you can tell us about?

7          **INMATE CALLOWAY:** I don't -- I don't think

8    my juvenile record was that bad.

9          **PRESIDING COMMISSIONER GRANLUND:** Well, and

10    not that bad.  I mean, we're not judging whether

11    it's good or bad.  We just want to know how many

12    times you were arrested.

13          **INMATE CALLOWAY:** Well, I can't recall.  Not

14    that many though.

15          **PRESIDING COMMISSIONER GRANLUND:** Can you

16    take a guess?

17          **INMATE CALLOWAY:** I'd say about two or three

18    times.

19          **PRESIDING COMMISSIONER GRANLUND:** Two or

20    three times.

21          **PRESIDING COMMISSIONER GRANLUND:** About two

22    or three times?

23          **INMATE CALLOWAY:** Yes.

24          **PRESIDING COMMISSIONER GRANLUND:** Okay.  And

25    what were those for?

26          **INMATE CALLOWAY:** I think that, the deadly

27    weapon and probably, if I can recall, it's been so

15

1    long ago, I can't recall if this is what I remember

2    and what I don't remember.

3            **PRESIDING COMMISSIONER GRANLUND:**  Any drugs?

4    Any drug arrests?

5            **INMATE CALLOWAY:**  No.

6            **PRESIDING COMMISSIONER GRANLUND:**  Any

7    problems with drugs?  Did you use drugs?

8            **INMATE CALLOWAY:**  No.  Marijuana frequently.

9            **PRESIDING COMMISSIONER GRANLUND:**  Marijuana?

10           **INMATE CALLOWAY:**  Yes.

11           **PRESIDING COMMISSIONER GRANLUND:**  And you

12   don't remember any of the circumstances of the

13   assault with a deadly weapon that you're -- except

14   you think that it's a -- you think it's concealing a

15   · deadly weapon?

16           **INMATE CALLOWAY:**  If I can remember, I think

17   (inaudible).  I think this is when I was arrested, a

18   girl accused me of pulling a gun on her.  I think,

19   it that's the assault -- if that's the assault.  But

20   then she came to court and said it wasn't me.

21           **PRESIDING COMMISSIONER GRANLUND:**  Okay.

22           **INMATE CALLOWAY:**  I think --

23           **PRESIDING COMMISSIONER GRANLUND:**  So it's a

24   . mistaken identity --

25           **INMATE CALLOWAY:**  Yes.

26           **PRESIDING COMMISSIONER GRANLUND:**  -- there?

27           **INMATE CALLOWAY:**  Yes.

1           **PRESIDING COMMISSIONER GRANLUND:**  Okay, that

2     -- that would have been the assault.

3           **INMATE CALLOWAY:**  Yes.

4           **PRESIDING COMMISSIONER GRANLUND:**

5     (Inaudible.)

6           **INMATE CALLOWAY:**  Yes.

7           **PRESIDING COMMISSIONER GRANLUND:**  And you

8     said you got arrested a couple of other times.

9           **INMATE CALLOWAY:**  I was arrested one more

10    time for concealing a deadly weapon, and I think,

11    for discharging a firearm in city limits.

12          **PRESIDING COMMISSIONER GRANLUND:**

13    Discharging a firearm in city limits?

14          **INMATE CALLOWAY:**  Yes.

15          **PRESIDING COMMISSIONER GRANLUND:**  The guns

16    that they found at your house, were they your guns?

17          **INMATE CALLOWAY:**  No.

18          **PRESIDING COMMISSIONER GRANLUND:**  How about

19    the -- the concealment.  Was that a gun, the

20    concealing a deadly weapon?

21          **INMATE CALLOWAY:**  Yes.

22          **PRESIDING COMMISSIONER GRANLUND:**  Was that

23    your gun?

24          **INMATE CALLOWAY:**  Yes.

25          **PRESIDING COMMISSIONER GRANLUND:**  It wasn't

26    the gun that was used in the shooting?

27          **INMATE CALLOWAY:**  No.

1       **PRESIDING COMMISSIONER GRANLUND:** Okay. And

2   why did you have the gun?

3       **INMATE CALLOWAY:** To protect myself, at my

4   house.

5       **PRESIDING COMMISSIONER GRANLUND:** You were

6   concealing it at your house?

7       **INMATE CALLOWAY:** Well, no, the concealing

8   was because I got robbed. A while prior to me

9   carrying a gun, I got robbed because a guy tried to

10  take my radio from me.

11      **PRESIDING COMMISSIONER GRANLUND:** Okay.

12  Where did you get the gun?

13      **INMATE CALLOWAY:** I bought it.

14      **PRESIDING COMMISSIONER GRANLUND:** You bought

15  it where?

16      **INMATE CALLOWAY:** On the street.

17      **PRESIDING COMMISSIONER GRANLUND:** You can't

18  remember who you bought if from?

19      **INMATE CALLOWAY:** No.

20      **PRESIDING COMMISSIONER GRANLUND:** Okay.

21  Anything else you want to tell us, any other crimes?

22  So, I've got a total then of three juvenile arrests.

23  Do you concur with that?

24      **INMATE CALLOWAY:** I'm pretty much sure of

25  that.

26      **PRESIDING COMMISSIONER GRANLUND:** And one of

27  them being dismissed, one of them resulting in a

18

1   year's probation.

2           **INMATE CALLOWAY:**  Uh-hmm.

3           **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

4   how about the disposition on the third one?

5           **INMATE CALLOWAY:**  Firing in a city limit, I

6   think we had to go see the -- we had to go down and

7   see, I think, Ira Reiner, or somebody at that time.

8   He wanted to talk to us.

9           **PRESIDING COMMISSIONER GRANLUND:**  And what

10  -- what were you firing at?

11          **INMATE CALLOWAY:**  Shooting down the street.

12          **PRESIDING COMMISSIONER GRANLUND:**  Just

13  shooting it -- shooting it down the street?

14          **INMATE CALLOWAY:**  Yeah, because some people,

15  they ran into -- into our house, to shoot up our

16  house and I was just trying to make sure that they

17  got out, you know, got out of the way.

18          **PRESIDING COMMISSIONER GRANLUND:**  Just kind

19  of cleaning up the neighborhood a little bit?

20          **INMATE CALLOWAY:**  Not so much cleaning up

21  the neighborhood, but just protecting me and my

22  family and my brother and my sister.

23          **PRESIDING COMMISSIONER GRANLUND:**  So you

24  were actually -- but you were shooting at people?

25          **INMATE CALLOWAY:**  Yeah, they was trying to

26  shoot up our house.

27          **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

19

1    you had to go see the District Attorney, is that --

2         **INMATE CALLOWAY:**  Yeah, Ira Reiner.  He --

3    we -- we went to jail, I bailed out and he sent --

4    he wanted to see me and my brother.  We went down

5    there and we talked to him.

6         **PRESIDING COMMISSIONER GRANLUND:**  And that

7    was it?

8         **INMATE CALLOWAY:**  That was it.

9         **PRESIDING COMMISSIONER GRANLUND:**  I knew

10   that he's a good, aggressive on-the-crime guy.

11   Okay.  How about your -- how about your personal

12   history.  Your father and mother are Paul and Alice

13   Calloway.

14        **INMATE CALLOWAY:**  Yes.

15        **PRESIDING COMMISSIONER GRANLUND:**  You were

16   born in Tennessee?

17        **INMATE CALLOWAY:**  Yes.

18        **PRESIDING COMMISSIONER GRANLUND:**  And you

19   have two older -- are they brothers or sisters?

20        **INMATE CALLOWAY:**  One older -- one older

21   brother and one younger, under me.

22        **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

23   then --

24        **INMATE CALLOWAY:**  And my sister.

25        **PRESIDING COMMISSIONER GRANLUND:**  And then a

26   sister.  So there's three boys and one girl in your

27   family and you're the -- you're the second oldest.

1        **INMATE CALLOWAY:** Yes.

2        **PRESIDING COMMISSIONER GRANLUND:** Okay. You

3   were raised by your natural parents. Your father

4   died at the age of eight. Were you in California

5   then?

6        **INMATE CALLOWAY:** Yes.

7        **PRESIDING COMMISSIONER GRANLUND:** And he --

8   he died in an automobile accident.

9        **INMATE CALLOWAY:** Yes.

10        **PRESIDING COMMISSIONER GRANLUND:** That's

11   sad, sorry to hear that. And then Luke and, let's

12   see, Luke and Russell are your brothers, Paula is

13   your sister.

14        **INMATE CALLOWAY:** Yes.

15        **PRESIDING COMMISSIONER GRANLUND:** And how

16   old are you now?

17        **INMATE CALLOWAY:** I'm 37.

18        **PRESIDING COMMISSIONER GRANLUND:** You're 37,

19   and then they've got Luke down as 41 and Paula as

20   age 43. Didn't you say Paula is younger than you?

21        **INMATE CALLOWAY:** No, Paula's older than me.

22   She's the oldest.

23        **PRESIDING COMMISSIONER GRANLUND:** Okay.

24   She's the oldest and then --   •

25        **INMATE CALLOWAY:** And then it's Luke and

26   then me and then my baby brother.

27        **PRESIDING COMMISSIONER GRANLUND:** So you are

1    the third youngest. Your brothers or sister, they

2    get in any trouble with the law?

3            **INMATE CALLOWAY:**  No.

4            **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

5    let's see, now here you served one term in juvenile

6    hall for -- now, we're back to the possession of the

7    deadly weapon.  It says here you served a term in

8    juvenile hall?

9            **INMATE CALLOWAY:**  I think about 24 days, 30

10   days, something like that.

11           **PRESIDING COMMISSIONER GRANLUND:**  Okay, but

12   that's more than probation and talking to the DA.

13           **INMATE CALLOWAY:**  But then they let me out.

14   I had to go immediately to report to probation.

15           **PRESIDING COMMISSIONER GRANLUND:**  Okay.  You

16   can really, Mr. Calloway, if you -- if you try to

17   lay this out and try to tell us and not try to make

18   us dig every single detail out of -- out of this

19   proceeding, it -- it probably works in your best

20   interest.

21           **INMATE CALLOWAY:**  All right, but this, it's

22   been so long --

23           **PRESIDING COMMISSIONER GRANLUND:**  You know,

24   I'd -- I'd like you to share to the best of your

25   ability --

26           **INMATE CALLOWAY:**  All right.

27           **PRESIDING COMMISSIONER GRANLUND:**  -- what

1    you remember.  I think if you've been in -- in

2    juvenile hall for 30 days for the possession of a

3    deadly weapon -- like I say, you remember earlier

4    you told me you had one year's probation.

5         **INMATE CALLOWAY:**  Yes, that was after they

6    detained me.

7         **PRESIDING COMMISSIONER GRANLUND:**  That was

8    after -- that was after 30 days in juvenile hall.

9         **INMATE CALLOWAY:**  Yeah, they detained me.

10        **PRESIDING COMMISSIONER GRANLUND:**  And you

11   also, you've been to -- to jail a couple of -- a

12   couple of other times?

13        **INMATE CALLOWAY:**  It's been so long ago, I

14   cannot remember.

15        **PRESIDING COMMISSIONER GRANLUND:**  How long

16   ago was it?

17        **INMATE CALLOWAY:**  It had to be in the '80s.

18        **PRESIDING COMMISSIONER GRANLUND:**  Okay, well

19   you would have had to have been an adult.  How old

20   were you when you were arrested for the crime, your

21   commitment offense?

22        **INMATE CALLOWAY:**  Right now?

23        **PRESIDING COMMISSIONER GRANLUND:**  Yeah.

24        **INMATE CALLOWAY:**  Twenty-four years old.

25        **PRESIDING COMMISSIONER GRANLUND:**  You were

26   24.  Okay, it says here that you had been in jail

27   twice for traffic tickets.

23

1          **INMATE CALLOWAY:**  Yeah, probably --

2          **PRESIDING COMMISSIONER GRANLUND:**  Do you

3     recall that?

4          **INMATE CALLOWAY:**  Yeah, traffic tickets.

5          **PRESIDING COMMISSIONER GRANLUND:**  All right.

6     So you've had two, and do you recall how long that

7     you spent in jail?

8          **INMATE CALLOWAY:**  It couldn't have been no

9     more than six or seven days for traffic tickets.

10         **PRESIDING COMMISSIONER GRANLUND:**  Okay.

11    Have you been jailed for anything else?

12         **INMATE CALLOWAY:**  Traffic -- no, I don't

13    think so.  Just --

14         **PRESIDING COMMISSIONER GRANLUND:**  Not that

15    you recall.

16         **INMATE CALLOWAY:**  Not that I recall.

17         **PRESIDING COMMISSIONER GRANLUND:**  Okay.  You

18    dropped out of high school.  You dropped out of

19    school in the ninth grade.  Is that correct?

20         **INMATE CALLOWAY:**  Yes.

21         **PRESIDING COMMISSIONER GRANLUND:**  Have you

22    obtained your GED?

23         **INMATE CALLOWAY:**  No.  I'm in school now.

24         **PRESIDING COMMISSIONER GRANLUND:**  You're in

25    school now.  You're working on it but you're still

26    at ninth grade.  And how about your family, do they

27    stay in contact with you?

24

 1              INMATE CALLOWAY:  Yes.

 2              PRESIDING COMMISSIONER GRANLUND:  And how do

 3    they do that?

 4              INMATE CALLOWAY:  I call.  My mom lives out

 5    of town, in Tennessee.

 6              PRESIDING COMMISSIONER GRANLUND:  Okay.  How

 7    about your brothers and sister?

 8              INMATE CALLOWAY:  Yes.

 9              PRESIDING COMMISSIONER GRANLUND:  And how do

10    they --

11              INMATE CALLOWAY:  I talk to them all the

12    time.

13              PRESIDING COMMISSIONER GRANLUND:  You talk

14    to them.  Do they come visit you?

15              INMATE CALLOWAY:  Yes.

16              PRESIDING COMMISSIONER GRANLUND:  Do they

17    send you letters?

18              INMATE CALLOWAY:  Yes.

19              PRESIDING COMMISSIONER GRANLUND:  Okay.  And

20    how about work, were you working at the time?

21              INMATE CALLOWAY:  Yes.

22              PRESIDING COMMISSIONER GRANLUND:  What were

23    you doing?

24              INMATE CALLOWAY:  I was a homemaker.

25              PRESIDING COMMISSIONER GRANLUND:  Homemaker

26    as in --

27              INMATE CALLOWAY:  Taking care of the

25

1    elderly.

2              PRESIDING COMMISSIONER GRANLUND:   Okay.  Did

3    you work in like, a rest home.

4              INMATE CALLOWAY:   No.  I worked at the house

5    where they arrested me at.

6              PRESIDING COMMISSIONER GRANLUND:   At the --

7    the house they arrested you at, okay.  And was that

8    for an individual or a company or -- tell us about

9    the --

10             INMATE CALLOWAY:   For an individual.

11             PRESIDING COMMISSIONER GRANLUND:   Okay.

12             INMATE CALLOWAY:   Just helping him out,

13   like, you know, give him his medication, take him to

14   the doctor.

15             PRESIDING COMMISSIONER GRANLUND:   Okay.  All

16   right.  Anything else you want to tell us about your

17   personal factors or --

18             INMATE CALLOWAY:   No.

19             PRESIDING COMMISSIONER GRANLUND:   -- crimes,

20   that sort of thing.  And you've -- you've adamantly

21   denied being in a gang.  You're not involved in any

22   gang since you came to prison either?

23             INMATE CALLOWAY:   No.

24             PRESIDING COMMISSIONER GRANLUND:   Any

25   tattoos?

26             INMATE CALLOWAY:   Just this one on my neck.

27             PRESIDING COMMISSIONER GRANLUND:   Okay, and

1   what does that say?

2           **INMATE CALLOWAY:**   It's a girlfriend.

3           **PRESIDING COMMISSIONER GRANLUND:**   Okay.

4   Let's move on to post-conviction factors --

5           **DEPUTY COMMISSIONER SCHAUFEL:**   Thank you.

6           **PRESIDING COMMISSIONER GRANLUND:**   -- Mr.

7   Schaufel.

8           **DEPUTY COMMISSIONER SCHAUFEL:**   What we're

9   going to do is, I'm going to talk about the Board

10  report, psych report, disciplinaries, and like I

11  say, there's one thing in the confidential file

12  concerning about (inaudible).   The Board report

13  completed for the hearing today starts out with an

14  addendum, an update from January, saying that you've

15  been here at Soledad and you've been in Basic

16  Education since August of 2000.   Your classification

17  score is 18.   The actual report itself notes that,

18  and I want to clarify that because this is the

19  initial hearing, we'll start back from 1993, when

20  you first came into the Department of Corrections.

21  It says that you came into prison through North Kern

22  State Prison in September of '93, and you

23  transferred to New Folsom, or California State

24  Prison, Sacramento, shortly thereafter, like three

25  months later.   In August of '95, to Ironwood's

26  (inaudible), assigned to academics there (inaudible)

27  and then in '90 -- April of '99, here to Soledad,

1    assigned to Sergeant -- on the Sergeant work crew.

2    What does that mean, yard crew?

3         **INMATE CALLOWAY:**  Yes.

4         **DEPUTY COMMISSIONER SCHAUFEL:**  Okay.  It

5    says that you've had 115s for -- in '96 for

6    resisting staff, three 128(a)s, '98, '95 and '95 for

7    disobeying an order, destruction of state property.

8    The last 115, February 27 of 2001, for not reporting

9    to academic assignment.  Previous disciplinary

10   violation was 1996 and that was resisting staff.  It

11   says there was -- they did random cell searches into

12   your cell, there was (inaudible) in your property

13   that was improper, to some degree.  And it said that

14   it was confiscated.  It says you became very upset,

15   started disrespecting the (inaudible).  This was an

16   officer named Voris (phonetic), saying, fuck you,

17   you little bitch, you can't make me cry over the

18   line crew.  You can't hurt me, you little bitch.  I

19   told Calloway to calm down and he said -- he

20   continued to be disrespectful toward me, stating,

21   fuck you, you motherfucker.  Let's handle this right

22   now.  I (inaudible) to place handcuffs (inaudible)

23   handcuffed, taken to my office.  He said, fuck you,

24   make me, and then he (inaudible† and placed his

25   hands on the wall, (inaudible) stating, fuck you,

26   and took an aggressive step towards me with his

27   fists clenched and held to his side.  I felt

28

1   threatened, activated a personal alarm, physically

2   placed him on the wall, trying to place handcuffs.

3   He was struggling and I went down and got his left

4   hand.  With the assistance of another officer, we

5   placed him in a prone position and took him away.

6   Was that you?

7           **INMATE CALLOWAY:**  Yes.

8           **DEPUTY COMMISSIONER SCHAUFEL:**  (Inaudible.)

9   That was -- that was what date -- September 28th.

10  There's -- there's a lock-up order at that same time

11  and it's done by a Lieutenant named Lee and it says

12  you subsequently -- or subsequent to this,

13  threatened the life of Officer Morris, stating, I'm

14  a lifer.  I'll kill you.  Did you say that?

15          **INMATE CALLOWAY:**  I don't remember that.

16          **DEPUTY COMMISSIONER SCHAUFEL:**  You might

17  have though.

18          **INMATE CALLOWAY:**  I don't think I said that.

19          **DEPUTY COMMISSIONER SCHAUFEL:**  What?

20          **INMATE CALLOWAY:**  I didn't say that.

21          **DEPUTY COMMISSIONER SCHAUFEL:**  Is that so?

22  You didn't say that?  That means, you might have

23  not?

24          **INMATE CALLOWAY:**  I didn't say that.

25          **DEPUTY COMMISSIONER SCHAUFEL:**  You didn't

26  say that.  One-twenty-eight's aren't anything

27  special, nothing -- nothing to talk about.  The

1    Board report says, under -- on Memo VI, Section A,
2    Summary, that considering the commitment offense,
3    prior record and prison adjustment, I believe
4    Calloway would pose an unpredictable degree of
5    threat to the public at this time.  And that's
6    completed by a counselor named Smith.  The psych
7    report, completed by Dr. Wilcox, W-I-L-C-O-X, June
8    of 2000, states that you dropped out at the 10th
9    grade and you're working on a GED.  Talking about
10   your family, it says that you have a sister in her
11   forties, but whereabouts is unknown.  You've got a
12   little brother (sic), 39, and one 27.  The young one
13   has got some sort of neurological defect.  And it
14   says your wife dropped out of the picture and you
15   only stay in touch with your mother.

16          **INMATE CALLOWAY:**  My mother, my brother, and
17   my sisters (sic).

18          **DEPUTY COMMISSIONER SCHAUFEL:**  You do stay
19   in touch with them?

20          **INMATE CALLOWAY:**  Yeah, my whole family.
21          **DEPUTY COMMISSIONER SCHAUFEL:**  All right.
22   It's not what the doctor (inaudible).  Regarding
23   current mental status, he said:

24          "Calloway is rather flippant and totally
25          denies he is involved in the life crime.
26          He says he denies involvement, stating he
27          was railroaded.  He says it (inaudible).

1    **DEPUTY COMMISSIONER SCHAUFEL:**  In 1996, you

2    saw someone from the Board who talked to you about

3    getting into vocational training, completing a GED,

4    Alcoholics Anonymous, Narcotics Anonymous type

5    programming and after that, you went to Post-Board

6    Classification Committee and they talked to you

7    about these -- these possibilities.  True?

8           **INMATE CALLOWAY:**  Yes.

9           **DEPUTY COMMISSIONER SCHAUFEL:**  Why didn't

10   you do any of them?

11          **INMATE CALLOWAY:**  Ninety-six, I had to be at

12   Ironwood then.  There, like I say, the waiting list

13   must have been long.

14          **DEPUTY COMMISSIONER SCHAUFEL:**  How long are

15   you going to wait?

16          **INMATE CALLOWAY:**  I'm in school now.

17          **DEPUTY COMMISSIONER SCHAUFEL:**  Starting up.

18          **INMATE CALLOWAY:**  I'm doing the best I can,

19   though.  What else to do -- I can't -- I can't go

20   beyond the road gate yet.

21          **DEPUTY COMMISSIONER SCHAUFEL:**  Participating

22   in self-help groups.

23          **INMATE CALLOWAY:**  Uh-hmm.

24          **DEPUTY COMMISSIONER SCHAUFEL:**  You've got a

25   narcotic -- you've got a history of using drugs.

26          **INMATE CALLOWAY:**  I've been cleared up with

27   that for 11 years now.

1    **DEPUTY COMMISSIONER SCHAUFEL:**   (Inaudible.)

2    I'll return it back to the Chair.

3    **PRESIDING COMMISSIONER GRANLUND:**   Okay,

4    parole plans.

5    **COMMISSIONER ANGELE:**   Mr. Calloway, if

6    you're released from custody, where do you plan to

7    live?

8    **INMATE CALLOWAY:**   I'll live with Eiffel

9    Bulard.   She should be down there somewhere.

10    **COMMISSIONER ANGELE:**   And where does she

11    relate -- reside, what city, Los Angeles?

12    **COMMISSIONER ANGELE:**   Okay.   And this is,

13    what a close family friend?

14    **INMATE CALLOWAY:**   Yes.

15    **COMMISSIONER ANGELE:**   You also have plans,

16    you wanted to go back to Tennessee and live with

17    your mother.   Is your mother still alive?

18    **INMATE CALLOWAY:**   Yeah, she's still in

19    Chattanooga, Tennessee.

20    **COMMISSIONER ANGELE:**   Pardon me?

21    **INMATE CALLOWAY:**   Chattanooga, Tennessee.

22    **COMMISSIONER ANGELE:**   Still in Tennessee?

23    **INMATE CALLOWAY:**   Yes.

24    **COMMISSIONER ANGELE:**   How about work?   What

25    do you plan to do?

26    **INMATE CALLOWAY:**   I've got a few friends

27    that have got their own businesses.

1    letters with you?

2         **INMATE CALLOWAY:**  No, I -- I didn't bring

3    them because I was just waiting.  I just told them

4    last week to send them.

5         **COMMISSIONER ANGELE:**  Okay.  If you -- if

6    you don't get a date today --

7         **INMATE CALLOWAY:**  Uh-hmm.

8         **COMMISSIONER ANGELE:**  Or if you do get a

9    date today, make sure you get letters in here that

10   let us know that you have a place to live.

11        **INMATE CALLOWAY:**  All right.

12        **COMMISSIONER ANGELE:**  And have a plan -- a

13   job out there waiting for you.

14        **INMATE CALLOWAY:**  Okay.

15        **COMMISSIONER ANGELE:**  Regardless of --

16        **INMATE CALLOWAY:**  I'll --

17        **COMMISSIONER ANGELE:**  -- whatever it is,

18   just make sure you get those in there.  Because I

19   have no letters in your file whatsoever.

20        **INMATE CALLOWAY:**  All right, I understand.

21        **COMMISSIONER ANGELE:**  Nothing at all.

22   Anything else you want to tell me about your parole

23   plans?

24        **INMATE CALLOWAY:**  Just, you know, try to do

25   my best to stay out.  Just, you know, maintain a

26   natural life and try to fit in society.

27        **COMMISSIONER ANGELE:**  Okay.  We send out --

1   3042 notices and those are notices that go out to
2   agencies that have a direct interest in your case.
3               INMATE CALLOWAY:  All right.
4               COMMISSIONER ANGELE:  I have nothing in
5   writing, as far as replies, however, there is a
6   representative here today from the Los Angeles
7   County District Attorney's Office, who I'm sure will
8   make a statement regarding your parole suitability
9   prior to the conclusion of this hearing.  Anything
10  else you would like to tell me about parole plans?
11              INMATE CALLOWAY:  No, Sir.
12              COMMISSIONER ANGELE:  All right, I'll return
13  to the Chair.
14              PRESIDING COMMISSIONER GRANLUND:  Any
15  questions, Mr. Schaufel?
16              DEPUTY COMMISSIONER SCHAUFEL:  In the
17  appellate court transcript, it says that an
18  eyewitness named Vernette (phonetic) opened her back
19  door, saw you shoot Weasel, heard a dozen shots,
20  three other people running.  She woke up a guy she
21  was with named Tinsley (phonetic).  She heard
22  someone screaming that you had shot Weasel.  She had
23  met you before.  She knew you from living in the
24  project for years.  She knew you by name.  She had
25  no doubt that you were the person who did the
26  shooting.  She identified by photo and
27  identification and she testified in-court against

1   you. And it says, Tinsley corroborated that

2   information. He told Vernette not to open the door.

3   She opened the door. She said that (inaudible) --

4   that you were shooting (inaudible). Tinsley grabbed

5   a handgun and went to the door. By then, the people

6   were gone. It says in jail, Tinsley saw you and you

7   repeated asked him to tell Vernette not to come to

8   court. It said that Tinsley said that he and

9   Vernette received threatening letters and he'd

10  personally been threatened by you and your

11  gangbanging buddies. Why would they say all of

12  that?

13          **INMATE CALLOWAY:** I have no idea. From word

14  of mouth, they must have thought that was me out

15  there doing the shooting that night, which it was

16  not me.

17          **DEPUTY COMMISSIONER SCHAUFEL:** Where were

18  you?

19          **INMATE CALLOWAY:** I was down the street, at

20  home. I live right down the street.

21          **DEPUTY COMMISSIONER SCHAUFEL:** Who were you

22  with?

23          **INMATE CALLOWAY:** I was with Rhonda Dossen

24  (phonetic).

25          **DEPUTY COMMISSIONER SCHAUFEL:** Okay, and who

26  is she?

27          **INMATE CALLOWAY:** She's my -- my -- I've got

 1    a baby by her.

 2           **DEPUTY COMMISSIONER SCHAUFEL:**   You've got a

 3    baby by her?

 4           **INMATE CALLOWAY:**   Yes.

 5           **DEPUTY COMMISSIONER SCHAUFEL:**   Why didn't

 6    she come to court and testify that you were there?

 7           **INMATE CALLOWAY:**   No, they -- they were

 8    scared because they had got threatened for them not

 9    to come to court in my behalf.

10           **DEPUTY COMMISSIONER SCHAUFEL:**   So, nobody

11    came to --

12           **INMATE CALLOWAY:**   No, nobody came.

13           **DEPUTY COMMISSIONER SCHAUFEL:**   -- to support

14    your alibi?

15           **INMATE CALLOWAY:**   Nobody came.

16           **DEPUTY COMMISSIONER SCHAUFEL:**   I have

17    nothing else.

18           **PRESIDING COMMISSIONER GRANLUND:**   Mr.

19    Angele, questions?

20           **COMMISSIONER ANGELE:**   A couple of questions.

21    Imperial Courts, is that the same as Imperial

22    Gardens?

23           **INMATE CALLOWAY:**   No, Sir.

24           **COMMISSIONER ANGELE:**   Two different places,

25    okay.   Listen, you have -- you pled guilty to the

26    killing of that young child.

27           **INMATE CALLOWAY:**   I was advised by my

1    counsel to do so.

2         **COMMISSIONER ANGELE:**  Okay.  You -- you seem

3    like an intelligent kind of guy.  I mean you're not

4    dumb acting or sounding.  Why would you plead guilty

5    to killing somebody -- well, wait, let me finish,

6    regardless of what -- what your counsel tells you,

7    if you didn't do the crime?

8         **INMATE CALLOWAY:**  It was -- at this time, I

9    was facing a capital punishment, right?

10        **COMMISSIONER ANGELE:**  Yeah.

11        **INMATE CALLOWAY:**  I had already been found

12   guilty on the Dennis Rogers.  I tell me -- I tell my

13   attorney what to do.  He said, I advise you to take

14   the manslaughter that they offered.  So, I just took

15   it.  Which, I know I didn't do it, but I'm just

16   trying to, you know, I've been down -- I was down

17   there for four years fighting a double murder which

18   I didn't do.  Fighting with special circumstance

19   over my -- for something I didn't do, you know.

20        **COMMISSIONER ANGELE:**  Well, I have to, then,

21   re-ask the question that Commissioner Schaufel asked

22   you.  You had witnesses who identified you.  Why --

23   why do you think they would do that?  I mean --

24        **INMATE CALLOWAY:**  They might have hated me,

25   which I didn't know at that time if they hated me,

26   or have something against me, or thought that was me

27   out there that night.

1      **COMMISSIONER ANGELE:**  And what kind of

2    threats did your girlfriend get?

3      **INMATE CALLOWAY:**  Like, she had better not

4    come to court for me.

5      **COMMISSIONER ANGELE:**  Can you think of any

6    rational reason why somebody would threaten your

7    girlfriend not to testify in your behalf?

8      **INMATE CALLOWAY:**  Because they know she was

9    the only key I had.

10      **COMMISSIONER ANGELE:**  But why -- why do you

11    think they would do that?  I mean, what -- what

12    reason would somebody have?  I mean, I can

13    understand somebody is threatening your girlfriend,

14    saying, don't come to court and say he did it.  But

15    this is somebody who might want to go to court to

16    say you didn't do it.

17      **INMATE CALLOWAY:**  Yeah.

18      **COMMISSIONER ANGELE:**  What rational reason

19    --

20      **INMATE CALLOWAY:**  That's -- that's what

21    really kind of like threw me off because I'm -- she

22    was four months pregnant at the time.

23      **COMMISSIONER ANGELE:**  Okay.

24      **INMATE CALLOWAY:**  You know, and she was kind

25    of scared, so you know, there wasn't really too much

26    I could do a that point, because I'd asked her, was

27    she coming to court.  She stated, no, these boys

43

1    keep bothering me.

2          COMMISSIONER ANGELE:  What boys were these?

3          INMATE CALLOWAY:  At Imperial Housing

4    Projects.

5          COMMISSIONER ANGELE:  Did she live there

6    too?

7          INMATE CALLOWAY:  No, she stayed right next

8    door to me.

9          COMMISSIONER ANGELE:  Okay.  Did -- did you

10   know, prior to this incident, I would assume, Cedric

11   Miguel?

12         INMATE CALLOWAY:  I didn't know nothing and

13   I don't know -- I didn't know none of this until I

14   was arrested and -- and convicted of this crime.

15         COMMISSIONER ANGELE:  You didn't know any of

16   the players at all?

17         INMATE CALLOWAY:  I didn't know none of the

18   players at all.

19         COMMISSIONER ANGELE:  Okay.

20         INMATE CALLOWAY:  Until after I was

21   convicted and then everything unfolded.  And I'm,

22   like, I didn't, you know, I didn't know that they

23   had a hand in it like that.

24         COMMISSIONER ANGELE:  You -- you make it

25   sound like almost a giant conspiracy here.  You --

26         INMATE CALLOWAY:  Yeah, that's what it --

27   that's what it all boiled down to.

44

1          **COMMISSIONER ANGELE:**  But you went to the
2     appellate, you went through appellate decision too.
3          **INMATE CALLOWAY:**  Yes.
4          **COMMISSIONER ANGELE:**  And you -- then the
5     conviction was upheld.
6          **INMATE CALLOWAY:**  Yes.
7          **COMMISSIONER ANGELE:**  So there were a lot of
8     people who didn't believe you.
9          **INMATE CALLOWAY:**  A lot of them.
10         **COMMISSIONER ANGELE:**  Obviously.
11         **INMATE CALLOWAY:**  A lot of them.
12         **COMMISSIONER ANGELE:**  People who identified
13    you as the shooter.  You went to trial.  You were
14    found guilty.  You plead guilty to another crime you
15    say you didn't commit.  You go to the appellate
16    hearing -- the appellate court, and the appellate
17    court upholds the conviction.  I mean, some place
18    along the line you would think that somebody's story
19    would fall apart if you were innocent.  And I, you
20    know, all I can do is take your word for it.  I
21    wasn't there.
22         **INMATE CALLOWAY:**  Uh-hmm.
23         **COMMISSIONER ANGELE:**  But, it just seems to
24    me like -- like the courts have -- have spoken and
25    you're the guy that did the killing.
26         **INMATE CALLOWAY:**  That's what they all say.
27         **COMMISSIONER ANGELE:**  Okay.  I have no other

1   questions.

2           **PRESIDING COMMISSIONER GRANLUND:**  Okay, Mr.

3   Calloway, you just told Mr. Angele that you didn't

4   know any of the players in this crime until you got

5   to court and got arrested.

6           **INMATE CALLOWAY:**  No, after -- after I was

7   convicted.  I know Cedric and all of them from

8   growing up in the neighborhood.  But I didn't know

9   that they had a hand in this until after I was

10  convicted, as far as, he supposedly had paid such-

11  and-such to go kill these boys for robbing his wife

12  or his car-jacking or something they say had

13  happened.

14          **PRESIDING COMMISSIONER GRANLUND:**  And Dennis

15  Rogers.

16          **INMATE CALLOWAY:**  Yes.

17          **PRESIDING COMMISSIONER GRANLUND:**  You knew

18  Dennis Rogers?

19          **INMATE CALLOWAY:**  Well, Denny stayed down

20  the street from me.

21          (Thereupon, the tapes were turned.)

22          **DEPUTY COMMISSIONER SCHAUFEL:**  All right.

23          **PRESIDING COMMISSIONER GRANLUND:**  Okay, so

24  you did know Dennis Rogers.

25          **INMATE CALLOWAY:**  He stayed down --

26          **PRESIDING COMMISSIONER GRANLUND:**  You did

27  know Cedric Miguel, the dope dealer.

46

1      **INMATE CALLOWAY:**  Yeah.

2      **PRESIDING COMMISSIONER GRANLUND:**  So you did

3  know -- you did know these players.

4      **INMATE CALLOWAY:**  I know -- I knowed (sic)

5  Cedric from growing up with him, when I was a little

6  boy.  They're all older than me.

7      **PRESIDING COMMISSIONER GRANLUND:**  So they're

8  guys from -- from the neighborhood.

9      **INMATE CALLOWAY:**  Yeah.

10      **PRESIDING COMMISSIONER GRANLUND:**  Well, I

11  just wanted to make sure, because I understood you

12  to say that you didn't know anything about it and

13  you didn't know these folks --

14      **INMATE CALLOWAY:**  No.

15      **PRESIDING COMMISSIONER GRANLUND:**  -- until

16  you were arrested.

17      **INMATE CALLOWAY:**  No, I didn't -- I didn't

18  know that they had a hand it.

19      **PRESIDING COMMISSIONER GRANLUND:**  Well, you

20  told Mr. Angele you didn't know any of the players.

21      **INMATE CALLOWAY:**  Then I didn't mean it

22  like that.  I meant it, as far as when I was

23  arrested, I did not know that they had a hand in

24  having this done.

25      **PRESIDING COMMISSIONER GRANLUND:**  Okay.  As

26  well, you told Mr. Schaufel about the Grape Street

27  stuff.  You said, well, that was when you were

47

1    younger..

2            **INMATE CALLOWAY:**  When I was younger.

3            **PRESIDING COMMISSIONER GRANLUND:**  Yeah.

4            **INMATE CALLOWAY:**  Uh-hmm.  I was a gang

5    member when I was younger.  And I did not --

6            **PRESIDING COMMISSIONER GRANLUND:**  A gang

7    member --

8            **INMATE CALLOWAY:**  Yeah, I admit that.

9            **PRESIDING COMMISSIONER GRANLUND:**  -- when

10   you were younger.

11           **INMATE CALLOWAY:**  I admit that.

12           **PRESIDING COMMISSIONER GRANLUND:**  First of

13   all, you know that -- do you recall that when you

14   were talking to me just about 10 minutes prior to

15   that, I asked you if you had any -- if you were in a

16   gang.  You said no.  I asked you if you were in a

17   prison gang.  You said no.  You didn't know any of

18   these gangbangers, you weren't part of a gang.  I

19   said, were you a part of a gang?  You said, no, they

20   said I was but I wasn't.

21           **INMATE CALLOWAY:**  Like I said, when I was

22   younger, I was a part of the Grape Street Crips.  I

23   admit that.

24           **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

25   I just -- there again, because I did -- I did try to

26   be, you know, as fair as I could.  Originally, when

27   we started out --

48

1           **INMATE CALLOWAY:**  Uh-hmm.

2           **PRESIDING COMMISSIONER GRANLUND:**  -- I told

3    you to think this stuff through, because when the

4    transcript is printed, and for however long that it

5    might be, in the event you weren't -- wouldn't get a

6    date today, you're going to have to answer that

7    question.  Every time you come to a hearing, they're

8    going to say, why did you say in the beginning of

9    the hearing you were not a gang member.  And then

10   why, 10 pages back here, do you say, yes, when I was

11   younger, I was a member of the Grape Street Crips.

12   I just -- I just want you to know that it -- that it

13   doesn't help -- help credibility.  As well, did you

14   get an opportunity to review your file?

15          **INMATE CALLOWAY:**  Yes.

16          **PRESIDING COMMISSIONER GRANLUND:**  Okay.  Did

17   you do that?

18          **INMATE CALLOWAY:**  No, I didn't.

19          **PRESIDING COMMISSIONER GRANLUND:**  Did you --

20   what -- what reason was that, that you didn't review

21   it?

22          **INMATE CALLOWAY:**  What, my CDC file?  I

23   didn't really need to see it.  I basically know

24   what's in there already.

25          **PRESIDING COMMISSIONER GRANLUND:**  Okay.

26   There again, I would advise you that in the event

27   you didn't get a date today and you come to your

1   next hearing, I -- I would read it. So that when,

2   there again, when you're asked about things that are

3   in it, you don't have to say, well, I can't really

4   remember. How many times was I arrested, well, I

5   don't know, I don't remember. You should be very

6   familiar with your C-file. Be very familiar with

7   your personal and criminal history, so that you are

8   able to talk about it in a manner that will be

9   convincing. And it will help you a lot if you do

10   that. So, it would really -- really be in your best

11   interest to keep up. These hearings don't come

12   along all that often. And when you get one, you

13   should really spend some time up front preparing for

14   the hearing, making sure that you have your letters,

15   that you're in your C-file, that you've reviewed

16   your C-file and that you know what's in there.

17   You'll -- you'll do much better.

18         **DEPUTY COMMISSIONER SCHAUFEL:** (Inaudible) a

19   question, briefly.

20         **PRESIDING COMMISSIONER GRANLUND:** Okay, Mr.

21   --

22         **DEPUTY COMMISSIONER SCHAUFEL:** And that is,

23   the -- the young man who was killed, that occurred

24   on July 9th.

25         **INMATE CALLOWAY:** Uh-hmm.

26         **DEPUTY COMMISSIONER SCHAUFEL:** Correct?

27         **INMATE CALLOWAY:** Yes.

1        **DEPUTY COMMISSIONER SCHAUFEL:** And the

2    seven-year-old girl that was killed occurred on

3    August 2nd.

4        **INMATE CALLOWAY:** Yes.

5        **DEPUTY COMMISSIONER SCHAUFEL:** You said, on

6    July 9th, you were at home with your baby's mother.

7        **INMATE CALLOWAY:** Yes.

8        **DEPUTY COMMISSIONER SCHAUFEL:** Where were

9    you on August 2nd, at 8:30 p.m.

10        **INMATE CALLOWAY:** The same thing, standing

11    in my front yard. It was still right around --

12        **DEPUTY COMMISSIONER SCHAUFEL:** Did she come

13    and testify in court (inaudible).

14        **INMATE CALLOWAY:** No, she didn't. No, she

15    didn't. Some more people came on behalf to testify

16    for me though.

17        **DEPUTY COMMISSIONER SCHAUFEL:** That -- that

18    you were there?

19        **INMATE CALLOWAY:** Yeah.

20        **DEPUTY COMMISSIONER SCHAUFEL:** With her?

21        **INMATE CALLOWAY:** Yeah, with them. It was

22    like a group of people in my front yard. I stayed

23    right around the corner from where all this stuff

24    happened.

25        **DEPUTY COMMISSIONER SCHAUFEL:** And they all

26    came to court and said that you were at home?

27        **INMATE CALLOWAY:** A couple people did--

51

1       **DEPUTY COMMISSIONER SCHAUFEL:**  A couple did?

2   Okay.  I have nothing else.

3       **PRESIDING COMMISSIONER GRANLUND:**

4   Commissioner Angele, you had another question?

5       **COMMISSIONER ANGELE:**  Yeah, I want to go

6   back to the -- to your plea of manslaughter.  You --

7   you had a hung jury in the first case.

8       **INMATE CALLOWAY:**  Yes.

9       **COMMISSIONER ANGELE:**  They still (inaudible)

10  only one person to get into the hung jury.  I still

11  don't understand why you pled guilty to it.

12      **INMATE CALLOWAY:**  I was advised by my

13  counsel.

14      **COMMISSIONER ANGELE:**  Okay.  I'm going to

15  give you a chance to clean up one thing that you

16  said, to make sure that I get it right and make sure

17  the record is right, because this is the foundation

18  of what's going to happen from now on.  You

19  indicated a moment ago that you didn't know these

20  guys were involved in this.  We're talking about

21  Cedric and all those kind of people --

22      **INMATE CALLOWAY:**  Yes.

23      **COMMISSIONER ANGELE:**  -- until after you

24  were convicted.

25      **INMATE CALLOWAY:**  Until after I was in

26  custody.  You know how people talk.  Once you're in

27  custody, people go to talking.  And I'm like, I

1    didn't know nothing about it when I was out there.

2         COMMISSIONER ANGELE:  Okay.

3         INMATE CALLOWAY:  And when I was in custody,

4    and then the people I know, the dude had them dudes

5    killed.  I don't know nothing about that stuff.

6         COMMISSIONER ANGELE:  Because there's no

7    doubt in mind you answered my question, you said,

8    until you were convicted.  And then you later said,

9    until you were arrested.  I want to make sure which

10   one is the proper one.

11        INMATE CALLOWAY:  It was when I was in

12   custody.

13        COMMISSIONER ANGELE:  Arrested, okay.

14        INMATE CALLOWAY:  When I was placed in

15   custody.

16        COMMISSIONER ANGELE:  I just want to make

17   sure that the record reflects the right answer for

18   you.

19        INMATE CALLOWAY:  Right, thank you.

20        COMMISSIONER ANGELE:  All right.

21        PRESIDING COMMISSIONER GRANLUND:  Okay, now

22   that -- that does raise one more question for me.

23   You guys lived in the -- in the projects.

24        INMATE CALLOWAY:  I ain't never lived in no

25   projects.

26        PRESIDING COMMISSIONER GRANLUND:  Okay,

27   close to the projects, in that neighborhood there?

53

1        **INMATE CALLOWAY:**  No, around the corner.

2        **PRESIDING COMMISSIONER GRANLUND:**  Right

3   around the -- around the corner.

4        **INMATE CALLOWAY:**  Yes.

5        **PRESIDING COMMISSIONER GRANLUND:**  Okay.  How

6   far was it from -- from where Mr. Rogers was shot

7   from where you lived?

8        **INMATE CALLOWAY:**  I'd say about -- about --

9   let me see, I'd say about two blocks.

10       **PRESIDING COMMISSIONER GRANLUND:**  About two

11   blocks away.

12       **INMATE CALLOWAY:**  Yes.

13       **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

14   how -- how about where the little girl was -- was

15   killed.  How far were you from there?

16       **INMATE CALLOWAY:**  I'd say that would be

17   about four blocks.

18       **PRESIDING COMMISSIONER GRANLUND:**  Okay.  So

19   within two to four blocks in the neighborhood and

20   you were just kind of hanging out with your friends

21   out in your front yard?

22       **INMATE CALLOWAY:**  Yeah, in my front yard.

23       **PRESIDING COMMISSIONER GRANLUND:**  Okay.  And

24   -- and these two murders took place and one in July,

25   the next one in August and then you were arrested in

26   September.  And that's the first you found out about

27   them.

54

1          **INMATE CALLOWAY:**  Like I say, July 9th, the

2    murder took place with Dennis Rogers, right?

3          **PRESIDING COMMISSIONER GRANLUND:**  Uh-hmm.

4          **INMATE CALLOWAY:**  Two days later, of course,

5    we know what happened.  I lived down the street.

6    They're going to -- you're going to hear.  People

7    are going to be talking and you're going to hear.

8    But it didn't have nothing to me, so I'm going on

9    doing my daily things that I do.

10         **PRESIDING COMMISSIONER GRANLUND:**  Okay.  All

11   right, because I thought I had heard you just tell

12   Mr. Angele that you didn't -- you didn't know

13   anything about it until you were arrested.

14         **ATTORNEY SKIPPER-DOTTA:**  What you mean it,

15   what do you mean?  I didn't know anything about

16   what?

17         **INMATE CALLOWAY:**  The murders, until after -

18   - after I was arrested.

19         **ATTORNEY SKIPPER-DOTTA:**  And what do you

20   mean?  Did you know it occurred or anything about

21   it?

22         **INMATE CALLOWAY:**  Yeah, I know -- I know it

23   was after -- after -- after the fact, I know what

24   happened.

25         **PRESIDING COMMISSIONER GRANLUND:**  Okay.

26   District Attorney's Office, any questions?

27         **DEPUTY DISTRICT ATTORNEY KASS:**  No.

55

1       **PRESIDING COMMISSIONER GRANLUND:**  Okay.
2    Counsel, any questions?

3       **ATTORNEY SKIPPER-DOTTA:**  I have a question,
4    a follow-up about your -- your involvement with the
5    Grape Street Crips.  We talked about this earlier,
6    prior to coming in the hearing.  You indicated to me
7    earlier that you were a member, but then you had
8    moved away.

9       **INMATE CALLOWAY:**  Yes.

10      **ATTORNEY SKIPPER-DOTTA:**  What did you -- and
11   can you tell -- give us a scenario of when, how old
12   you were and where you moved to?

13      **INMATE CALLOWAY:**  It was like, 13 to about
14   17, and then we moved from over there.

15      **ATTORNEY SKIPPER-DOTTA:**  Okay.  You were 13
16   to 17 years old, you were involved with the -- and
17   then what -- and then you moved?

18      **INMATE CALLOWAY:**  We moved away.

19      **ATTORNEY SKIPPER-DOTTA:**  And where did you
20   move to?

21      **INMATE CALLOWAY:**  We moved to, let me see,
22   where did we move?  I think my mother moved to
23   Compton, somewhere.

24      **ATTORNEY SKIPPER-DOTTA:**  Okay, your mother
25   moved to Compton.  And at that point, were you
26   involved with a street gang.

27      **INMATE CALLOWAY:**  Nope.

56

1          **ATTORNEY SKIPPER-DOTTA:** Okay. At the time

2     this happened, in 1989, were you involved with the

3     Grape Street Crips?

4          **INMATE CALLOWAY:** Nope.

5          **ATTORNEY SKIPPER-DOTTA:** Okay. I don't have

6     anything further.

7          **PRESIDING COMMISSIONER GRANLUND:** Okay,

8     thank you. Mr. Angele, you had another question.

9          **COMMISSIONER ANGELE:** I have a question of

10    the District Attorney. Obviously, there was a

11    search warrant issued at an address in Los Angeles

12    wherein two guns were recovered, along with a box of

13    ammunition. Were those the guns that were used in

14    either one of the homicides? Do you know?

15         **DEPUTY DISTRICT ATTORNEY KASS:** I don't

16    think we were able to match them because the wounds

17    to Mr. Rogers were through and through. And from my

18    reading of the original reports, on the second

19    victim, Kanita Hailey, I don't know if they

20    recovered a bullet --

21         **COMMISSIONER ANGELE:** Okay.

22         **DEPUTY DISTRICT ATTORNEY KASS:** -- to do a

23    comparison.

24         **COMMISSIONER ANGELE:** Thank you.

25         **PRESIDING COMMISSIONER GRANLUND:** Okay,

26    closing statement.

27         **DEPUTY DISTRICT ATTORNEY KASS:** Yes.

57

1    Obviously, on behalf of the Los Angeles County

2    District Attorney's Office, we would oppose a parole

3    date at this time.   There are a number of things

4    that concern me about Mr. Calloway's statement.

5    First of all, although he corroborates our theory as

6    to the motive for the killing of Dennis Rogers and

7    at least for the intended victim, which resulted in

8    the killing of Kanita Hailey, the only thing that he

9    disputes is the fact that he was the shooter in both

10    crimes.   And this is even though Bertha Ray Vernette

11    had actually been acquainted with Mr. Calloway for a

12    period of approximately 12 years when the July 9th,

13    1989 crime occurred.   I am distressed by the fact

14    that Mr. Calloway states that he was no longer a

15    member of the Grape Street Crips because he'd moved

16    to Compton.   Having been in the Hard Core Gang Unit

17    myself, my recollection is that there is a segment

18    of the Grape -- Grape Street Crips in Compton.   So I

19    don't know the fact that he was residing there would

20    have eliminated that possibility.   And I think it's

21    clear that he was still with a gang when both of

22    these killings occurred.   He -- Mr. Calloway appears

23    to have no insight into the original crimes, because

24    he maintains his innocence, even though in the first

25    murder, the witness had known him for over a decade.

26    And the second murder, we had a witness who was able

27    to identify him from photographs and a live line-up,

58

1    even after he changed his personal appearance,

2    although he was ordered by a judge not to do so.

3    And also, at the preliminary hearing. And he

4    appears to have no insight as to what he should be

5    doing in order to be released from prison, in

6    admission to accepting some responsibility for these

7    crimes. The first one, the victim was shot in the

8    back. He was chased down and essentially executed.

9    In the second one, the little girl was unfortunately

10    the one who suffered. She was shot in the head and

11    died as a result. Mr. Calloway has four children at

12    this point, and he does not appear to have thought

13    about or made any plans or want to rehabilitate

14    himself or to upgrade himself so that he can support

15    the children that he has in this world. So, at this

16    point, we feel that he is a danger to the community

17    and that he should not be given a parole date.

18         **PRESIDING COMMISSIONER GRANLUND:** Okay,

19    thank you. Ms. Skipper-Dotta, closing.

20         **ATTORNEY SKIPPER-DOTTA:** Thank you. On

21    behalf of Mr. Calloway, he has been incarcerated

22    approximately 11 years. We've heard his testimony

23    today regarding his case. I -- I would submit, by

24    looking at the appellate report, that it wasn't as

25    clear cut as -- as the portrayal. I guess,

26    Vernette, at a couple of times, had disputed her

27    testimony and taken it back. I would -- if it is

1   available, it would be helpful to have any kind of
2   police reports taken at the time of statements made,
3   if that's possible. All we have is the appellate
4   report, which is just sort of a testimony that was
5   taken at the trial, which a lot of times isn't
6   exactly what happens, depending upon the rules of
7   evidence. A lot of times you don't get the clear
8   picture. And I think that might clarify some issues
9   the Board has regarding statements made. On Mr.
10  Calloway's behalf, he's done well in the
11  institution. He does have two 115s. The last one
12  was for failure to report, which is more of an
13  administrative, last -- I think it's two months ago.
14  But in 11 years, he's had two, which -- which is
15  good. He's not having a pattern of violence in the
16  institution. He doesn't have a pattern of substance
17  abuse in the institution. One 115 was for excessive
18  property, one was for loitering, I believe. The
19  psychological report is -- it talks about Mr.
20  Calloway's denial and his prior gang activity. It
21  does say that he has a risk factor of marijuana and
22  that he should be tested. It makes it hard for the
23  psychologist, at this point it was Wilcox, and that
24  he did deny the crime. And it was difficult for the
25  doctor, he said, to be able to make a diagnosis.
26  The law says that Mr. Calloway doesn't need to admit
27  the crime to be found suitable for it. He has

1    denied the crime since he has been in custody.

2    Although, the psychiatric report, I wouldn't say is

3    supportive, it's -- it looks sort of benign in the

4    fact that it really can't say much of anything.  One

5    thing that I -- it says that he doesn't have any

6    psychological problem on Axis I.  It did say that

7    his only diagnosis is that of antisocial

8    personality.  And we can infer from that that it

9    might be on Axis II, but he doesn't go into any kind

10   of -- thorough diagnosis, so it's sort of a, I

11   believe, a poorly written.  And in that fact, I'd

12   ask that in any -- if there is any future hearing,

13   that another report be prepared that might be a

14   little more thorough and informative to the Board.

15   Employment-wise, he's been a good worker.  He's

16   worked in Culinary.  He's worked at -- as a Housing

17   Porter, and again, at Work Crew in Soledad.  He's in

18   academics now.  I believe he completed ABE-I and II

19   and he's in ABE-III.  He did -- the file reflects at

20   SCP, Sac and Ironwood, he did participate for a

21   short time in academics.  We have Mr. Calloway

22   planning to go back to live in California with a

23   friend of the family.  There's no letter in the file

24   today, but that is his plans.  Overall, his

25   disciplinary record is not bad.  It's not

26   outstanding but it's -- in 11 years, having two 115s

27   of -- of a -- not a pattern of disruptive behavior

1    over a period of time, I think that shows a lot for

2    him.  When he came in, he was 24 -- well, actually

3    when he was arrested it was 24.  He came into the

4    institution when he was 28.' I think that he's done

5    quite well.  Overall, he's a good worker.  He's

6    trying to upgrade educationally.  He stays out of

7    trouble, for the most part, and I submit on those

8    comments.

9         **PRESIDING COMMISSIONER GRANLUND:**  Thank you.

10   Mr. Calloway, is there anything you would like to

11   add in your closing statement?  This is your

12   opportunity to tell the Panel why you're suitable

13   for parole.  You can leave it with what your

14   attorney has said, or you can add anything you would

15   like.

16        **INMATE CALLOWAY:**  No, I'll leave it with

17   what my attorney said.

18        **PRESIDING COMMISSIONER GRANLUND:**  Okay.  We

19   will recess and invite you back when --

20                    R E C E S S

21                    --o0o--

22

23

24

25

26

27

62

1          CALIFORNIA BOARD OF PRISON TERMS

2                   D E C I S I O N

3          **DEPUTY COMMISSIONER SCHAUFEL:**  You're on.

4          **PRESIDING COMMISSIONER GRANLUND:**  Okay,

5    we're back on record in the matter of Paul Calloway.

6    Mr. Calloway, the Panel reviewed all information

7    received from the public and relied on the following

8    circumstances in concluding that the prisoner is not

9    suitable for parole and would pose an unreasonable

10   risk of danger to society or a threat to public

11   safety if released from prison.  Number one, the --

12   the offense was carried out in an especially cruel

13   and callous manner.  The victims were -- multiple

14   victims were killed, in separate incidents.  The

15   offense was carried out in a dispassionate and

16   calculated manner such as an execution style murder.

17   The offense was carried out in a manner which

18   demonstrates an exceptionally callous disregard for

19   human suffering and the motive for the crime is

20   inexplicable, or very trivial in relation to the

21   offense.  The murder of the victim did not deter the

22   prisoner from later committing another criminal

23   offense.  Specifically, in another attempt to shoot

24   one -- or a separate victim accidentally.  Kanita

25   Hailey was shot and killed.  Ms. Hailey was seven-

26   years-old.  She received a gunshot wound to the head

27   **PAUL CALLOWAY   H-92309   DECISION   PAGE 1   4/25/01**

1    and subsequently died.  These conclusions were drawn
2    from the Statement of Facts, wherein the prisoner
3    chased down Dennis Rogers after a contract had been
4    put out on Mr. Rogers by a local dope dealer in
5    apparent gang activity, chased him down, and gunned
6    him down, killing him instantly.  The prisoner has a
7    record of violence or assaultive behavior and an
8    escalating pattern of criminal conduct or violence.
9    He's failed previous grants to avoid criminality --
10   or previous grants of probation and cannot be
11   counted on to avoid criminality.  He has failed to
12   profit from society's previous attempts to correct
13   his criminality.  Such attempts include juvenile
14   probation, juvenile hall, and county jail.  The
15   prisoner has failed to program in any manner,
16   virtually, while incarcerated.  He's failed to
17   develop a marketable skill that could be put to use
18   upon release, failed to upgrade educationally and
19   vocationally and not participated in beneficial
20   self-help or therapy programs.  And has failed to
21   demonstrate evidence of positive change.  Misconduct
22   while incarcerated includes three 128s and two
23   serious 115 disciplinaries for failure to report to
24   work on 2/27 of this year and another serious
25   resisting of staff on 8/28/96.  The psychiatric
26   report, dated 6/26, 2000, by Dr. Wilcox is not --
27   **PAUL CALLOWAY  H-92309  DECISION  PAGE 2  4/25/01**

64

1   not supportive in that he states that if released to
2   the community and involved in gang activity, his
3   risk for violence would be higher than average.  The
4   hearing Panel notes that responses to PC 3042
5   notices indicate opposition to a finding of parole
6   suitability, specifically the District Attorney of
7   Los Angeles County.  The Panel makes the findings:
8   That the prisoner needs therapy in order to face,
9   discuss, understand and cope with stress in a
10  nondestructive manner.  Until progress is made, the
11  prisoner continues to be unpredictable and a threat
12  to others.  The prisoner could use some therapy in a
13  controlled setting.  It's needed, but the motivation
14  and amenability are questionable, in view of the
15  prisoner's assaultive history and some continued
16  negative behavior and lack of program participation.
17  There is no indication that the prisoner would
18  behave differently if paroled.  In a separate and
19  unanimous decision, the hearing Panel finds that the
20  prisoner has been convicted of murder, and it is not
21  reasonable to expect that parole would be granted at
22  a hearing during the next five years.  The prisoner
23  committed the offense in a especially cruel manner.
24  Specifically chased down and gunned down his victim,
25  Mr. Rogers and some month later, participated in
26  another shooting in which an innocent seven-year-old
27  **PAUL CALLOWAY   H-92309   DECISION   PAGE 3   4/25/01**

65

1    girl, Ms. Hailey, was killed. Multiple victims were

2    killed in separate incidents. The offense was

3    carried out in a dispassionate and calculated

4    manner. The offense was carried out in a manner

5    which demonstrates an exceptionally callous

6    disregard for human suffering, and the motive for

7    the crime is inexplicable or very trivial in

8    relation to the offense. The prisoner has a prior

9    record of violent behavior. And that the prisoner

10   has a prior assault with a deadly weapon arrest and

11   a discharging a firearm within the city conviction,

12   which as we discussed here today, was discharging a

13   firearm, actually in his neighborhood, on a -- on an

14   open street. The prisoner recently committed

15   serious disciplinary violations on 2/27/01, for

16   failure to report work and 8/28/96, for resisting

17   staff. The Panel recommends that the prisoner

18   become and remain disciplinary-free, work towards

19   reducing his custody level, and if available upgrade

20   vocationally and educationally. And if available,

21   participate in self-help and therapy programs. Mr.

22   Angele, do you have anything to add to the reading?

23          **COMMISSIONER ANGELE:** I have no comments.

24          **PRESIDING COMMISSIONER GRANLUND:** Mr.

25   Schaufel?

26          **DEPUTY COMMISSIONER SCHAUFEL:** Nothing to

27   **PAUL CALLOWAY   H-92309   DECISION   PAGE 4   4/25/01**

66

1    add, thank you.

2            **PRESIDING COMMISSIONER GRANLUND:**  Okay, Sir,

3    Good luck to you.  You've got a -- you've got a lot

4    of work to do if you intend to get a date.

5            **ATTORNEY SKIPPER-DOTTA:**   Thank you.

6                         --o0o--

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   PAROLE DENIED FIVE YEARS

26   EFFECTIVE DATE OF THIS DECISION_____ MAY 1 6 2001

27   PAUL CALLOWAY  H-92309  DECISION   PAGE 5   4/25/01

67

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, KARIN R. LEWIS, a duly designated transcriber, CAPITOL ELECTRONIC REPORTING, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total one in number and cover a total of pages numbered 1 through 66, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, at SOLEDAD, CALIFORNIA, in the matter of the INITIAL PAROLE CONSIDERATION HEARING of PAUL CALLOWAY, CDC No. H-92309, on APRIL 25th, 2001, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape(s) to the best of my ability.

I hereby certify that I am a disinterested party in the above-captioned matter and have no interest in the outcome of the hearing.

Dated May 12th, 2001, at Sacramento County, California.

Karin R. Lewis
Transcriber
**CAPITOL ELECTRONIC REPORTING**

# EXHIBIT    "D"

# EXHIBIT   "E"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS



INMATE COPY

In the matter of the Life )
Term Parole Consideration )
Hearing of:                )    CDC Number H-92309
                           )
PAUL CALLOWAY              ·)
                           )
_____)


CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

SEPTEMBER 13, 2006


PANEL PRESENT:

Archie "Joe" Biggers, Presiding Commissioner
Alejandro Armenta, Deputy Commissioner


OTHERS PRESENT:

Paul Calloway, Inmate
___ Sparks, Attorney for Inmate
Lawrence Morrison, District Attorney's Office

CORRECTIONS TO THE DECISION HAVE BEEN MADE

            _____  No      See Review of Hearing
            _____  Yes     Transcript Memorandum

**Jo Anne Jackson, Northern California Court Reporters**

INDEX

Page

Proceedings ................................................. 1

Case Factors ............................................... 9

Pre-Commitment Factors .................................... 11

Post-Commitment Factors ................................... 19

Parole Plans .............................................. 28

Closing Statements ........................................ 48

Recess .................................................... 52

Decision .................................................. 53

Adjournment ............................................... 60

Transcriber Certification ................................. 61

1

## P R O C E E D I N G S

1    **PRESIDING COMMISSIONER BIGGERS:** This is a

2    subsequent parole consideration hearing for Paul

3    Calloway, CDC number H92309. Today's date is

4    September 13, 2006. We're located at Correctional

5    Training Facility, Soledad. The inmate was received on

6    September 16, 1993 in Los Angeles County. Life term

7    began on the same date. And the minimum parole date

8    was April 4, 2001. The controlling offense the inmate

9    has admitted is one count of murder, second degree.

10   (inaudible) The case number is TA001416 (inaudible).

11   The inmate received a term of 15 years to life plus two

12   years and that involved some other additional counts.

13   Count three was involuntary manslaughter, violation of

14   Code 192 and same county, same case number TA001416.

15   And there was also a voluntary manslaughter use of a

16   firearm which is a violation of (inaudible) and the

17   case number was the same (inaudible) and (inaudible)

18   six years of the current sentence and a fatal attempt

19   using a firearm 1022.58 Penal Code Los Angeles case

20   number is same, count number three. (Inaudible)

21   April 4, 2001. Now Mr. Calloway, this hearing is being

22   tape recorded and for the purposes of voice

23   identification each of us will state our first and last

24   name, spelling our last name. And when it's your turn

25   (inaudible) give us your CDC number. My name is Archie

26   "Joe" Biggers, B-I-G-G-E-R-S, I'm Commissioner, Board

2

1    of Parole Hearings.

2         **DEPUTY COMMISSIONER ARMENTA:**  My name is

3    Alejandro Armenta, A-R-M-E-N-T-A, I'm the Deputy

4    Commissioner.

5         **DEPUTY DISTRICT ATTORNEY MORRISON:**  Lawrence

6    Morrison, M-O-R-R-I-S-O-N, Los Angeles District

7    Attorney.

8         **ATTORNEY SPARKS:**  (inaudible).

9         **INMATE CALLOWAY:**  Paul Calloway --

10        **PRESIDING COMMISSIONER BIGGERS:**  Can you speak

11   up a little bit.

12        **INMATE CALLOWAY:**  Paul Calloway, G-A-L-L-O-W-A-

13   Y, H92309.

14        **PRESIDING COMMISSIONER BIGGERS:**  All right.

15   Thank you.  Mr. Calloway, in front of you there,

16   there's an ADA statement.  Would you please read it out

17   loud for us?

18        **INMATE CALLOWAY:**

19        "The Americans with Disabilities Act,

20        ADA, is a law to help people with

21        disabilities.  Disabilities are

22        problems that make it hard for some

23        people to see, hear, breathe, talk,

24        walk, learn, think, work, or take

25        care of themselves than it is for

26        others.  Nobody can be kept out of

27        public places or activities because

1          of a disability.  If you have a
2          disability you have the right to ask
3          for help to get ready for your BPT
4          hearing, get to the hearing, talk,
5          read forms and papers, and understand
6          the hearing process.  BPT will look
7          at what you ask for to make sure that
8          you have a disability that is covered
9          by the ADA, and that you have asked
10         for the right kind of help.  If you
11         do not get help, or if you do not
12         think you got the help or the help
13         you need, ask for a BPT 1074
14         Grievance Form.  You can also get
15         help to fill it out."

16         **PRESIDING COMMISSIONER BIGGERS:**  Okay.
17  Mr. Calloway do you know what that means?

18         **INMATE CALLOWAY:**  It's for if I need any type of
19  disability.

20         **PRESIDING COMMISSIONER BIGGERS:**  Do you have
21  any, well, let me just put it to you this way, there
22  are certain disabilities that have been defined by the
23  Americans with Disabilities Act.  Do you have any of
24  those disabilities?

25         **INMATE CALLOWAY:**  No, sir.

26         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I see
27  here that you signed a 373 on January 25, 2006

4

1   indicating that you did not have any of those

2   disabilities.  Is that still true?

3        **INMATE CALLOWAY:**  I think so (inaudible).

4        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I see

5   that you (inaudible) level is 6.4 and your total grade

6   point level is 4.5.  Is that still correct?

7        **INMATE CALLOWAY:**  No, not, not (inaudible).

8        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  What is

9   it?

10       **INMATE CALLOWAY:**  It's higher than that.

11       **PRESIDING COMMISSIONER BIGGERS:**  Higher than

12  that?

13       **INMATE CALLOWAY:**  Yeah.  It should be --

14       **PRESIDING COMMISSIONER BIGGERS:**  This was sent

15  by a 128 dated, a 128E dated 8/24/05 and I'm sure that

16  Deputy Commissioner Armenta will go through that very

17  shortly.  But I just wanted to (inaudible) to make sure

18  (inaudible).  Do you have any hearing impairment?

19       **INMATE CALLOWAY:**  No, sir.

20       **PRESIDING COMMISSIONER BIGGERS:**  You don't wear

21  glasses?

22       **INMATE CALLOWAY:**  No, sir.

23       **PRESIDING COMMISSIONER BIGGERS:**  Have you ever

24  been included in Triple CMS or the EOP program?

25       **INMATE CALLOWAY:**  No, sir.

26       **PRESIDING COMMISSIONER BIGGERS:** you know what ER BIGGERS:

27  those are?

5

1        **INMATE CALLOWAY:**  Yes, I do.

2        **PRESIDING COMMISSIONER BIGGERS:**  What are they?

3        **ATTORNEY CHRISTENSEN:**  Like a mental disability

4    or something.

5        **PRESIDING COMMISSIONER BIGGERS:**  Mental health

6    issues.  You ever taken any type of (inaudible)

7    medication (inaudible)?

8        **INMATE CALLOWAY:**  No, sir.

9        **PRESIDING COMMISSIONER BIGGERS:**  How far did you

10   get in school?  You (inaudible) school (inaudible)?

11       **INMATE CALLOWAY:**  I went to what you call it?

12       **PRESIDING COMMISSIONER BIGGERS:**  (inaudible).

13   Okay.  So, but here I just got your, just passed to me

14   that on your chrono here you have a total of 9.1 that

15   is your overall test score on the TABE (inaudible).

16       **INMATE CALLOWAY:**  Okay.

17       **PRESIDING COMMISSIONER BIGGERS:**  And I'm sure

18   that Deputy Commissioner will (inaudible).

19       **INMATE CALLOWAY:**  Right.

20       **PRESIDING COMMISSIONER BIGGERS:**  Thank you.  Do

21   you suffer from any disability that will prevent you

22   from participating in today's hearing?

23       **INMATE CALLOWAY:**  No, sir.

24       **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Mr.

25   Spark, do you feel that your --

26   **ATTORNEY SPARKS:**  Yes (inaudible) **PRESIDING COMMISSIONER BIGGERS**

27       **DEPUTY COMMISSIONER HERNANDEZ:**  -- client's ADA

6

1   rights have been met?

2          **ATTORNEY SPARKS:**  Yes.

3          **PRESIDING COMMISSIONER BIGGERS:**   This hearing is

4   being conducted pursuant to Penal Code Section 3041 and

5   3042 and arose (inaudible) Board of Prison Hearings

6   (inaudible) for life inmates.  The purpose of today's

7   hearing is to once again consider the number and the

8   nature of the crime you were committed for.  Your prior

9   criminal and social hearing (inaudible) and your

10  behaving program since your commitment.  We've had the

11  opportunity to review your Central File and your prior

12  transcript.  And you will be given the opportunity to

13  correct or clarify the record.  We will make a decision

14  today and inform you whether or not we find you

15  suitable for parole and the reason for our decision.

16  If you are found suitable for parole the length of your

17  confinement will be explained to you.  Nothing that

18  happens here today will change the mind of the court.

19  This Panel is not here to retry your case.  Do you

20  understand?

21         **INMATE CALLOWAY:**  Yes, sir.

22         **PRESIDING COMMISSIONER BIGGERS:**  The Panel is

23  here for the sole purpose of determining your

24  suitability for parole.  Do you understand that?

25         **INMATE CALLOWAY:**  Yes, sir.

26         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  This

27  hearing will be conducted in three phases.  I will talk

7

1    to you and discuss with you the crime for which you
2    were committed, your prior criminal and social history.
3    Deputy Commissioner Armenta will discuss with you your
4    post-conviction factors which will include your
5    psychological evaluation (inaudible).  Then I will come
6    back and discuss with you your parole plans and letters
7    of support or opposition that may be in your file to
8    include the petition that you just did.
9         **INMATE CALLOWAY:**  Um-hmm.
10        **PRESIDING COMMISSIONER BIGGERS:**  Once that is
11   concluded the commissioner, the district attorney and
12   your attorney will be given the opportunity to ask you
13   questions.  The questions from the district attorney
14   will be asked through the chair and you will direct
15   your answer to the Panel and not to the district
16   attorney.  Then after the district attorney, your
17   attorney and you will be given the opportunity to make
18   a final statement regarding your parole suitability.
19   Your statement should address why you feel you are
20   suitable for parole.  At the conclusion of your
21   statement the Panel will then recess, clear the room
22   and deliberate.  Once the deliberations are completed
23   the Panel will resume the hearing and announce its
24   decision.  The California Code of Regulations states
25   that regardless of time served, a life inmate shall be
26   found unsuitable for and denied parole if in the judgment of the Panel the inmate would pose a
27   judgment of the Panel the inmate would pose an

8

1  unreasonable risk of danger to society if released from

2  prison.  You had certain rights.  Those rights include

3  the right of a timely notice of this hearing, the right

4  to review your Central File (inaudible) and the right

5  to present relevant documents.  So I'll go ahead,

6  Mr. Sparks do you feel that your rights been met?

7        **INMATE CALLOWAY:**  Yes.

8        **PRESIDING COMMISSIONER BIGGERS:**  You also have

9  the additional right to be heard by an impartial Panel.

10  Do you have any objection to the Panel?

11        **INMATE CALLOWAY:**  No, sir.

12        **PRESIDING COMMISSIONER BIGGERS:**  I'm going to

13  ask the deputy commissioner if any confidential

14  material will be used?

15        **DEPUTY COMMISSIONER ARMENTA:**  None.

16        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm

17  going to mark the hearing checklist.  I'm going to make

18  that Exhibit 1 and I'm going to pass it to your

19  attorney and the district attorney to ensure that we're

20  all operating off the same set of documents.

21        **ATTORNEY SPARKS:**  Prison attorney has all the

22  documents, thank you.

23        **DEPUTY DISTRICT ATTORNEY MORRISON:**  I have the

24  documents.

25        **PRESIDING COMMISSIONER BIGGERS:**  All right.

26  Thank you very much.  Let the record reflect that both

27  attorneys do have the same set of documents.  Are there

9

1   any additional documents (inaudible) --

2          **ATTORNEY SPARKS:**  (inaudible) no.

3          **PRESIDING COMMISSIONER BIGGERS:**  -- other than

4   the letters that you gave me Mr. Sparks?

5          **ATTORNEY SPARKS:**  No.  Thank you.

6          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Are

7   there any preliminary objections?

8          **ATTORNEY SPARKS:**  No.

9          **PRESIDING COMMISSIONER BIGGERS:**  Will the inmate

10  be speaking with the Panel?

11         **ATTORNEY SPARKS:**  Yes, but not about the crime.

12         **PRESIDING COMMISSIONER BIGGERS:**  Not about the

13  crime.  All right.  Would you please raise your right

14  hand?  Do you solemnly swear or affirm that the

15  testimony you give at this hearing will be the truth

16  and nothing but the truth?

17         **INMATE CALLOWAY:**  Yes, sir.

18         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm

19  going to read into the summary of the crime and then I

20  will also read in it your version (inaudible).

21         "July 9, 1989, at approximately 10:30 p.m.

22         Inmate Calloway and two unidentified black

23         males chased down the victim Dennis Rogers

24         in the Imperial Court Housing Projects and

25         shot him (inaudible).  Calloway was

26         positively identified as the shooter.  An

27         investigation revealed that a contract was

10

1    put on Dennis Rogers, aka "Weasel" by

2    Cedrick Miguel, M-I-G-U-E-L, a known drug

3    dealer because Dennis Rogers and his

4    companion Donnel, D-O-N-N-E-L Jones, aka

5    Duke, had carjacked Cedrick Miguel's wife.

6    Calloway was identified (inaudible)

7    disruptive through August 2, 1989 at about

8    8:30 p.m. three male blacks drove by the

9    Imperial Court Housing Project (inaudible)

10   the car and shot at Donnel Jones, Duke

11   (inaudible).  Duke ducked down to the

12   ground and 7-year-old Kanita, K-A-N-I-T-A

13   Haley was shot in the head and killed.

14   Calloway was the shooter in both

15   incidents.  On September 14, 1989

16   detectives (inaudible) 211 E. 113th Street.

17   They (inaudible) a search warrant and

18   recovered two guns (inaudible).  Calloway

19   was in the residence the day the

20   (inaudible) was taken into custody for the

21   (inaudible).

22   And this was all taken from the probation officer's

23   report (inaudible) Superior Court in the State of

24   California.  Now Mr. Calloway's version was that his

25   understanding of the Los Angeles Police (inaudible) was

26   informed that he was hired by a contract to kill a

27   Dennis Rogers.  He maintains he doesn't know anything

11

1  about the crime and he's (inaudible).  Is that correct,
2  sir?

3          **INMATE CALLOWAY:**  That's correct.

4          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Thank
5  you.  All right.  Since you're not going to tell us
6  about the crime, sir, I'm going to move right in to your
7  social history.  You were, at the age of this crime, how
8  old were you?  You were 27, 28?

9          **INMATE CALLOWAY:**  I was 24.

10          **PRESIDING COMMISSIONER BIGGERS:**  24, okay.  You
11  were 24 years old.  Your father passed away in an
12  automobile accident in 1972?

13          **INMATE CALLOWAY:**  Yes, sir.

14          **PRESIDING COMMISSIONER BIGGERS:**  And your
15  mother's still living.  Is that correct?

16          **INMATE CALLOWAY:**  Yes.

17          **PRESIDING COMMISSIONER BIGGERS:**  And she's in
18  good health?  She's an R.N.?

19          **INMATE CALLOWAY:**  Yes, sir.

20          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And you
21  have a sister whose whereabouts are unknown?

22          **INMATE CALLOWAY:**  My sister's in the Los Angeles
23  area.

24          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  How did
25  they, how did we get this (inaudible).  You haven't had
26  a psychological evaluation since 2003?  Oh, there's one
27  here in 2006.  It didn't really go into a lot of the

12

1    history in the — okay.  So you had a sister.  Do you

2    know where your sister, she's in Las Vegas?

3         **INMATE CALLOWAY:**  Yeah.

4         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  How

5    about your, your, you got a brother and also, you got

6    two brothers?

7         **INMATE CALLOWAY:**  Yes, sir.

8         **PRESIDING COMMISSIONER BIGGERS:**  And where are

9    they?

10        **INMATE CALLOWAY:**  In L.A.

11        **PRESIDING COMMISSIONER BIGGERS:**  In L.A.  Do

12   they come to visit you at all?

13        **INMATE CALLOWAY:**  They come every now and then.

14        **PRESIDING COMMISSIONER BIGGERS:**  Every now,

15   when's the last time they came and visited you?

16        **INMATE CALLOWAY:**  A couple of years ago.

17        **PRESIDING COMMISSIONER BIGGERS:**  Couple of years

18   ago?

19        **INMATE CALLOWAY:**  Yes, sir.

20        **PRESIDING COMMISSIONER BIGGERS:**  It says here

21   you were married at age 21?

22        **INMATE CALLOWAY:**  I got married at age 24.

23        **PRESIDING COMMISSIONER BIGGERS:**  Twenty four.

24   How did they get all these dates mixed up?  That's why

25   we have these hearings to get these records clear.  You

26   were married at age 24 and not 21?

27        **INMATE CALLOWAY:**  Yes, sir.

13

1          **PRESIDING COMMISSIONER BIGGERS:**  And you had,

2     you  had no children from this union, is that correct?

3          **INMATE CALLOWAY:**  (inaudible).

4          **PRESIDING COMMISSIONER BIGGERS:**  But you did

5     have three children (inaudible) from other --

6          **INMATE CALLOWAY:**  Previous (inaudible).

7          **PRESIDING COMMISSIONER BIGGERS:**  -- previous

8     situations, I guess that's what you call it.  Okay.

9     Are they all from the same lady?

10          **INMATE CALLOWAY:**  No, sir.

11          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And

12     probably two boys and girls, two girls and boy, or?

13          **INMATE CALLOWAY:**  Two girls and a boy.

14          **PRESIDING COMMISSIONER BIGGERS:**  Two girls and a

15     boy.  And where are they at this point?

16          **INMATE CALLOWAY:**  With their mother.

17          **PRESIDING COMMISSIONER BIGGERS:**  They're with

18     their mother?

19          **INMATE CALLOWAY:**  Yeah.

20          **PRESIDING COMMISSIONER BIGGERS:**  Are they in the

21     L.A. area as well?

22          **INMATE CALLOWAY:**  Yes, sir.

23          **PRESIDING COMMISSIONER BIGGERS:**  Do they come

24     and visit you at all?

25          **INMATE CALLOWAY:**  No, sir.

26          PRESIDING COMMISSIONER BIGGERS:  Okay.  How

27     often do you see them?

14

1        **INMATE CALLOWAY:** (inaudible) birthday and

2  holidays.

3        **PRESIDING COMMISSIONER BIGGERS:** Birthdays and

4  holidays?

5        **INMATE CALLOWAY:** Yeah.

6        **PRESIDING COMMISSIONER BIGGERS:** And the last

7  time you saw them?

8        **INMATE CALLOWAY:** It's been a while now.

9        **PRESIDING COMMISSIONER BIGGERS:** Been a while?

10       **INMATE CALLOWAY:** Yeah.

11       **PRESIDING COMMISSIONER BIGGERS:** But you write

12  and keep in contact with them?

13       **INMATE CALLOWAY:** Yes, sir.

14       **PRESIDING COMMISSIONER BIGGERS:** I see here that

15  your agreement drug was marijuana. Did you use on a

16  daily basis?

17       **INMATE CALLOWAY:** A lot of times, yeah.

18       **PRESIDING COMMISSIONER BIGGERS:** (inaudible).

19  Never drank alcohol and deny any other street drugs,

20  right?

21       **INMATE CALLOWAY:** Yeah.

22       **PRESIDING COMMISSIONER BIGGERS:** How did you get

23  involved with a gang affiliation?

24       **INMATE CALLOWAY:** Well I got, you know, brought

25  up in a tough neighborhood and gang violence

26 (inaudible).               PRESIDING COMMISSIONER BIGGERS

27       **PRESIDING COMMISSIONER BIGGERS:** Well, did you,

15

1    when did you first join?

2         INMATE CALLOWAY:  I'll say about (inaudible).

3         PRESIDING COMMISSIONER BIGGERS:  Were there any

4    other crimes that you committed or that you did get in

5    trouble for?

6         INMATE CALLOWAY:  (inaudible) I really can't

7    name it but I don't think I was too bad of a kid when I

8    was (inaudible) coming up.

9         PRESIDING COMMISSIONER BIGGERS:  Okay.  Well, I

10   can see that you had no prior.  And you were in a gang

11   from age 13 or 14.

12        INMATE CALLOWAY:  I kind of backed up as I got

13   older.  But, you know, I done change my lifestyle.

14        PRESIDING COMMISSIONER BIGGERS:  Okay.  And

15   that's this.  Again, I don't see too many people that

16   don't have that many priors.  You are, are you 42 years

17   of age now?

18        INMATE CALLOWAY:  Yes, sir.

19        PRESIDING COMMISSIONER BIGGERS:  You are, you

20   got one sister and two brothers?

21        INMATE CALLOWAY:  Yes, sir.

22        PRESIDING COMMISSIONER BIGGERS:  Okay.  And your

23   mom's still living?

24        INMATE CALLOWAY:  Yes, sir.

25        PRESIDING COMMISSIONER BIGGERS:  Father passed

26   away as. plus (inaudible) living...

27        INMATE CALLOWAY:  Yes, sir.

16

1        PRESIDING COMMISSIONER BIGGERS:  And you have

2    three kids?

3        INMATE CALLOWAY:  Yes, sir.

4        PRESIDING COMMISSIONER BIGGERS:  And you went to

5    continuation school you said?

6        INMATE CALLOWAY:  Yes, sir.

7        PRESIDING COMMISSIONER BIGGERS:  And you

8    graduated from that (inaudible)?

9        INMATE CALLOWAY:  Um-hmm.

10       PRESIDING COMMISSIONER BIGGERS:  Jobs, what kind

11   of jobs did you have prior to coming here?

12       INMATE CALLOWAY:  I used to do a lot of summer

13   jobs like WOCAC (phonetic), stuff like that.

14       PRESIDING COMMISSIONER BIGGERS:  What does that

15   mean?  I'm sorry.

16       INMATE CALLOWAY:  That's a (inaudible).  I

17   worked there three times in the summer time, a little

18   summer job.

19       PRESIDING COMMISSIONER BIGGERS:  And what were

20   you doing?

21       INMATE CALLOWAY:  (inaudible) fields and

22   (inaudible).

23       PRESIDING COMMISSIONER BIGGERS:  Okay.  Is there

24   anything that you'd like to add to the social or you

25   don't have any prior.  Is there anything that I missed

26   on the social aspect that you want to get into the

27   record?

17

1      **INMATE CALLOWAY:** Not really, not really.

2      **PRESIDING COMMISSIONER BIGGERS:** Not really.

3  Are you engaged or anything at this point?

4      **INMATE CALLOWAY:** I'm married.

5      **PRESIDING COMMISSIONER BIGGERS:** I was wondering

6  if you were listening to me because you seem to be

7  just, all right. I'm going to ask the deputy

8  commissioner to go through the post-conviction factors.

9      **DEPUTY COMMISSIONER ARMENTA:** (inaudible).

10     **INMATE CALLOWAY:** Um-hmm.

11     **DEPUTY COMMISSIONER ARMENTA:** In prison since

12  you were received, 9/16/1983, we primarily covered was

13  your last hearing but there's another (inaudible) for

14  the back. You had your last hearing on April 25th of

15  the year 2000 and at that time you were denied the five

16  years.

17     **INMATE CALLOWAY:** Okay.

18     **DEPUTY COMMISSIONER ARMENTA:** I have gone over

19  your C File and gone over the reports. Looks like you

20  (inaudible)?

21     **INMATE CALLOWAY:** Yes, sir.

22     **DEPUTY COMMISSIONER ARMENTA:** That's the life

23  prisoner's evaluation report with a date of April

24  (inaudible). Also I've gone over the, what is normally

25  the post-conviction progress report prepared by

26  correctional counselors Allison as well as Trebaker

27  (phonetic). I've got your psychological report by

18

1   Dr. Macomber, M-A-C-O-M-B-E-R dated July 2006.  At the

2   present time your scores are down to the minimum of 19.

3   And as far as training, you did your training.  You

4   have a number of certificates, (inaudible) computer-

5   aided --

6           INMATE CALLOWAY:  Construction.

7           DEPUTY COMMISSIONER ARMENTA:  -- construction

8   certificate of completion dated August 26, 2005.

9   (Inaudible) entrepreneur?

10          INMATE CALLOWAY:  (inaudible)

11          DEPUTY COMMISSIONER ARMENTA:  Entrepreneur

12  development.  Here we are.  Certificate of completion

13  dated August 25th, boy it's hot from the press, huh?

14  These are - how long was the course?

15          INMATE CALLOWAY:  It was eight weeks.

16          DEPUTY COMMISSIONER ARMENTA:  Eight weeks?

17          INMATE CALLOWAY:  Yeah, eight weeks (inaudible).

18          DEPUTY COMMISSIONER ARMENTA:  (inaudible).  What

19  did you learn from that?

20          INMATE CALLOWAY:  (inaudible).

21          DEPUTY COMMISSIONER ARMENTA:  (inaudible)?

22          INMATE CALLOWAY:  Yeah.

23          DEPUTY COMMISSIONER ARMENTA:  Did they talk to

24  you about (inaudible)?

25          INMATE CALLOWAY:  Yeah.

26          DEPUTY COMMISSIONER ARMENTA:  Marketing?

27          INMATE CALLOWAY:  Yeah.

19

1          DEPUTY COMMISSIONER ARMENTA:  It is to, you

2     would know whether it was feasible or not?

3          INMATE CALLOWAY:  Yes, sir.

4          DEPUTY COMMISSIONER ARMENTA:  Marketing --

5          INMATE CALLOWAY:  The marketability.

6          DEPUTY COMMISSIONER ARMENTA:  The (inaudible)?

7          INMATE CALLOWAY:  (inaudible).

8          DEPUTY COMMISSIONER ARMENTA:  (inaudible).

9          INMATE CALLOWAY:  (inaudible) certificates.

10         DEPUTY COMMISSIONER ARMENTA:  The building, the

11    (inaudible), the (inaudible)?

12         INMATE CALLOWAY:  Yeah.

13         DEPUTY COMMISSIONER ARMENTA:  Yeah, I know

14    you're taking those course and (inaudible).  I would

15    think that that's all we need at this time.  Okay.  You

16    also have a certificate completed for AVE, one class.

17    You've also been very involved in WCF (phonetic)?

18         INMATE CALLOWAY:  Yes, I have.

19         DEPUTY COMMISSIONER ARMENTA:  Let me, I have

20    here that you did graduate from high school in 1983?

21         INMATE CALLOWAY:  That's right.

22         DEPUTY COMMISSIONER ARMENTA:  Jordan High School

23         INMATE CALLOWAY:  That's right.

24         INMATE CALLOWAY:  That's in L.A.?

25         INMATE CALLOWAY:  Yes, sir.

26         DEPUTY COMMISSIONER ARMENTA:  And after that you

27    took your GED?

20

1        **INMATE CALLOWAY:** (inaudible).

2        **DEPUTY COMMISSIONER ARMENTA:** (inaudible) Let me

3    show you.  In 1997?

4        **INMATE CALLOWAY:** (inaudible).

5        **DEPUTY COMMISSIONER ARMENTA:** Yeah.  I would

6    think that you were happy to be, you graduated.

7        **INMATE CALLOWAY:** (inaudible).

8        **DEPUTY COMMISSIONER ARMENTA:** That was in one of

9    the reports, could be one of the many letters that

10   we're finding in some of our reports.  Yeah, and I was

11   kind of wondering about that.  After I'm done, I might

12   want to look that up again.

13       **INMATE CALLOWAY:** (inaudible).

14       **DEPUTY COMMISSIONER ARMENTA:** Then you

15   participated in NA?

16       **INMATE CALLOWAY:** I (inaudible).

17       **DEPUTY COMMISSIONER ARMENTA:** (inaudible) in

18   2003?

19       **INMATE CALLOWAY:** Exactly.

20       **DEPUTY COMMISSIONER ARMENTA:** You've also taken

21   a lot of health-related courses.

22       **INMATE CALLOWAY:** Yes, I'm conscious about my

23   health.

24       **DEPUTY COMMISSIONER ARMENTA:** Okay.

25       **INMATE CALLOWAY:** You know.

26       **DEPUTY COMMISSIONER ARMENTA:** Deputy Commissioner Armenta, re

27       **INMATE CALLOWAY:** (inaudible).

21

1        **DEPUTY COMMISSIONER ARMENTA:**  Then you also

2    completed a course called father for two?

3        **INMATE CALLOWAY:**  Yes, sir.

4        **DEPUTY COMMISSIONER ARMENTA:**  In the area of

5    115's, you have two?

6        **INMATE CALLOWAY:**  Yes, sir.

7        **DEPUTY COMMISSIONER ARMENTA:**  None in the last

8    five years.  You've had, you actually got one right

9    (inaudible) huh?

10        **INMATE CALLOWAY:**  Um-hmm.

11        **DEPUTY COMMISSIONER ARMENTA:**  One at that time,

12    a couple of months prior.

13        **INMATE CALLOWAY:**  (inaudible).

14        **DEPUTY COMMISSIONER ARMENTA:**  Okay.  And that

15    was for failure to report for assignment.

16        **INMATE CALLOWAY:**  Yes.

17        **DEPUTY COMMISSIONER ARMENTA:**  And before that

18    you haven't had any in a while.

19        **INMATE CALLOWAY:**  Yeah.

20        **DEPUTY COMMISSIONER ARMENTA:**  Is this correct,

21    the last one before that was in 1991?

22        **INMATE CALLOWAY:**  Yes, sir.

23        **DEPUTY COMMISSIONER ARMENTA:**  Well, that was

24    still two years (inaudible).

25        **INMATE CALLOWAY:**  (inaudible).

**DEPUTY COMMISSIONER ARMENTA:**

27    (inaudible) in 15 years and then that time only one in

22

1    10 years.  You have a couple of 128's.  They both were

2    the same, disobeying orders.  And both of them are also

3    in 1995.  And (inaudible)?

4         **INMATE CALLOWAY:**  (inaudible).

5         **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  And your

6    courses, you (inaudible) the computer?

7         **INMATE CALLOWAY:**  Yes.

8         **DEPUTY COMMISSIONER ARMENTA:**  Only a couple of

9    years.

10        **INMATE CALLOWAY:**  (inaudible).

11        **DEPUTY COMMISSIONER ARMENTA:**  I have here that

12   you also worked in the working crew and you also worked

13   in the kitchen?

14        **INMATE CALLOWAY:**  That's right.

15        **DEPUTY COMMISSIONER ARMENTA:**  Have you had other

16   jobs?

17        **INMATE CALLOWAY:**  Porter jobs, just Porter jobs.

18        **DEPUTY COMMISSIONER ARMENTA:**  You've been a

19   Porter, yeah?

20        **INMATE CALLOWAY:**  Yeah, you know.

21        **DEPUTY COMMISSIONER ARMENTA:**  I have here that I

22   got this chrono from you.  "Inmate Calloway has

23   successfully completed a 18-week seminar on how to

24   become a sober father and not get enemies."  This

25   (inaudible) training class?

26        **INMATE CALLOWAY:**  The training class.

27        **DEPUTY COMMISSIONER ARMENTA:**  When you say 18

1   weeks, is that once a week or?

2          **INMATE CALLOWAY:**  Once, yeah.  No, every, we go

3   once a week for four weeks out of the month.  We do it

4   every Thursday morning.

5          **DEPUTY COMMISSIONER ARMENTA:**  Oh, okay.  So that

6   also covers here in saying anger management?

7          **INMATE CALLOWAY:**  Yes, sir.

8          **DEPUTY COMMISSIONER ARMENTA:**  Anger management

9   and other (inaudible) of phase II (inaudible) addiction

10  recovery program?

11         **INMATE CALLOWAY:**  No, (inaudible).

12         **DEPUTY COMMISSIONER ARMENTA:**  Okay.  According

13  to the psychological report under diagnostic

14  impression, Axis I, it says, "No mental disorder.  Axis

15  II no personality disorder."  Axis III, you have no

16  physical disorder.  So, Axis IV is the area of stress

17  is due to your long-term and you had a functional score

18  of 85.  Under Section 14 which is the assessment of

19  dangerousness, he considers potential for dangerous

20  behavior in the institution,

21              "Mr. Calloway has never been involved in

22              serious disciplinaries.  At this time

23              we're experiencing racial riots at the

24              prison.  He's never been involved in any

25              of the facilities (inaudible), possession

26              of weapons, assaults on others or other

27              serious disciplinaries.  By nature he

24

1          appears to be a gentle, passive

2          individual who is not at all aggressive

3          for violence.  In comparison to other

4          inmates potential for dangerous behavior

5          is definitely below average.  The

6          continued potential for dangerous

7          behavior when release to the community,

8          the level of service (inaudible) advice

9          of the ministry."

10   This is an actuarial measure, that assessment.  Criminal

11   history, substance abuse history.  Current attitude

12   (inaudible) in prison in order to determine current risk

13   levels on parole.  He obtains 0.9 (inaudible).  This

14   course means that there's a hundred (inaudible) release.

15   On parole, he would be expected to do better on parole

16   than 99 of them.  This is a very low risk level.  That's

17   what he saw.  He poses no more risk to society than the

18   average citizen in the community.  Okay.  Sir, I covered

19   the information I got from you and what I found from

20   your C File.  You have certificates in some of those

21   courses I mentioned.  But for example (inaudible)

22   certificate of completion (inaudible) instruction; a

23   certificate of completion ABE, we did mention that; a

24   certificate of achievement for (inaudible) curriculum,

25   arts, Level A.  And we have your diploma from high

26   school.  I'm sorry, remember I asked you about your GED?

27          **INMATE CALLOWAY:**  Um-hmm.

25

1          **DEPUTY COMMISSIONER ARMENTA:**  I have it here,

2    Paul Calloway.

3          **INMATE CALLOWAY:**  I (inaudible).

4          **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  You got

5    sick?

6          **INMATE CALLOWAY:**  (inaudible).

7          **DEPUTY COMMISSIONER ARMENTA:**  Unless there's two

8    people with the same name.

9          **INMATE CALLOWAY:**  (inaudible) with my name

10   (inaudible) same last name.

11         **DEPUTY COMMISSIONER ARMENTA:**  Yeah.  There are

12   two of you on the yard?

13         **INMATE CALLOWAY:**  Yeah.

14         **DEPUTY COMMISSIONER ARMENTA:**  I don't know.

15   That's probably his.

16         **INMATE CALLOWAY:**  (inaudible).

17         **DEPUTY COMMISSIONER ARMENTA:**  Okay.

18   (Inaudible).  I mean if you say (inaudible).

19         **INMATE CALLOWAY:**  (inaudible).

20         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I have a

21   question for you too, then Mr. Calloway.  I asked you

22   about (inaudible) and you told me you didn't have any.

23         **INMATE CALLOWAY:**  I said not to my knowledge.

24         **PRESIDING COMMISSIONER BIGGERS:**  Do you recall

25   your 2001 Board report?

26         **INMATE CALLOWAY:**  I think so.  (inaudible)

27         **PRESIDING COMMISSIONER BIGGERS:**  Do you recall

1  telling the commissioner that you had actually two or
2  three, when you were in juvenile? One was (inaudible)
3  assault with a deadly weapon?

4        **INMATE CALLOWAY:** (inaudible).

5        **PRESIDING COMMISSIONER BIGGERS:** Okay. Was that
6  true or not?

7        **INMATE CALLOWAY:** That was true.

8        **PRESIDING COMMISSIONER BIGGERS:** Well, why did
9  you tell me you didn't have any?

10       **INMATE CALLOWAY:** That's been so long ago and I
11 forgot those.

12       **PRESIDING COMMISSIONER BIGGERS:** You forgot.

13       **INMATE CALLOWAY:** I was like 13 or 14 years old
14 (inaudible).

15       **PRESIDING COMMISSIONER BIGGERS:** Well, and then
16 I asked you if you were arrested for it, you said,
17 "Yes." And what other arrest (inaudible). I don't
18 think (inaudible) that bad. I think you said it was
19 about two or three times. And then you (inaudible)
20 weapon. Do you recall what happened? Why did you get
21 arrested was it assault with a deadly weapon?

22       **INMATE CALLOWAY:** (inaudible).

23       **INMATE CALLOWAY:** It's been so long ago, right?
24 (Inaudible) I just don't --

25       **PRESIDING COMMISSIONER BIGGERS:** You don't know
26 what, you can't tell me anything about INMATE CALLOWAY:
27 when I looked at the Board report it (inaudible). So,

27

1   let me go back and check one other place here, just in

2   (inaudible). Even in the probationer officer's report

3   it doesn't show (inaudible) summary. It says here

4   that, I don't see anything there. I thought, well,

5   this must be something that you were thinking about?

6       **INMATE CALLOWAY:** Well, I was (inaudible), in

7   (inaudible) I (inaudible) nothing serious.

8       **PRESIDING COMMISSIONER BIGGERS:** Okay. Well,

9   assault with a deadly weapon is not serious?

10       **INMATE CALLOWAY:** (inaudible).

11       **DEPUTY COMMISSIONER ARMENTA:** No, it's in the C

12   File.

13       **PRESIDING COMMISSIONER BIGGERS:** Okay. There it

14   says that this is (inaudible).

15       **DEPUTY COMMISSIONER ARMENTA:** No, I'm right,

16   it's here. (Inaudible) available. I'm pretty sure

17   that (inaudible) consist of arrest or a conviction for

18   assault with a deadly weapon --

19       **PRESIDING COMMISSIONER BIGGERS:** And murder II.

20       **DEPUTY COMMISSIONER ARMENTA:** -- and murder II.

21   No prior criminal term.

22       **PRESIDING COMMISSIONER BIGGERS:** What was the

23   murder II for?

24       **INMATE CALLOWAY:** I don't have, I ain't had no

25   murder when I was 11 years old.

26       **PRESIDING COMMISSIONER BIGGERS:** An issue we (inaudible) through

27   stated there. The way it was written (inaudible).

28

1    Okay.  I'm going to now look at your parole plans and

2    you indicated that your primary program is to go to one

3    of the (inaudible) in Chattanooga, Tennessee?

4          INMATE CALLOWAY:  Yes.

5          PRESIDING COMMISSIONER BIGGERS:  You know,

6    there's a (inaudible) for that, don't you?

7          INMATE CALLOWAY:  Yes, I don't have to stay in

8    California (inaudible).

9          PRESIDING COMMISSIONER BIGGERS:  Right, but you

10   can petition as you work with your parole officer to

11   see if Tennessee would be willing to supervise your

12   parole if you were out there.  And then they would work

13   out something in the event if you were accepted.  Why

14   aren't you, why aren't you staying with your wife?

15         INMATE CALLOWAY:  We're kind of separated right

16   now.  She got lonely after 17 years.

17         PRESIDING COMMISSIONER BIGGERS:  Well, I told

18   you, I asked you (inaudible).  You said well, you're

19   married but --

20         INMATE CALLOWAY:  We still keep in contact.

21   It's just about like, you know, (inaudible).

22         PRESIDING COMMISSIONER BIGGERS:  And if you

23   parole to the State of California you plan on staying

24   with a family friend by the name of Ms. Effie Bullar,

25   B-U-L-L-A-R?

26         INMATE CALLOWAY:  Effie Bullar.

27         PRESIDING COMMISSIONER BIGGERS:  Okay.  And who

29

1  is she?

2          **INMATE CALLOWAY:**  She a good friend of mine.

3          **PRESIDING COMMISSIONER BIGGERS:**  Good friend of

4  yours?

5          **INMATE CALLOWAY:**  Um-hmm.

6          **PRESIDING COMMISSIONER BIGGERS:**  (inaudible)

7          **INMATE CALLOWAY:**  Yeah.

8          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  How

9  about employment, you don't have any specific

10  employment at this time?

11          **INMATE CALLOWAY:**  (inaudible).

12          **PRESIDING COMMISSIONER BIGGERS:**  (inaudible).

13  And I agree with the officer, this happened (inaudible)

14  January, 25th.  (Inaudible) employment report.

15          **INMATE CALLOWAY:**  Yeah.

16          **PRESIDING COMMISSIONER BIGGERS:**  And Ms. Bullar

17  owns a childcare center and he's willing to hire you as

18  a childcare provider assistant?

19          **INMATE CALLOWAY:**  Just I would clean up some

20  around there after everybody leave.

21          **PRESIDING COMMISSIONER BIGGERS:**  You know that

22  you have to, it may be hard for her to do that because

23  if she's running a child, that type of business

24  requires background checks and a whole lot of other

25  stuff, or you have to be certified.

26          **INMATE CALLOWAY:**  Okay.      INMATE CALLOWA

27          **PRESIDING COMMISSIONER BIGGERS:**  So, she may not

1  be able to hire you for anything that would do with her

2  childcare business. That's possible, I don't know. Is

3  she's a certified --

4        **INMATE CALLOWAY:** Yes, she is.

5        **PRESIDING COMMISSIONER BIGGERS:** -- what age

6  group of kids does she keep?

7        **INMATE CALLOWAY:** Well, she keeps them from five

8  to eleven, something like that.

9        **PRESIDING COMMISSIONER BIGGERS:** Okay. And does

10 she have any, does she do it by herself or does she

11 have any other --.

12       **INMATE CALLOWAY:** It's some other workers.

13       **PRESIDING COMMISSIONER BIGGERS:** -- Okay. Well,

14 that may be something that she, she's going to have to

15 check into because she's certified to do this by the

16 State that means she has to be bonded and she also has

17 to be insured and everybody pass a investigation.

18       **INMATE CALLOWAY:** Um-hmm.

19       **PRESIDING COMMISSIONER BIGGERS:** Okay. All

20 right. At this point, I'm going to go to the letters

21 of support. And I'll start with the one that you just

22 got here. I see there is also a petition. It said you

23 (inaudible). Who started the petition?

24       **INMATE CALLOWAY:** (inaudible).

25       **PRESIDING COMMISSIONER BIGGERS:** Okay. And I'll

26 read the letter. Ms. Bullar says that she wrote to you

27 earnestly. My name is Effie Bullar. I'm a friend of

31

```
 1   Paul Calloway who is an inmate here at CTF, (inaudible)
 2   for a crime he didn't commit.  He's always refused to
 3   commit to the murder (inaudible) court (inaudible)
 4   seven years to life."  And she basically said
 5   (inaudible) on eye witness report stated at the crime
 6   scene (inaudible) in a few months.  It says she was
 7   recently able to contact the eyewitness named Claudia
 8   who saw what took place the day the victim
 9   (inaudible)."  What have you done on this (inaudible)?
10          INMATE CALLOWAY:  It's in the (inaudible) with
11   Delancey Project it's, you know, to try and see if they
12   could help me out as much as (inaudible) could.
13          PRESIDING COMMISSIONER BIGGERS:  Have you heard
14   anything from them?
15          INMATE CALLOWAY:  Not yet.
16          PRESIDING COMMISSIONER BIGGERS:  Okay.  And
17   that's one of the reasons why you didn't talk about
18   your family, then, is that correct?
19          INMATE CALLOWAY:  Yes, sir.
20          PRESIDING COMMISSIONER BIGGERS:  Well, I think
21   this is all good, and all well and good, but this is an
22   administrative hearing primarily for to see if you are
23   in fact suitable for parole.  To send a petition like
24   this, we have to go on the record, you have, you pled
25   guilty.  Why did you plead guilty?
26          INMATE CALLOWAY:  I pled guilty because they was
27   telling me to.
```

32

1       **PRESIDING COMMISSIONER BIGGERS:**  You pled guilty
2   to involuntary manslaughter --

3       **INMATE CALLOWAY:**  Manslaughter.

4       **PRESIDING COMMISSIONER BIGGERS:**  -- of a 7-year-
5   old girl.  Convicted by the jury of second-murder.
6   (Inaudible).

7       **ATTORNEY SPARKS:**  He didn't do it.  (Inaudible)
8   case (inaudible).

9       **INMATE CALLOWAY:**  (inaudible) for something I
10  didn't do.

11      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Well,
12  that was also discussed in your last, at your last
13  Panel as to why you pled guilty you said because of
14  your attorney.  And I also saw in there that there were
15  numerous for lack of a better term, there were
16  indications that somebody also found (inaudible)
17  something to that effect.  Is that correct?

18      **INMATE CALLOWAY:**  Yes, sir.

19      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I have
20  some letters that were given to me by your attorney.
21  The first one is from the Gonzalez brothers and it's
22  dated 5/06.  It says, "There is A request from a
23  fellow, family friend of Mr. Paul Calloway.  He is
24  (inaudible) a family friend.  The Gonzalez family, the
25  gentleman was to relate all the (inaudible).  Paul was
26  raised with respect for authority and he'd be respectful
27  (inaudible) in his community (inaudible).  He was

33

1  surrounded in (inaudible).  The Gonzalez brothers.  How
2  do you know them?

3      **INMATE CALLOWAY:**  We grew up together.

4      **PRESIDING COMMISSIONER BIGGERS:**  Grew up
5  together?

6      **INMATE CALLOWAY:**  (inaudible).

7      **PRESIDING COMMISSIONER BIGGERS:**  Okay.
8  (Inaudible).  A letter dated April 5' 2006 from a
9  Mr. Luke Calloway.  Is that your brother?

10      **INMATE CALLOWAY:**  That's my nephew.

11      **PRESIDING COMMISSIONER BIGGERS:**  Nephew.  He's
12  20 years old and about to turn 21 on April 26th so he's
13  now 21.  Writing now for my uncle who was a father to
14  me when I didn't have a dad.  I was advised that
15  (inaudible) or anything I set my heart on.  One
16  (inaudible) is to become a professional basketball
17  player and when I was on the court playing, I
18  (inaudible) possible.  (Inaudible) and he says that you
19  have been locked up, he's felt lonely and rejected but
20  (inaudible).  He said that he'd probably get in trouble
21  mainly because you're not there to keep him out of
22  trouble.

23      **INMATE CALLOWAY:**  (inaudible).

24      **PRESIDING COMMISSIONER BIGGERS:**  And (inaudible)
25  he would act up?

26      **INMATE CALLOWAY:**  I was real proud of him.  So
27  I'm very proud of him.

34

1    **PRESIDING COMMISSIONER BIGGERS:**  Okay.  But it's

2    obvious that he respects you a lot because he's

3    admitting a lot of things here that are negative but

4    (inaudible) that I know that you probably find very

5    (inaudible).  There's another letter dated 2/6/06 and

6    this is from Camelia Avarez (phonetic)?

7    **INMATE CALLOWAY:**  Carmen.

8    **PRESIDING COMMISSIONER BIGGERS:**  Carmen, it's

9    hard to read.  You made a copy of this (inaudible)?

10    **INMATE CALLOWAY:**  Counsel made a copy.

11    **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I need

12    to tell them to put some more ink in there so we can

13    see it.  Carmen Avarez is a good friend of yours and

14    she's known you for over 20 years.  She'll call you a

15    very dear friend.  She says you have family and friends

16    that are praying for him on a daily basis and until we

17    give you a chance for parole to be a productive

18    citizen.  I have another letter from Paula and also

19    Carl.  This is your sister, right?

20    **INMATE CALLOWAY:**  Yes.

21    **PRESIDING COMMISSIONER BIGGERS:**  And she hopes

22    that we will find it in our heart to forgive my brother

23    and set him free.

24                        (Tape two)

25    **PRESIDING COMMISSIONER BIGGERS:**  You indicated

26    that your primary parole (inaudible) his to go with your

27    mother back in Chattanooga, Tennessee?

35

1          **INMATE CALLOWAY:**  Yes.

2          **PRESIDING COMMISSIONER BIGGERS:**  You know the

3   procedure for that don't you?

4          **INMATE CALLOWAY:**  I'm trying to find out.  They

5   supposed to be trying to (inaudible) parole.

6          **PRESIDING COMMISSIONER BIGGERS:**  But (inaudible)

7   you work with your parole officer and see if Tennessee

8   will be willing to supervise your parole if you're out

9   there.

10         **INMATE CALLOWAY:**  Okay.

11         **PRESIDING COMMISSIONER BIGGERS:**  And they will

12  work out something if Tennessee will accept you.  What

13  did you, why aren't you staying with your wife?

14         **INMATE CALLOWAY:**  Because I'm separated right

15  now.  It gets kind of lonely after 17 years.

16         **PRESIDING COMMISSIONER BIGGERS:**  Well, I told

17  you, I asked you a few minutes ago, you said well,

18  we're married but --

19         **INMATE CALLOWAY:**  We still keep in contact.

20  It's just about like, you know, (inaudible).

21         **PRESIDING COMMISSIONER BIGGERS:**  And if you

22  parole to the State of California you plan to stay with

23  a family member.  Her name is Effie Bullar, B-U-L-L-A-

24  R?

25         **INMATE CALLOWAY:**  Effie Bullar.

26         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  And where

27  is she?

36

1          **INMATE CALLOWAY:**  She a good friend of mine.

2          **PRESIDING COMMISSIONER BIGGERS:**  Good friend of

3  yours?

4          **INMATE CALLOWAY:**  Um-hmm.

5          **PRESIDING COMMISSIONER BIGGERS:**  (inaudible)

6          **INMATE CALLOWAY:**  Yeah.

7          **PRESIDING COMMISSIONER BIGGERS:**  Okay.  How

8  about employment, you don't have any specific

9  employment at this time?

10          **INMATE CALLOWAY:**  (inaudible).

11          **PRESIDING COMMISSIONER BIGGERS:**  (inaudible).

12  And I agree with the officer, this happened (inaudible)

13  January, 25th.  (Inaudible) employment report.

14          **INMATE CALLOWAY:**  Yeah.

15          **PRESIDING COMMISSIONER BIGGERS:**  And Ms. Bullar

16  owns a childcare center and he's willing to hire you as

17  a childcare provider assistant?

18          **INMATE CALLOWAY:**  Just I would clean up some

19  around there after everybody leave.

20          **PRESIDING COMMISSIONER BIGGERS:**  You know that

21  you have to, it may be hard for her to do that because

22  if she's running a child, that type of business

23  requires background checks and a whole lot of other

24  stuff, or you have to be certified.

25          **INMATE CALLOWAY:**  Okay.

26          **PRESIDING COMMISSIONER BIGGERS:**  So she wouldn't

27  be able to hire you for anything that would do with her

1    childcare business.  That's possible, I don't know.  Is
2    she's a certified --
3              INMATE CALLOWAY:  Yes, she is.
4              PRESIDING COMMISSIONER BIGGERS:  -- what age
5    group of kids does she keep?
6              INMATE CALLOWAY:  Well, she keeps them from five
7    to eleven, something like that.
8              PRESIDING COMMISSIONER BIGGERS:  Okay.  And does
9    she have any, does she do it by herself or does she
10   have any other --.
11             INMATE CALLOWAY:  It's some other workers.
12             PRESIDING COMMISSIONER BIGGERS:  -- Okay.  Well,
13   that may be something that she, she's going to have to
14   check into because she's certified to do this by the
15   State that means she has to be bonded and she also has
16   to be insured and everybody pass a investigation.
17             INMATE CALLOWAY:  Um-hmm.
18             PRESIDING COMMISSIONER BIGGERS:  Okay.  All
19   right.  At this point, I'm going to go to your letters
20   of support.  And I'll start with the one that we
21   (inaudible) back here.  I see there is also a petition.
22   It said that you were wrongly convicted.  Who started
23   the petition?
24             INMATE CALLOWAY:  (inaudible).
25             PRESIDING COMMISSIONER BIGGERS:  Okay.  And I'll
26   read the letter.  Ms. Bullar says that PRESIDING COMMISSIONER BIGGERS
27   earnestly.  My name is Effie Bullar.  I'm a friend of

38

1    Paul Calloway who is an inmate here at CTF, (inaudible)
2    seven-and-a-half years for a crime he didn't commit.
3    He's always refused to commit to the murder (inaudible)
4    court (inaudible) seven years to life." And she
5    basically said (inaudible) on eye witness report stated
6    at the crime scene (inaudible) in a few months. It
7    says she was recently able to contact the eyewitness
8    named Claudia who saw what took place the day the
9    victim (inaudible)." What have you done on this
10   (inaudible)?

11       **INMATE CALLOWAY:** It's in the (inaudible) with
12   Delancey Project it's, you know, to try and see if they
13   could help me out as much as (inaudible) could.

14       **PRESIDING COMMISSIONER BIGGERS:** Have you heard
15   anything from them?

16       **INMATE CALLOWAY:** Not yet.

17       **PRESIDING COMMISSIONER BIGGERS:** Okay. And
18   that's one of the reasons why you didn't talk about
19   your family, then, is that correct?

20       **INMATE CALLOWAY:** Yes, sir.

21       **PRESIDING COMMISSIONER BIGGERS:** Well, I think
22   this is all good, and all well and good, but this is an
23   administrative hearing primarily for to see if you are
24   in fact suitable for parole. To send a petition like
25   this, we have to go on the record, you have, you pled
26   guilty, why did you plead guilty?

27       **INMATE CALLOWAY:** I pled guilty; my attorney was

39

1    telling me to.

2         **PRESIDING COMMISSIONER BIGGERS:**  You pled guilty

3    to the voluntary manslaughter --

4         **INMATE CALLOWAY:**  Manslaughter.

5         **PRESIDING COMMISSIONER BIGGERS:**  -- of a 7-year-

6    old girl.  Convicted by the jury of second-murder.

7    (Inaudible).

8         **PRESIDING COMMISSIONER BIGGERS:**  He didn't do

9    it.  (Inaudible) case (inaudible).

10        **INMATE CALLOWAY:**  (inaudible) for something I

11   didn't do.

12        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Well,

13   that was also discussed in your last, at your last

14   Panel as to why you pled guilty you said because of

15   your attorney.  And I also saw in there that there were

16   numerous for lack of a better term, there were

17   indications that somebody also found (inaudible)

18   something to that effect.  Is that correct?

19        **INMATE CALLOWAY:**  Yes, sir.

20        **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I have

21   some letters that were given to me by your attorney.

22   The first one is from the Gonzalez brothers and it's

23   dated 5/06.  It says, "There is a request from a

24   fellow, family friend of Mr. Paul Calloway.  He is

25   (inaudible) a family friend.  The Gonzalez family, the

26   gentleman was to relate all the (inaudible) Paul who's

27   raised with respect for authority man, no disrespectful

41

1    I'm very proud of him.

2            **PRESIDING COMMISSIONER BIGGERS:**  Well, it's

3    obvious that he respects you a lot because he's

4    admitting a lot of things here that are negative but

5    (inaudible) that I know that you probably find very

6    (inaudible).  There's another letter dated 2/6/06 and

7    this is from Camelia Avarez (phonetic)?

8            **INMATE CALLOWAY:**  Carmen.

9            **PRESIDING COMMISSIONER BIGGERS:**  Carmen, it's

10   hard to read.  You made a copy of this (inaudible)?

11           **INMATE CALLOWAY:**  Counsel made a copy.

12           **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I need

13   to tell them to put some more ink in there so we can

14   read it.  Carmen Avarez.  She's a good friend of yours

15   and she's known you for over 20 years.  She'll call you

16   a very dear friend.  She says you have family and

17   friends that are praying for him on a daily basis and

18   until we give you a chance for parole to be a

19   productive citizen.  I have another letter from Paula

20   and also Carl.  This is your sister, right?

21           **INMATE CALLOWAY:**  Yes.

22           **PRESIDING COMMISSIONER BIGGERS:**  And she hopes

23   that you will find, well we will, in our heart to

24   forgive my brother and set him free.

25           **PRESIDING COMMISSIONER BIGGERS:**  This is dated

26   (inaudible) here on the front of the letter but it's

27   dated from (inaudible) February 2006, February 3, '06.

42

1    This talks about the (inaudible) witnesses (inaudible)
2    up for whatever this case and that talks about having
3    you falsely accused and that you are a (inaudible) and
4    that (inaudible) will come forward (inaudible).  All
5    right.  This is a letter from your mom.  There is no
6    date on it.  But she says that I'm a Paul Calloway's
7    mother.  As a mother I feel my son is not guilty.
8    (Inaudible) person.  He was just in the wrong place.
9    My son (inaudible).  Please excuse the error for
10   writing this (inaudible) my son free.  (Inaudible) he
11   was found guilty (inaudible).  (Inaudible) A copy of
12   the letter from Ms. Bullar without the petition.  It's
13   an older letter dated February 6, 2006.  Again she
14   talks about how (inaudible) supportive.  (Inaudible)
15   demonstrate courage, perseverance and (inaudible) in
16   the opposite direction and a role model (inaudible).
17   (Inaudible).  Further the letter suggests that by
18   granting you parole you (inaudible) that you will
19   (inaudible) positive in the prison system which you
20   have an exemplary record over the last 17 years.
21   (Inaudible) someone else (inaudible).  The first letter
22   (inaudible) petition.  And she started that as well.
23   Did I miss something in going through your letters
24   (inaudible) anybody got a place for you to stay?
25   (Inaudible).
26          ATTORNEY SPARKS:  I didn't see (inaudible)
27   either.

43

1          **PRESIDING COMMISSIONER BIGGERS:**  I didn't see

2     anything in there that talked about you have a place to

3     live.  Let me go back through here and look

4     (inaudible).  Who's it from?

5          **INMATE CALLOWAY:**  Actually the (inaudible).

6          **PRESIDING COMMISSIONER BIGGERS:**  (inaudible)?

7          **ATTORNEY SPARKS:**  Yeah.  It's just the

8     (inaudible) right here.

9          **PRESIDING COMMISSIONER BIGGERS:**  And Ms. Bullar

10    wrote a letter to the governor on July 6th that I will

11    read in to the record also.  And she said, "Dear

12    Governor Schwarzenegger, the man whose name is listed

13    above will go before the Board of Parole, Board of

14    Prison Terms.  He will be seen in a few months from

15    now.  He's (inaudible) seven-and-a-half years to live

16    in prison.  And mistakenley I witnessed a (inaudible).

17    He has served time for a crime he didn't commit.  As an

18    inmate of the California (inaudible) he has done

19    everything possible to (inaudible) society and

20    rehabilitate himself (inaudible).  Mr. Calloway

21    (inaudible) was innocent the whole entire time of his

22    prison stay (inaudible) to society and (inaudible) will

23    all prove (inaudible) with respect to community and

24    (inaudible).  Paul Calloway's parole (inaudible)

25    citizen should be found suitable for parole.  So

26    clearly (inaudible).  Furthermore all lifers (inaudible).

27    lifers (inaudible) are less than one percent.  These

44

1  (inaudible) the safest man in (inaudible) in

2  California.  How did she come up with a one percent?

3          INMATE CALLOWAY:  (inaudible).

4          PRESIDING COMMISSIONER BIGGERS:  I'd say she's

5  wrong on that one.  Then I got the letter here from

6  Ruth.  And I also have a letter from the Calloway

7  brothers, I mean the --

8          INMATE CALLOWAY:  Gonzalez brothers?

9          PRESIDING COMMISSIONER BIGGERS:  From

10  (inaudible) each --

11          INMATE CALLOWAY:  I think it might be somewhere

12  in that, I have the Bullar letter.

13          PRESIDING COMMISSIONER BIGGERS:  Well,

14  (inaudible).  Let's go over some stuff about you about

15  you being a role model and (inaudible) operated a

16  (inaudible) three letters and one February 6th, 2006.

17  You (inaudible)?

18          INMATE CALLOWAY:  (inaudible).

19          PRESIDING COMMISSIONER BIGGERS:  (inaudible)

20  there's a April 5th letter as well.  No that's from your

21  nephew.

22          INMATE CALLOWAY:  You got some --

23          ATTORNEY SPARKS:  (inaudible).

24          PRESIDING COMMISSIONER BIGGERS:  Okay.

25          ATTORNEY SPARKS:  She recently has a, I have

26  recently purchased a duplex (inaudible).  In one unit

27  it has (inaudible) another family.  But (inaudible)

45

1    Mr. Calloway to examine upon his release.

2         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Do you

3    have any job offers?

4         **INMATE CALLOWAY:**  I got one (inaudible) I sent

5    tem a resume and (inaudible) file.

6         **PRESIDING COMMISSIONER BIGGERS:**  Right.  And it

7    says, "Thank you for submitting the resume.  We will

8    (inaudible) and we will contact you directly if there's

9    a match between the qualifications and the

10   (inaudible)."

11        **INMATE CALLOWAY:**  I believe there's one more.

12        **PRESIDING COMMISSIONER BIGGERS:**  (inaudible).

13        **INMATE CALLOWAY:**  From the school or something

14   (inaudible).

15        **PRESIDING COMMISSIONER BIGGERS:**  (inaudible)

16   job?

17        **INMATE CALLOWAY:**  (inaudible) letter.

18        **PRESIDING COMMISSIONER BIGGERS:**  Thank you for

19   your interest in our organization.  This is a nonprofit

20   agency that provides outpatient (inaudible) in the

21   primary (inaudible) construction industry.  You talked

22   about how you worked on over (inaudible).  You

23   submitted applications (inaudible) approached by one of

24   the collaborating CEO's (inaudible) with information

25   (inaudible).  Have you tried to contact any

26   (inaudible)?

27        **INMATE CALLOWAY:**  (inaudible).

46

1     **PRESIDING COMMISSIONER BIGGERS:** (inaudible) to
2   better assist you please call our office upon release.
3   But it also says here that you have to be (inaudible).
4   They're willing to work with you upon your release.
5   But he says here that we referred to (inaudible) one of
6   the (inaudible) CEO's. So that's an indication to me
7   that they want you to write one of the CEO's that you
8   have identified here. Have them send a letter to
9   (inaudible) jobs so that once you are released you can
10  call them up and say CEO, so and so, (inaudible). You
11  understand how that works?

12     **INMATE CALLOWAY:** Yeah.

13     **PRESIDING COMMISSIONER BIGGERS:** So the issues
14  is trying to find something. (Inaudible) that's the
15  whole thing is do not be sending out (inaudible). But
16  there is some stuff that need to be taken (inaudible).

17     **INMATE CALLOWAY:** I understand.

18     **PRESIDING COMMISSIONER BIGGERS:** Is there
19  anything that I left out on your parole plans that you
20  want to go into?

21     **INMATE CALLOWAY:** (inaudible).

22     **PRESIDING COMMISSIONER BIGGERS:** Okay. There is
23  a, we sent out 3042 notices to law enforcement that
24  are notices in your case and I don't see any letters of
25  opposition in your file. However, we do have the
26  district attorney from Los Angeles who will be asking
27  for (inaudible). In fact, I'll ask the district

1   attorney Mr. Morrison to, did you have any questions
2   for Mr. Calloway?

3       **DEPUTY DISTRICT ATTORNEY MORRISON:**  Just a
4   couple.

5       **PRESIDING COMMISSIONER BIGGERS:**  Okay.

6       **DEPUTY DISTRICT ATTORNEY MORRISON:**  How many of
7   the people that signed the petition has the inmate
8   called the credibility to voluntary manslaughter of the
9   child?

10      **INMATE CALLOWAY:**  I would say not right off hand
11  but someone, they know about the whole thing.

12      **DEPUTY DISTRICT ATTORNEY MORRISON:**  And when the
13  chair asked the inmate about the recently discovered
14  witness, that witness was in fact presented at the
15  motion for a new trial.  Is that correct?

16      **INMATE CALLOWAY:**  Yes, sir.

17      **DEPUTY DISTRICT ATTORNEY MORRISON:**  And that was
18  denied by the trial court and by the court of appeal?

19      **INMATE CALLOWAY:**  Yes, sir.

20      **DEPUTY DISTRICT ATTORNEY MORRISON:**  I have
21  nothing further.

22      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Mr.
23  Sparks.

24      **ATTORNEY SPARKS:**  No questions.

25      **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm
26  going to ask the district attorney to close at this
27  point.

48

1          **DEPUTY DISTRICT ATTORNEY MORRISON:**  First of all
2     I would note that the inmate got a concurrent six-year
3     sentence for involuntary manslaughter of 7-year-old
4     Kanita Haley, and if the inmate is ever granted parole
5     in the murder of Mr. Rogers and the BPH regulations
6     call for an assessment of an additional 36 months, one
7     half of six years to be added to whatever term is
8     determined by matrix for the Rogers' murder.  The
9     district attorney opposes parole in the strongest
10     possible way.  The district attorney on behalf of the
11     citizens of Los Angeles County thought that these two
12     deaths the appropriate sentence would be death for the
13     inmate.  The fact that the jury only convicted him of
14     second-degree murder of Mr. Rogers where he, the inmate
15     and fellow (inaudible) Homeys chased him down in a
16     contract hit, the inmate shot him four times in the
17     back.  It resulted in the second-degree murder
18     conviction.  That's what a determined matrix that is
19     used to evaluate if he is ever found suitable.
20     Notwithstanding having killed Mr. Rogers, the inmate
21     then participated in a drive by on the second intended
22     victim Donnel Jones but as all too often happens in
23     gang murders in Los Angeles and elsewhere he missed.
24     And instead he killed a 7-year-old child.  The inmate
25     pled guilty to voluntary manslaughter after a second
26     jury was unable to reach a verdict on that and was
27     charged murder at trial.  And he continues to protest

49

1   his innocence. He presented a witness to motion to a
2   new trial that someone had planned (inaudible) by
3   (inaudible). As the inmate just told us that the
4   motion for a new trial was denied by the court, trial
5   court and found the witness unbelievable. And the
6   court of appeal also noted that (inaudible) the trial
7   court's direct ruling. Los Angeles and other
8   communities cross (inaudible) the same type of criminal
9   street gang that resulted in two deaths before this
10  Panel. The crime alone under Gannonberg and Rosenvance
11  it was sufficient and he was denied parole. He has no
12  demonstration of any insight on behalf of the inmate as
13  to the cause and factors of these. He's freely denied
14  it. But the Panel has to base it's decision on the
15  information before it. The inmate stated he feels no
16  remorse because he didn't do the crime and yet he has
17  the (inaudible) for whatever he did. He's been
18  convicted by the jury of murder and (inaudible)
19  involuntary manslaughter in a plea bargain. I also
20  note the inmate received two 128's since the last
21  hearing. It did show an inability to comply with rules
22  which does not bode well for release on parole. I
23  would have to say that of all the reports by
24  Dr. Macomber that I have read at this institution this
25  year, last year and previous years, this is the most
26  outrageous and absurd psychological evaluation I have
27  ever seen. To call this inmate a gentle and nonviolent

50

1    person is an insult to the memory of particularly the
2    innocent victim Kanita Haley.  Dr. Macomber makes no
3    mention of involuntary manslaughter to which the inmate
4    pled guilty in his evaluation and appears that Dr.
5    Macomber swallowed whole-hearted (inaudible) and
6    completely the inmates claim of innocence.  The
7    psychological assessment is unsupported and should be
8    disregarded by the Panel.  I believe the inmate merits
9    a lengthy multiple denial based on his unsuitability
10   and no showing he has changed (inaudible) from the
11   cold-blooded killer he was on the streets of Los
12   Angeles.  Thank you.

13           **PRESIDING COMMISSIONER BIGGERS:**  Mr. Sparks.

14           **ATTORNEY SPARKS:**  (inaudible) Panel today
15   (inaudible) previous lifestyle in gang involvement.
16   He's maintained stable relationships in the community.
17   And you can see by the parole plans that he brought
18   here today that includes family and friends; he's been
19   looking at job offers and a place where he can use his
20   employable skills.  He's been attending programming and
21   (inaudible) employment certification, computers and
22   being involved (inaudible) and involving himself in AA
23   and NA.  Since 2001 he's being involved with fatherhood
24   classes on (inaudible) classes, SEC classes,
25   salesmanship classes, learning basically how to improve
26   himself while incarcerated so that when he returns to
27   the community he would no longer (inaudible) a need to

51

1   pose as a danger to the community. He's only had two

2   115's. The only (inaudible) good citizen in prison,

3   the last one in '01 and it was nonviolent. I'll submit

4   that.

5        **PRESIDING COMMISSIONER BIGGERS:** Okay. Now

6   Mr. Calloway, do you have the opportunity to show the

7   Panel why you feel you are suitable.

8        **INMATE CALLOWAY:** I would be a productive

9   citizen in the community (inaudible).

10       **PRESIDING COMMISSIONER BIGGERS:** You have to

11  convince us that you're suitable for parole.

12       **INMATE CALLOWAY:** I understand that, Your Honor.

13  (Inaudible). If you only knew what I have to go

14  through, Your Honor.

15       **PRESIDING COMMISSIONER BIGGERS:** You were

16  convicted of second-degree murder. This is an

17  administrative hearing and you (inaudible) set on the

18  Panel (inaudible). Based on your convictions that you

19  (inaudible). So, irregardless of how you got here what

20  has and what has been tough for your, our job is to

21  (inaudible) see if you're suitable based on what you

22  have done while you've been in the institution. So I

23  know it's been tough and it's not going to be easy.

24       **INMATE CALLOWAY:** I know.

25       **PRESIDING COMMISSIONER BIGGERS:** But then I'm

26  giving you the opportunity at this point to tell us why

27  do you feel that you've done everything.

52

1          **INMATE CALLOWAY:**  My life has changed, I'm older
2    person that I was 20 years ago.
3          **PRESIDING COMMISSIONER BIGGERS:**  But (inaudible)
4    got to, (inaudible) all kind of rules?
5          **INMATE CALLOWAY:**  Yes, I have.
6          **PRESIDING COMMISSIONER BIGGERS:**  I would feel
7    bad myself (inaudible).  We will go into deliberations.
8                          R -E-C-E-S-S
9                          --o0o--
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

53

1              CALIFORNIA BOARD OF PAROLE HEARINGS

2                            DECISION

3

4        **DEPUTY COMMISSIONER ARMENTA:** Let the record

5   reflect that everyone that was in the room prior to us

6   going into deliberations are back in the room.

7   **PRESIDING COMMISSIONER BIGGERS:** In the matter of

8   Mr. Paul Calloway, CDC number H92309. Mr. Calloway

9   We've reviewed all the information received from the

10  public and relied on the following circumstances in

11  concluding that you're not suitable for parole and

12  would pose an unreasonable risk of danger to society or

13  a threat to public safety if released from prison. Now

14  Mr. Calloway, you did not talk about the crime, that's

15  your right. (Inaudible). ª And in view of the records

16  and (inaudible) you are saying that you are not guilty

17  of the crime. The record reflects otherwise. And we

18  have to (inaudible) on the record until such time and

19  (inaudible) you can prove that you're not guilty of the

20  (inaudible) crime. Judging the, all the other input, I

21  know the appellate decision (inaudible) of the Board

22  report details (inaudible) by yourself, was very cold,

23  cruel and callous in that you and the (inaudible) on

24  the record that you and some (inaudible) that you were

25  buying for in the chase down of Mr. Dennis Rogers in

26  the Imperial Court housing project (inaudible). And

27  **PAUL CALLOWAY H-92309 DECISION PAGE 1   9/13/06**

1    the jury found you guilty of that second-degree murder
2    death. You were positively identified (inaudible) and
3    subsequently through video (inaudible) contacted and
4    relied on (inaudible) by a Cedrick Miguel who was a
5    known drug dealer. There were multiple (inaudible) in
6    separate incidents, one an innocent bystander, 7-year-
7    old Kanita Haley was also killed during a (inaudible)
8    attempted murder of another individual who was also a
9    one Donnel Jones who drove (inaudible) and the 7-year-
10   old (inaudible). And again, the record indicated that
11   you were the shooter in both of those incidents in
12   regards to what you (inaudible). Both of these events
13   I would say (inaudible). The motive if it is in fact
14   true was very trivial in that somebody had hired out
15   you to go out there and carry out a murder (inaudible).
16   This information was taken from the probationer's
17   report as well as the appellate decision. The, I want
18   to note for the record that in previous reports you
19   indicated, the previous Panel indicated that you
20   (inaudible) when you were granted some probation
21   (inaudible) and I haven't been able to find that
22   anywhere. So therefore, I want go on record that this
23   Panel cannot find that this inmate (inaudible) you
24   would do it on probation (inaudible) or done jail time,
25   whatever. So that should clear up the matter that the
26   previous Panel did say that you were (inaudible) on the
27   **PAUL CALLOWAY H-92309 DECISION PAGE 2   9/13/06**

55

1   CYA assessment. The, your S&P (inaudible), you've been

2   down a long time, sir. And you should have been able

3   to get a vocation at this (inaudible). And I don't'

4   know what you're waiting on. I know that you feel that

5   you are not (inaudible) get you out of here, but you

6   understand that you're here to work on (inaudible)

7   vocation. And (inaudible) and you are successful and

8   appeal your case, you will have somebody that you can

9   (inaudible) on the outside. So you need to get you, to

10  work on a vocation. You have not done that. You, you

11  have been taking some classes, computer program, the

12  (inaudible), fatherhood, a lot of (inaudible). And

13  those classes are well and good but you need to

14  (inaudible) and you also need, you got a high school

15  diploma but upgrade yourself educationally. You should

16  have some college courses that you can take or

17  correspondence courses. You need all that done.

18  (inaudible) you indicated the way that you feel that

19  it's going to happen. Take advantage of everything you

20  have to (inaudible). Okay. You had two 128 chronos

21  for (inaudible) for disobeying orders. The last one

22  was, you had two suited 115's, excuse me. One was in

23  2001 (inaudible) report and the other one was in '96

24  for (inaudible) staff. You also have only two 128's.

25  The psychological evaluation from Dr. Macomber

26  (inaudible). We have to disagree (inaudible)

27  **PAUL CALLOWAY H-92309 DECISION PAGE 3   9/13/06**

56

1   assessment and not to say that you're not a gentle,

2   passive individual, its just that based on the record

3   that we have in front of us that does not demonstrate

4   that you are a gentle, passive person.  He also states

5   that you are, you have a job.  You don't have a job.

6   (inaudible).

7        **INMATE CALLOWAY:**  (inaudible) prison.

8        **PRESIDING COMMISSIONER BIGGERS:**  No, no.  He

9   thought that you have a job waiting for you right now

10  and it's a documented conversation and I'll quote, this

11  is an indication to us that you may (inaudible) be

12  somewhat (inaudible), he says, "Mr. Calloway has a

13  supportive family in the community.  He is offered

14  (inaudible) residence as well as employment."  It's an

15  indicatio to us that perhaps he got confused about

16  something, so, therefore I think that the time when you

17  come back up we'll have another psychological

18  (inaudible) more detail because apparently he feels

19  that you're not.  It's hard for us to do an assessment

20  based on what (inaudible).  On your parole, you need to

21  firm up your parole plans.  I know that this

22  (inaudible) offer you a place to stay.  But you said

23  that she was (inaudible).

24       **INMATE CALLOWAY:**  (inaudible).

25  **PRESIDING COMMISSIONER BIGGERS:**  Now, (inaudible)

26  you're going to be able to support that.

27  **PAUL CALLOWAY H-92309 DECISION PAGE 4  9/13/06**

1    (inaudible).

2          **INMATE CALLOWAY:**   I know and well, I don't know
3    if I can find me a job.

4          **PRESIDING COMMISSIONER BIGGERS:**   (inaudible).
5          **INMATE CALLOWAY:**   (inaudible).

6          **PRESIDING COMMISSIONER BIGGERS:**   Marketable
7    skills (inaudible) you find a job (inaudible).   That
8    make sense now?

9          **INMATE CALLOWAY:**   Make a lot of sense.
10   **PRESIDING COMMISSIONER BIGGERS:**   And because he doesn't
11   show us how you're going to support yourself when you
12   get out (inaudible).   And things have changed
13   (inaudible).   I mean gas is $2 and something a gallon
14   now.   We do note that the district attorney of L.A. on
15   the 3042 responses indicate an opposition of parole
16   suitability?   However, we want to comment you for
17   (inaudible) for the last few years.   (inaudible)
18   forces, (inaudible) classes and classes on salesmanship
19   and entrepreneur development.   Those are all well and
20   good.   But you have (inaudible).   And, however, those
21   positive aspects (inaudible) here today do not
22   (inaudible) the factors of unsuitability.   In a
23   separate decision we're here (inaudible) convicted of
24   murder in the second degree and also pled to a
25   voluntary manslaughter, it's not reasonable to expect
26   that parole be granted during the next three years.
27   **PAUL CALLOWAY H-92309 DECISION PAGE 5   9/13/06**

58

1   And this is based on the following, the crime itself, a
2   very calculated, cruel crime in that you and, on the
3   record, you and your, and your codefendant went to an
4   area seeking out (inaudible) to get involved in a known
5   drug dealer.  They done something to his wife and he
6   tried to (inaudible).  And again --

7           **INMATE CALLOWAY:**  (inaudible) for the record
8   that I - (inaudible).

9           **PRESIDING COMMISSIONER BIGGERS:**  It was a
10  calculated incident, multiple victims was, were
11  attacked, one was killed and the other one, the other
12  incident involved an innocent bystander, a 7-year-old
13  little lady by the name of Ms. Kanita Haley was killed.
14  Both of those events (inaudible) life.  We, the last
15  thing that I want to bring up is the fact that you
16  recently had a (inaudible).  Now, keep in mind even
17  when you get a date, every year that you (inaudible)
18  115, you (inaudible).  So you need to make sure that
19  you stay disciplinary free.  You also need to take this
20  time now until such time as your appeal (inaudible) get
21  yourself a vocation.  And start getting involved in the
22  self-help program.  (inaudible) that you upgrade
23  yourself in vocation, (inaudible).  Huh?

24          **INMATE CALLOWAY:**  I have (inaudible).
25  **PRESIDING COMMISSIONER BIGGERS·**  And that you
26  participate in the self-help more than just a low
27  **PAUL CALLOWAY H-92309 DECISION PAGE 6   9/13/06**

59

1   (inaudible) education, something that's going to really
2   benefit you and also only you know if you were involved
3   in that situation and you have to make the best of the
4   situation (inaudible).  So I'm going to order another
5   (inaudible) evaluation so you can talk to, and
6   determine whether or not (inaudible) come back with
7   some more positive things to say about you.  Okay?  Do
8   you have anything you want answered?

9        **DEPUTY COMMISSIONER ARMENTA:**  Well, as far as
10  your 115's, when you look at it, you only have one in
11  the last 15 years.  Unfortunately that, the one in the
12  year 2001.  But I think overall you've, you've been
13  doing okay.  You do need to get a (inaudible) because
14  that's one of the things that we, that the Board as
15  well as the governor, we're going to look for that.

16       **PRESIDING COMMISSIONER BIGGERS:**  And I'm going
17  to put, and what I'm doing, like I said, I'm going to
18  order another psychological evaluation too (inaudible)
19  discuss your (inaudible) as well as the other
20  (inaudible) some of the underlying causes of the way
21  you were when you were out there.  Okay.  That
22  concludes the hearing.  The time is now 5:30.  Good
23  luck to you, sir.

24  //

25  //

26  //

27  **PAUL CALLOWAY H-92309 DECISION PAGE 7  9/13/06**

28

60

1       **INMATE CALLOWAY:** (inaudible).

2                **A D J O U R N M E N T**

3                         --o0o--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   **PAROLE DENIED THREE YEARS**

24   **THIS DECISION WILL BE FINAL ON:** ___JAN 1 1 2007___

25   **YOU WILL BE PROMPTLY NOTIFIED IF, PRIOR TO THAT**

26   **DATE, THE DECISION IS MODIFIED.**

27   **PAUL CALLOWAY H-92309    DECISION PAGE 8    9/13/06**

61

## CERTIFICATE AND

## DECLARATION OF TRANSCRIBER

I, JO ANNE JACKSON, a duly designated transcriber, NORTHERN CALIFORNIA COURT REPORTERS, do hereby declare and certify under penalty of perjury that I have transcribed tape(s) which total two in number and cover a total of pages numbered 1 - 60, and which recording was duly recorded at CORRECTIONAL TRAINING FACILITY, SOLEDAD, CALIFORNIA, in the matter of the SUBSEQUENT PAROLE CONSIDERATION HEARING OF PAUL CALLOWAY, CDC NO. H-92309, ON SEPTEMBER 13, 2006, and that the foregoing pages constitute a true, complete, and accurate transcription of the aforementioned tape to the best of my ability.

I hereby certify that I am a disinterested party in the above-mentioned matter and have no interest in the outcome of the hearing.

Dated December 8, 2006, at Sacramento, California.

Jo Anne Jackson

JO ANNE JACKSON, TRANSCRIBER

**NORTHERN CALIFORNIA COURT RPTRS**

# EXHIBIT HT2

1   CYA assessment.  The, your S&P (inaudible), you've been
2   down a long time, sir.  And you should have been able
3   to get a vocation at this (inaudible).  And I don't'
4   know what you're waiting on.  I know that you feel that
5   you are not (inaudible) get you out of here, but you
6   understand that you're here to work on (inaudible)
7   vocation.  And (inaudible) and you are successful and
8   appeal your case, you will have somebody that you can
9   (inaudible) on the outside.  So you need to get you, to
10  work on a vocation.  You have not done that.  You, you
11  have been taking some classes, computer program, the
12  (inaudible), fatherhood, a lot of (inaudible).  And
13  those classes are well and good but you need to
14  (inaudible) and you also need, you got a high school
15  diploma but upgrade yourself educationally.  You should
16  have some college courses that you can take or
17  correspondence courses.  You need all that done.
18  (inaudible) you indicated the way that you feel that
19  it's going to happen.  Take advantage of everything you
20  have to (inaudible).  Okay.  You had two 128 chrcnos
21  for (inaudible) for disobeying orders.  The last one
22  was, you had two suited 115's, excuse me.  One was in
23  2001 (inaudible) report and the other one was in '96
24  for (inaudible) staff.  You also have only two 128's.
25  The psychological evaluation from Dr. Macomber
26  (inaudible),  We have to disagree (inaudible)
27  **PAUL CALLOWAY H-92309 DECISION PAGE 3   9/13/06**

56

1   assessment and not to say that you're not a gentle,

2   passive individual, its just that based on the record

3   that we have in front of us that does not demonstrate

4   that you are a gentle, passive person.  He also states

5   that you are, you have a job.  You don't have a job.

6   (inaudible).

7        **INMATE CALLOWAY:**  (inaudible) prison.

8        **PRESIDING COMMISSIONER BIGGERS:**  No, no.  He

9   thought that you have a job waiting for you right now

10  and it's a documented conversation and I'll quote, this

11  is an indication to us that you may (inaudible) be

12  somewhat (inaudible), he says, "Mr. Calloway has a

13  supportive family in the community.  He is offered

14  (inaudible) residence as well as employment."  It's an

15  indicatio to us that perhaps he got confused about

16  something, so, therefore I think that the time when you

17  come back up we'll have another psychological

18  (inaudible) more detail because apparently he feels

19  that you're not.  It's hard for us to do an assessment

20  based on what (inaudible).  On your parole, you need to

21  firm up your parole plans.  I know that this

22  (inaudible) offer you a place to stay.  But you said

23  that she was (inaudible).

24       **INMATE CALLOWAY:**  (inaudible).

25  **PRESIDING COMMISSIONER BIGGERS:**  Now, (inaudible)

26  you're going to be able to support that, we have no address that

27  **PAUL CALLOWAY H-92309 DECISION PAGE 4  9/13/06**

57

1   (inaudible).

2          **INMATE CALLOWAY:**  I know and well, I don't know

3   if I can find me a job.

4          **PRESIDING COMMISSIONER BIGGERS:**  (inaudible).

5          **INMATE CALLOWAY:**  (inaudible).

6          **PRESIDING COMMISSIONER BIGGERS:**  Marketable

7   skills (inaudible) you find a job (inaudible).  That

8   make sense now?

9          **INMATE CALLOWAY:**  Make a lot of sense.

10  **PRESIDING COMMISSIONER BIGGERS:**  And because he doesn't

11  show us how you're going to support yourself when you

12  get out (inaudible).  And things have changed

13  (inaudible).  I mean gas is $2 and something a gallon

14  now.  We do note that the district attorney of L.A. on

15  the 3042 responses indicate an opposition of parole

16  suitability?  However, we want to comment you for

17  (inaudible) for the last few years.  (inaudible)

18  forces, (inaudible) classes and classes on salesmanship

19  and entrepreneur development.  Those are all well and

20  good.  But you have (inaudible).  And, however, those

21  positive aspects (inaudible) here today do not

22  (inaudible) the factors of unsuitability.  In a

23  separate decision we're here (inaudible) convicted of

24  murder in the second degree and also pled to a

25  voluntary manslaughter, it's not reasonable to expect

26  that parole be granted during the next three years

27  **PAUL CALLOWAY H-92309 DECISION PAGE 5   9/13/06**

# EXHIBIT   "F"


47

1   attorney Mr. Morrison to, did you have any questions

2   for Mr. Calloway?

3          **DEPUTY DISTRICT ATTORNEY MORRISON:**  Just a

4   couple.

5          **PRESIDING COMMISSIONER BIGGERS:**  Okay.

6          **DEPUTY DISTRICT ATTORNEY MORRISON:**  How many of

7   the people that signed the petition has the inmate

8   called the credibility to voluntary manslaughter of the

9   child?

10         **INMATE CALLOWAY:**  I would say not right off hand

11  but someone, they know about the whole thing.

12         **DEPUTY DISTRICT ATTORNEY MORRISON:**  And when the

13  chair asked the inmate about the recently discovered

14  witness, that witness was in fact presented at the

15  motion for a new trial.  Is that correct?

16         **INMATE CALLOWAY:**  Yes, sir.

17         **DEPUTY DISTRICT ATTORNEY MORRISON:**  And that was

18  denied by the trial court and by the court of appeal?

19         **INMATE CALLOWAY:**  Yes, sir.

20         **DEPUTY DISTRICT ATTORNEY MORRISON:**  I have

21  nothing further.

22         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  Mr.

23  Sparks.

24         **ATTORNEY SPARKS:**  No questions.

25         **PRESIDING COMMISSIONER BIGGERS:**  Okay.  I'm

26  going to ask the district attorney to close at this

27  point.

# EXHIBIT   "G"

NOT TO BE PUBLISHED

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | No. B080321 |
| Plaintiff and Respondent, | (Super.Ct.No. TA001416) |
| v. | COURT OF APPEAL · SECOND DIST. |
| PAUL CALLOWAY, | F I L E D |
| Defendant and Appellant. | NOV 1 4 1994 |
| | JOSEPH A. LANE       Clerk |
| | Deputy Clerk |

APPEAL from a judgment of the Superior Court of
Los Angeles County. Victoria M. Chavez, Judge. Affirmed.

Manuel E. Nestle, under appointment by the Court of
Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George
Williamson, Chief Assistant Attorney General, Carol Wendelin
Pollack, Senior Assistant Attorney General, Kenneth C. Byrne,
Supervising Deputy Attorney General, and William T. Harter,
Deputy Attorney General, for Plaintiff and Respondent.

2

Paul Calloway appeals from the judgment entered following a jury trial resulting in his conviction of second degree murder with the personal use of a firearm (Pen. Code, §§ 187, subd. (a), 12022.5, subd. (a)) and after he entered a negotiated plea of guilty to voluntary manslaughter, with the personal use of a firearm (Pen. Code, §§ 192, subd. (a), 12022.5, subd. (a)). He contends: "I. The trial court's denial of appellant's motion for a new trial was an abuse of discretion. II. The trial court erred in imposing a restitution fine without determining the appellant's ability to pay."

## EVIDENCE ADDUCED AT TRIAL

Viewed in accordance with the usual rules on appeal (People v. Ochoa (1993) 6 Cal.4th 1199, 1206), the evidence established shortly before 10:50 p.m. on July 9, 1989, Los Angeles police officers responded to a shooting call at Leshawn "Shawn" McGinnie's apartment, number 237, at 2254 East 113th Street in the Imperial Courts Housing Project in Los Angeles.[1] Officer William Cox, a homicide detective, arrived there at 12:30 a.m. and observed blood on the back porch of the apartment, which made it appear as if the deceased, Dennis "Wezo" Rogers, age 18, was shot outside and then dragged inside

---

1.  Originally in the instant case, appellant was charged with the death penalty in connection with the two instant unrelated counts of murder. During his first trial, the jury was unable to agree as to verdicts for either count of murder, and the court declared a mistrial. The instant facts are taken from appellant's second trial.

3

the apartment. Around the corner of the building, Cox found
blood spatters, a plate of spilled food and fresh bullet holes
in the building's stucco. 2/ Cox found .45 caliber shell
casings not far from there, to the east near Gorman Street.
Cox observed the street lamps illuminating the area were in
good working order.

The deputy medical examiner concluded the cause of
death was four gunshot wounds to the body, two of which were
fatal. The deputy medical examiner opined these
"through-and-through" wounds would not have prevented the
deceased from walking some distance before he collapsed after
he was shot.

The night of the shooting, Burtha Burnett lived across
a playground from Shawn's back door, at 2230 East 113th Street,
apartment number 236, in the same project. Burnett lived with
her boyfriend, Leonard Tinsley, and her two children. That
day, Wezo and his girlfriend, Shawn, went to the beach with
Burnett and Tinsley. In the early evening, "Cripple" Dray,
Tinsley and Wezo were outside drinking while Burnett remained
inside the apartment. Tinsley then came inside and took a nap.

Late in the evening, Burnett was watching television
when she saw shadows, as if there were persons outside running
back and forth. Tinsley woke up and looked and commented it
was probably the police. Burnett then heard shooting, which

_____
2.   Wezo's mother testified on the evening of the shooting
she gave him a plate of food.

4

was coming closer. She heard a knock on her back door. Neither she nor Tinsley answered the door. There was more knocking and then more shooting. Tinsley told Burnett not to answer the door and again fell asleep. Burnett opened her back door and, across the playground, saw appellant shoot Wezo in the back at Shawn's back door. She heard about a dozen shots and there were three other men in the area. Appellant turned and looked at her and fled. Burnett woke up Tinsley. She heard Shawn screaming appellant shot Wezo. Tinsley commented she was crazy, and Burnett told him to get up and see.

Burnett met appellant only once or twice. She had lived for years in the same project and knew appellant by name. She had no doubt appellant was the youth she saw shoot Wezo.

Burnett spoke with police officers that night but was too afraid to go to the police station. Los Angeles Police Officer Gerald Manske knocked on her door several days later and she told him about appellant committing the shooting and that she was afraid. She indicated appellant had a jheri curl hairstyle. She made a photographic identification of appellant. Burnett testified that she and one of her sisters had a fight about her talking to the police: The sister did not want her to testify. Appellant knocked on her door twice the day following the shooting, but she did not answer the door.

Tinsley's trial testimony corroborated Burnett's. He

saw the shadows that night and fell back to sleep. He awoke again when there was shooting, and he told Burnett not to open the door. She opened the door and said appellant was shooting Shawn. Tinsley grabbed a handgun and went to the door, but by then the persons outside were gone. Burnett had Tinsley check on Shawn, and he returned to tell her it was Wezo who was shot. Donnell "Duke" Jones was at Shawn's apartment when Tinsley checked on her.

Later, Tinsley was incarcerated in the county jail where Tinsley saw appellant. Appellant told Tinsley he was innocent and repeatedly asked Tinsley not to let Burnett come to court on him. Tinsley told him he would do what he could. At the time, Tinsley felt sorry for appellant and he was afraid of appellant's cohorts, who were both in and out of jail. Tinsley admitted he had lied to appellant's trial attorneys when he spoke to them about the case. He told them Burnett was smoking marijuana and drinking that night and the lighting was so bad Burnett could not have seen the shooting. Tinsley admitted he had lied in making these statements. He admitted he also lied to the trial attorneys when he said he was taking Burnett out of town. As it turned out, he tried to get Burnett to leave town, but Burnett refused to leave. Tinsley explained he had lied because he was afraid. Tinsley said he and Burnett had received threatening letters. He personally was threatened by appellant's "gang banging buddies" through his own "gang banging buddies." Tinsley acknowledged appellant never

6

threatened him personally. Tinsley specifically said
"Muldoon," a fellow he saw in county jail, and "Derrick,"
Burtha Burnett's sister's boyfriend, had conveyed threats to
him. 3/

In defense, appellant did not testify. The defense
had Shawn's prior testimony from an earlier court proceeding
read into evidence. Shawn had testified she found Wezo on her
doorstep after the shooting. With Duke's help, she dragged
Wezo into her apartment. The shooting sounded as if it
occurred immediately outside her back door. The street light
providing illumination outside her door was broken on the night
of the shooting. After the shooting, Burnett told her Burnett
saw three unnamed masked men run by Burnett's trash cans and
throw guns inside. Shawn was impeached with her failure to
mention the masks in earlier police statements and with her
statement in which she said Burnett told her Burnett saw the
shooters and they ran into the next door apartment belonging to
"Dirt Bike Fred." Shawn admitted she knew appellant.

---

3. The evidence adduced at trial with regard to count 2 is
omitted as it is not in issue with regard to the motion for a
new trial or the restitution order. As to count 2, on August
2, 1992, an eyewitness, Eliuth Galindo, was at her apartment's
second story window and saw appellant shoot.at Duke and another
youth from an alley in the project. A little girl, Kanita
Hailey, was playing nearby and was shot in the head by
appellant's bullet and died as a result. Galindo identified
appellant in a photographic display and in a live line-up.
There was evidence appellant changed his distinctive jheri curl
hairstyle before the line-up despite his having been ordered by
the magistrate not to change his physical appearance. Some of
the witnesses to the unrelated Hailey killing knew, or were
related to, Wezo.

Constance Nelloms, who was age 14 at the time of the shooting, testified on the night of the shooting she was standing outside her apartment in the project with Andre Johnson and Jacqueline Lewis. She saw the shooting, but could not identify the perpetrators. The men were dressed in black. Nelloms denied having told the police what Burnett told her about the shooting. She claimed she did not know appellant. She did not recall telling Shawn she knew appellant killed Wezo.

Burnett testified she did not tell Shawn who shot Wezo the day after the shooting, and she was impeached with her prior testimony to the contrary.

Dr. John Ryan, a forensic pathologist, testified Wezo had two fatal gunshot wounds. The deceased could have staggered up to 170 feet before collapsing and dying. A person with these wounds would die within 18 to 28 minutes. The wounds were consistent with a theory the deceased was running or falling forward when shot.

James Warner, a firearms examiner, opined the shell casings would have been found where the gun was fired. He also opined, if a person was shot "through-and-through" while lying down, one would expect to find the expended bullets on the ground near the person. He acknowledged sometimes the expended bullets ricocheted off.

In rebuttal, Cox testified he took a July 10, 1989, statement from Nelloms, Exhibit number 65. Nelloms told him, on the night of the shooting, she saw four to five youths clad

8

in black in the area and ran into her apartment.  There was
shooting.  Andre stood at the door and told her "they" were
shooting Wezo.  Burnett later told her the youths ran into
Fred's apartment next door to Burnett.  The youths threw a gun
in the trash can.  Fred was an "O.G. Grape Street."  The boy
Burtha Burnett saw wearing the purple rag was tall and
light-skinned and had a jheri curl hairstyle.

The jury returned a verdict of second degree murder as
to the Wezo killing in count 1 of the information, with a true
finding as to the firearm use.  The jury could not agree on a
verdict as to the murder alleged in count 2, that of Kanita
Hailey.  The court declared a mistrial as to count 2.  Later,
the defense made the motion for a new trial as to count 1.
Appellant was sentenced in count 1 to an aggregate term of 20
years to life, without the possibility of parole.

Thereafter, the People announced they were no longer
seeking the death penalty.  At a defense request, the court
vacated its sentence as to count 1.  Appellant pled guilty to
an amended information alleging a new count 3, voluntary
manslaughter, with the personal use of a firearm.  The murder
charge in count 2 was dismissed.  At sentencing, for count 1,
the court imposed a 15 year to life term with the possibility
of parole, enhanced by two years for the use of a firearm.  For
the count 3 voluntary manslaughter, the court imposed a
concurrent middle term of six years and stayed the two-year
term for the firearm use pursuant to Penal Code section 1170.1,

subdivision (h).  The aggregate term was 17 years to life in
state prison.  The court additionally imposed a $1,000
restitution fine.

DISCUSSION

### I.  MOTION FOR NEW TRIAL

Before sentencing appellant moved, inter alia, pursuant
to Penal Code section 1181, subdivision 8, for a new trial
based on newly discovered evidence.  4/

Attached to the motion for new trial, was the
declaration of Claudia Burnett, one of Burtha Burnett's
sisters.  Claudia Burnett declared, on the night of the murder,
she and her other sister, Beatrice Burnett, drove to Burtha
Burnett's residence from Claudia's nearby residence.  They
parked on 113th Street.  While Beatrice was at Burtha Burnett's
front door talking with her, Claudia saw three youths chasing
Wezo.  One of the youths was a short, fat youth named "Bayball"
and he had a handgun.  No one else appeared to have a gun.
Soon thereafter, she heard shots, and Bayball jumped back over
the fence.  While this was going on, Beatrice and Burtha
Burnett were talking.  No one was at Burtha Burnett's back
door.  Claudia stated she had known appellant for 17 years and
none of the youths was appellant.  Claudia claimed, at one

---

4.    In the motion for new trial, appellant also complained
certain prior inconsistent testimony by Burtha Burnett was not
admitted into evidence.

time, Burtha Burnett had dated appellant. On two previous
occasions, Burtha told her Burtha did not see appellant commit
the shooting. Burtha told Claudia when Burtha went to Court
she said she did not say anything. Claudia claimed Wezo was
shot since Tinsley had him commit carjackings.

In support of the motion for new trial, defense
counsel commented the court was well aware of the facts as the
court heard the evidence during both trials. Defense counsel
urged the result would have been different had the jury had the
benefit of Claudia Burnett's testimony and Burtha Burnett's
prior inconsistent testimony, especially since the physical
evidence at the shooting scene belied Burtha Burnett's claim as
to how the shooting occurred.

The prosecutor commented Claudia Burnett's testimony
was incredible as it was offered so belatedly. The prosecutor
said Claudia Burnett was not present in court and he did not
wish to have the court consider her statement in the absence of
cross-examination.

The court commented, even considering Claudia
Burnett's declaration at face value, the declaration did not
meet the requirements for granting a new trial based on newly
discovered evidence. The court concluded it was unlikely
Claudia Burnett's testimony would have affected the verdict and
the court denied the motion for new trial.

The contention the court abused its discretion in
denying the motion for new trial lacks merit. "The

determination for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (People v. Delgado (1993) 5 Cal.4th 312, 328.) Burtha Burnett testified she saw the shooting and recognized appellant as the shooter. Burtha Burnett's testimony was corroborated by Tinsley's trial testimony. Burtha Burnett and Tinsley testified at length to the pressure applied to them to get them to leave town or to change their testimony. Burtha Burnett's sister, Claudia Burnett, apparently was the girlfriend of one of appellant's associates and was not anxious to have her sister testify during the trial. This record amply demonstrates the trial court properly exercised its discretion in concluding the use of Claudia Burnett's newly discovered testimony at a trial was unlikely to affect the verdict. (People v. Delgado, supra, 5 Cal.4th at pp. 328-329; cf. People v. Long (1940) 15 Cal.2d 590, 607-608.)

II.    IMPOSITION OF A RESTITUTION FINE.

The court stated in imposing the $1000 restitution fine that the restitution fine was "to be collected from any prison earnings that [appellant made] while incarcerated by the Department of Corrections."

The contention the court erred in imposing a restitution fine without making a finding appellant had the ability to pay lacks merit.

Appellant did not object to the lack of a finding or

12

the imposition of restitution fine at sentencing.  Hence, the
issue is waived on appeal.  (People v. Walker (1991) 54 Cal.3d
1013, 1023; People v. Foster (1993) 14 Cal.App.4th 939, 944;
People v. Zito (1992) 8 Cal.App.4th 736, 742; People v. McMahan
(1992) 3 Cal.App.4th 740, 749-750.)

Furthermore, even were this court to consider the
contention on its merits, appellant would not prevail.  Under
Government Code section 13967, subdivision (a), which states
the restitution fine is "subject to" a defendant's ability to
pay, there is no requirement an express finding be made in
every case.  (People v. Frye (1994) 21 Cal.App.4th 1483,
1487.)  It appears from the record that appellant has a
prospective ability to earn sufficient funds in state prison to
allow him to pay the restitution fine.  (Id., at pp.
1485-1487.)

The judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


LILLIE, P.J.


WOODS (Fred), J.

COURT COPY

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES

PROBATION OFFICER'S REPORT

REPORT SEQUENCE NO.  1

| DEFENDANT'S NAME(S) | COURT | JUDGE | COURT CASE NO |
|---|---|---|---|
| PAUL CALLOWAY, JR. | SC—B | CHAVEZ | TA001416 |

| ADDRESS (PRESENT XXXXXX | HEARING DATE | DEFENSE ATTY. | PROSECUTOR |
|---|---|---|---|
| 2110 E. 113TH STREET  (213) 564-7385<br>LOS ANGELES, CA 90059 | 5-5-93 | PD | DA |

| BIRTHDATE | AGE | SEX | RACE | DPO | AREA OFFICE | PHONE NO. |
|---|---|---|---|---|---|---|
| 10-13-64 | 28 | M | B | R. ROBINSON | SC | 603-7907 |

| CITIZENSHIP STATUS | DRIVER'S LICENSE/EXP. DATE | | |
|---|---|---|---|
| C | N/A | | |

| PROBATION NO. | CII NO | BOOKING NO | TYPE REPORT |
|---|---|---|---|
| X— 01503228 | A06956565 | 1605200 | X  Probation and sentence |

| DAYS IN JAIL THIS CASE | CUSTODY STATUS XXXXXXXXXX | ___ Pre-Conviction (131.3 CCP) |
|---|---|---|
| ☒ ESTIMATED  ☐ VERIFIED<br>1,320 | REMANDED | ___ Post sentence<br>___ Diversion (Specify) _____ |

## PRESENT OFFENSE: LEGAL HISTORY

CHARGED with the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

187 PC (MURDER) - 12022.5(A) - 1203.06 SPECIAL ALLEGATION AND 187 PC (MURE
- 12022.5A AND 1203.06 PC SPECIAL ALLEGATION

CONVICTED of the crimes of (INCLUDE PRIORS, ENHANCEMENTS OR SPECIAL CIRCUMSTANCES)

COUNT 1

| CONVICTED BY | DATE OF CONVICTION/XXXXXXX | COUNT(S) CONTINUED TO P & S FOR DISPOSITION |
|---|---|---|
| JURY | 4-20-93 | N/A |

| PROPOSED PLEA AGREEMENT | SOURCES OF INFORMATION |
|---|---|
| UNKNOWN | DA FILE |

| DATE(S) OF OFFENSE | TIME(S) |
|---|---|
| 7-9-89 | 10:30 PM |

DEFENDANT: ☒ N/A     ☐ SENTENCED TO STATE PRISON/COUNTY JAIL ON CASE _____    HOLD/WARRA
(SEE PRIOR     ☐ ON PROBATION     ☐ PENDING PROBATION VIOLATION    ☐ PENDING NEW CASE     ☐ YES ☒
RECORD
SECTION)     ☐ ON PAROLE-REMAINING TIME _____

## RECOMMENDATION:

| ☐ PROBATION | ☒ DENIAL | ☐ DIAGNOSTIC STUDY | ☐ CYA | ☐ OTHER _____ |
|---|---|---|---|---|
| | ☐ COUNTY JAIL | ☐ 707.2 WIC | | |
| | ☒ STATE PRISON | ☐ 1203.03 PC | | |

| PRESENT OFFENSE: (CONTINUED) | | | SOURCES OF INFORMATION (this page) DA FILE | | | |
|---|---|---|---|---|---|---|

| ARREST DATE | TIME | BOOKED AS | OFFENSE | LOCATION OF ARREST | ARRE AGEN |
|---|---|---|---|---|---|
| 9-14-89 | 0710 HOURS | PAUL CALLOWAY | 187 PC | 2110 E. 113TH ST. | LAI |
| | | | | | |
| | | | | | |
| | | | | | |

| CO-DEFENDANT(S) | | CASE NO. | DISPOSITION | |
|---|---|---|---|---|
| | | | | |
| | | | $IMP$  $SNTACLS$ | |

ELEMENTS AND RELEVANT CIRCUMSTANCES OF THE OFFENSE:

ON JULY 9, 1989 AT ABOUT 10:30 PM THREE MALE BLACKS CHASED DOWN DENNIS ROGERS IN THE IMPERIAL COURTS HOUSING PROJECTS (WEASEL FROM PJ WATTS) AND SHOT HIM, KILLING HIM.

ON AUGUST 2, 1989 AT ABOUT 8:30 PM MALE BLACKS DROVE BY IMPERIAL COURTS HOUSING PROJECTS. ONE OF THEM GOT OUT OF THE CAR AND SHOT AT DONNEL JONES ("DUKE" FROM PJ WATTS). DUKE DOVE TO THE GROUND AND A SEVEN-YEAR-OLD, KANITA HAILEY, WAS SHOT IN THE HEAD AND KILLED.

DEFENDANT WAS A SHOOTER IN BOTH INCIDENTS. IT IS BELIEVED A CONTRACT WAS PUT OUT ON DUKE AND WEASEL BY CEDRIC MIGUEL, A BIG TIME DOPE DEALER, BECAUSE DUKE AND WEASEL ROBBED CEDRIC'S WIFE OF HER CAR. DEFENDANT IS FROM GRAPE STREET.

ON SEPTEMBER 14, 1989, DETECTIVE RESPONDED TO 2110

-2- (CALLOWAY)

1    EAST   113TH   STREET   WHERE   THEY   SERVED   THE   SEARCH   WARRANT.

2    DETECTIVE   RECOVERED   TWO   (2)   GUNS   AND   A   BOX   OF   AMMUNITION.

3    DEFENDANT CALLOWAY WAS ALSO AT THE RESIDENCE.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

-3- (CALLOWAY)

| VICTIM: | SOURCES OF INFORMATION (this page) |
| --- | --- |
| | DA FILE |

| NAME<br>KANITA HAILEY (DECEASED) –<br>MYRTLE MURRY (DEF'S MOTHER) | COUNT(S)<br>1 |
| --- | --- |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

VICTIM DECEASED

· INSURANCE COVERAGE

UNKNOWN

| LOSS: ☐ YES ☐ NO<br>UNKNOWN | ESTIMATED LOSS<br>UNKNOWN | RESTITUTION ALREADY MADE<br>UNKNOWN | APPLIED FOR VICTIM RESTITUTION FU<br>☒ UNK   ☐ YES   ☐ NO |
| --- | --- | --- | --- |

VICTIM STATEMENT:

        THE PROBATION OFFICER WAS UNABLE TO CONTACT THE VICTIM'S MOTHER AT HER RESIDENCE BY PHONE.  VICTIM NOTIFIED BY MAIL.

| RESTITUTION | TOTAL NUMBER OF VICTIMS | ESTIMATED LOSS TO ALL VICTIMS | VICTIM(S) NOTIFIED OF P&S HEARING<br>☐ YES   ☐ NO |
| --- | --- | --- | --- |
| DOES DEFENDANT HAVE INSURANCE<br>TO COVER RESTITUTION:<br>☐ YES   ☐ NO | | INSURANCE COMPANY NAME/ADDRESS/TELEPHONE NO. | |

-4-  (CALLOWAY)

| ADDITIONAL VICTIMS: | SOURCES OF INFORMATION (this case) |
|---|---|
| | DA FILE. |

| NAME | COUNT(S) |
|---|---|
| DENNIS ROGERS - (DECEASED) | 1 |

INJURY: PROPERTY LOSS (TYPE / COST / ETC.)

VICTIM DECEASED

INSURANCE COVERAGE

UNKNOWN

| LOSS: ☐ YES ☐ NO  UNKNOWN | ESTIMATED LOSS  UNKNOWN | RESTITUTION ALREADY MADE  UNKNOWN | APPLIED FOR VICTIM RESTITUTION FU ☒ UNK   ☐ YES   ☐ NO |
|---|---|---|---|

VICTIM STATEMENT:

THE PROBATION OFFICER WAS UNABLE TO CONTACT THE VICTIM'S FAMILY BECAUSE THERE WERE NO ADDRESS OR TELEPHONE NUMBER GIVEN IN THE DA FILE.

-5- (CALLOWAY)

76P7258-Prob. 18SC-AV

1 | PRIOR RECORD:

2

3 | AKA'S:

4

JUVENILE HISTORY:

5

THERE   IS   NO   RECORDED   JUVENILE   HISTORY   AND

6

DEFENDANT ADMITS NO RECORD.

7

ADULT HISTORY:

8

NO RECORDED ADULT HISTORY.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PERSONAL HISTORY:

SOURCES OF INFORMATION (this page)

DEFENDANT

SUBSTANCE ABUSE:

_____ No record, indication, or admission of alcohol or controlled substance abuse.

X    Occasional social or experimental use of _____ MARIJUANA _____ acknowledged.

_____ See below:  Indication / admission of significant substance abuse problem.

Referred to Narcotic Evaluator    ☐ Yes ☐ No    _____ Narcotic Evaluator's report attached

Additional Information

PHYSICAL / MENTAL / EMOTIONAL HEALTH:

_____ No indication or claim of significant physical / mental / emotional health problem.

_____ See below:    Indication / claim of significant physical / mental / emotional health problem.

Additional Information

THE DEFENDANT STATES HE HAS ASTHMA.

-7- (CALLOWAY)

| PERSONAL HISTORY: (CONTINUED) | SOURCES OF INFORMATION (this page) |
|---|---|
| | DEFENDANT |

| RESIDENCE | TYPE RESIDENCE | LENGTH OF OCCUPANCY | MORTGAGE/RENT | RESIDES WITH/RELATIONSHIP |
|---|---|---|---|---|
| | HOUSE | 5 YEARS | 0 | HIS GODMOTHER |

| RESIDENTIAL STABILITY LAST FIVE YEARS | CAME TO STATE / FROM | CAME TO COUNTY / FROM |
|---|---|---|
| STABLE | BORN | BORN |

Additional information

| MARRIAGE / PARENTHOOD | MARITAL STATUS | NAME OF SPOUSE / PRESENT COHABITANT |
|---|---|---|
| | SINGLE | N/A |

| LENGTH OF UNION | NO. OF CHILDREN THIS UNION | SUPPORTED BY |
|---|---|---|
| N/A | N/A | N/A |

| NO. PRIOR MARRIAGES / COHABITATIONS | NO. OF CHILDREN THESE UNIONS | SUPPORTED BY |
|---|---|---|
| N/A | N/A | N/A |

| NO. OF OTHER CHILDREN | SUPPORTED BY |
|---|---|
| N/A | N/A |

Additional information

FORMAL EDUCATION:

COMPLETED THE 12TH GRADE.

-8-  (CALLOWAY)

| 1 | **PERSONAL HISTORY:** (CONTINUED) | | SOURCES OF INFORMATION (this page) |
| 2 | | | DEFENDANT |

| | | | | |
|---|---|---|---|---|
| **EMPLOYMENT STATUS** | ☐ EMPLOYED | REFERRED TO WORK FURLOUGH | EMPLOYER AWARE OF PRESENT OFFEN: | |
| | ☒ UNEMPLOYED | ☐ YES ☒ NO | ☐ N/A | ☐ YES  ☒ NO |

| XXXXXX/LAST EMPLOYER / ADDRESS / PHONE | OCCUPATION | PERIOD OF EMPLOYMENT | GROSS MONTHLY WAG |
|---|---|---|---|
| FREDDIE PELAYO 2110 EAST 113TH STREET LOS ANGELES, CA | HOME CARE | 1986 TO 1989 | $400 A MONTH |
| | EMPLOYMENT STABILITY LAST 5 YEARS | TYPES OF PREVIOUS EMPLOYMENT | |
| ☐ VERIFIED      ☐ UNVERIFIED | UNSTABLE | NONE | |

Additional information

| **FINANCIAL STATUS** | INCOME STABILITY 0 | NET MONTHLY INCOME 0 | |
|---|---|---|---|
| PRIMARY INCOME SOURCE 0 | SECONDARY INCOME SOURCE(S) 0 | EST. TOTAL ASSETS 0 | EST. TOTAL LIABILI 0 |

MAJOR ASSETS / ESTIMATED VALUE

NONE

MAJOR LIABILITIES / ESTIMATED AMOUNT (MONTHLY)

NONE

Additional information

| GANG ACTIVITY | ☒ YES   ☐ NO | Name of Gang __GRAPE STREET CRIPS__ |

-9- (CALLOWAY)

DEFENDANT'S STATEMENT:

        DEFENDANT STATES THAT LAPD WAS INFORMED THAT HE WAS CONTRACTED TO KILL THIS GUY. HE DOES NOT KNOW ANYTHING ABOUT THE CRIME.

INTERESTED PARTIES:

        THE INVESTIGATING OFFICER IN THIS CASE WAS UNAVAILABLE FOR QUESTIONING.

EVALUATION:

        IT APPEARS THAT THIS 28-YEAR-OLD DEFENDANT PARTICIPATED IN THE PRESENT OFFENSE BECAUSE OF HIS INVOLVEMENT IN VIOLENT GANG ACTIVITIES. THE DEFENDANT DENIES THE OFFENSE AND SHOWED NO REMORSE FOR WHAT HAS HAPPENED. THE PROBATION OFFICER FEELS THAT THE DEFENDANT HAS LITTLE, IF ANY, DESIRE TO DISCONTINUE HIS INDULGENCE IN CRIMINAL ACTIVITIES.

        IF THE DEFENDANT'S ACTIVITY WITHIN THE COMMUNITY IS TO BE RE-DIRECTED, THEN STATE PRISON IS CERTAINLY WARRANTED. THEREFORE, THE ONLY ALTERNATIVE IS TO PLACE THE DEFENDANT IN A SECURE SETTING SUCH AS IS AFFORDED BY THE CALIFORNIA DEPARTMENT OF CORRECTIONS. BOTH HE AND THE COMMUNITY WILL BE BETTER SERVED BY THE INSTANT EXTRACTION AND EXPOSURE TO A MORE SECURE SETTING.

-10- (CALLOWAY)

76C692G - PROB. 5A 1/92

1      SENTENCING CONSIDERATIONS:

2     THE DEFENDANT IS INELIGIBLE FOR PROBATION PURSUANT

3 TO 12022.5A PC.

4      CIRCUMSTANCES IN AGGRAVATION:

5     1. THE CRIME INVOLVED GREAT VIOLENCE, GREAT
       BODILY HARM, THREAT OF GREAT BODILY HARM, OR
6      OTHER ACTS DISCLOSING A HIGH DEGREE OF
       CRUELTY, VICIOUSNESS OR CALLOUSNESS.
7

8     2. THE DEFENDANT USED A WEAPON AT THE TIME OF THE
       COMMISSION OF THE CRIME.

9      CIRCUMSTANCES IN MITIGATION:

10     THERE APPEARS TO BE NO CIRCUMSTANCES IN

11 MITIGATION.

12 RECOMMENDATION:

13     IT IS RECOMMENDED THAT PROBATION BE DENIED, AND

14 THAT THE DEFENDANT BE SENTENCED TO STATE PRISON WITH

15 PRE-IMPRISONMENT CREDIT OF 1,320 DAYS; THAT THE COURT ORDER THE

16 DEFENDANT TO PAY A RESTITUTION FINE OF $100 AS PROVIDED IN

17

18

19

20

21

22

23

-11- (CALLOWAY)

1  SUBDIVISION (A) OF SECTION 13967 OF THE GOVERNMENT CODE.

2  RESPECTFULLY SUBMITTED,

3  BARRY J. NIDORF
   PROBATION OFFICER

4

5  BY_____

6     ROLAND R. ROBINSON, DEPUTY
      SOUTH CENTRAL AREA OFFICE

7     (310) 603-7907

8  READ AND APPROVED:              I HAVE READ AND CONSIDERED
                                   THE FOREGOING REPORT OF THE
9                                  PROBATION OFFICER.

10

11  CHARLES ROGERS, SDPO
    (310) 603-7894                 _____

12                                 JUDGE OF THE SUPERIOR COURT

13  (SUBMITTED 4-28-93)
    (TYPED 4-29-93)
    RR:TXRX:TB(8)

14

15      IF PROBATION IS GRANTED, IT IS RECOMMENDED THAT

16  THE COURT DETERMINE DEFENDANT'S ABILITY TO PAY COST OF PROBATION

17  SERVICES  PURSUANT  TO  SECTION  1203.1B  PENAL  CODE.   COST  OF

18  PRESENTENCE INVESTIGATION AND PRESENTENCE REPORT - $412.00.  COST

19  OF SUPERVISION - $28.00 PER MONTH.

20

21

22

23

    -12- (CALLOWAY)

# EXHIBIT "I"

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
August, 2006 Lifer Calendar

CORRECTIONAL TRAINING FACILITY SOLEDAD
JULY, 2006

| | |
|---|---|
| NAME: | CALLOWAY, PAUL |
| CDC#: | C-92309 |
| DOB: | 10/13/64 |
| OFFENSE: | PC 187 MURDER, SECOND DEGREE, AND VOLUNTARY MANSLAUGHTER |
| DATE OF OFFENSE: | 7/9/89 & 8/2/89 |
| SENTENCE: | 17 YEARS TO LIFE |
| MEPD: | 4/4/01 |
| EVALUATION DATE: | 7/29/06 |

I.    IDENTIFYING INFORMATION:

Mr Paul Calloway is a 41 year old, first term, married, African-American male from Los Angeles County. He is a Christian. He has served 16 years in custody.

SOURCES OF INFORMATION:

This evaluation is based upon a single 90 minute interview, plus review of the central and medical files.

The psychiatric evaluation, dated 6/26/00, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

CALLOWAY, PAUL
H-92309
7/29/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Calloway related during the interview in a serious, sober, and cooperative manner. His mental status was within normal limits. There was no history of any mental or emotional problems in this case. His thinking was rational, logical, and coherent. His speech was normal, fluent and goal oriented. His eye contact was excellent. His memory was intact. His judgment was intact. His insight and self-awareness were very good. There is no evidence of signs or symptoms of Anti-Social Personality Disorder, or any other personality disorder.

Mr. Calloway has been making a good institutional adjustment. He only has received one disciplinary in 1996 for resisting staff. There is no evidence of aggression, violence, possession of weapons, or assaults on others. He has completed his high school diploma, but he currently is enrolled in education in order to get his GED.

### CURRENT DIAGNOSTIC IMPRESSION

| Axis I:   | No mental disorder      |
| Axis II:  | No personality disorder |
| Axis III: | No physical disorder    |
| Axis IV:  | Life term incarceration |
| Axis V:   | Current GAF: 85         |

### XIII.   REVIEW OF LIFE CRIME

Mr. Calloway stated that he is innocent, in that he was not the person, who is responsible for these two shootings. He has received information recently indicating that the female witness, Bertha Bernett, deliberately lied in court in order to please her boyfriend at the time. Her boyfriend was a friend of the adult male victim who was shot. He has learned that her sister Claudia, knows that her sister lied in court, and she also knows the person who committed these crimes, a person named Terrance Smith, AKA Bayball. Mr. Calloway has contacted the Innocent Project for legal assistance in his case.

Mr. Calloway stated that he had been raised in the same neighborhood as the man who was shot, who was a young man at the time. He stated that they were casual associates, and he never had any confrontations or arguments with the victim. He

CALLOWAY, PAUL
H-92309
7/29/06
PAGE 3

stated that the victim's death was a very tragic and sad situation, and that he is
sorry that it happened. He also is very sorry at the death of the other victim, even
though he had nothing to do with it. Calloway stated that he has three daughters
himself, and that it would be extremely tragic to lose a daughter in such a
senseless crime.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, Mr.
Calloway has never been involved in serious disciplinaries. At this time,
we are experiencing racial riots at this prison. He has never been involved
in any of these activities including possession of weapons, assaults on
others, or any other serious disciplinary. By nature, he appears to be a
gentle, passive individual, who is not at all aggressive or violent. In
comparison to other inmates, potential for dangerous behavior is definitely
below average.

B.  In considering potential for dangerous behavior when released to the
community, the Level of Service Inventory-Revised was administered.
This is an actuarial measure that assesses criminal history, substance abuse
history, current attitudes, and achievements in prison, in order to
determine current risk level on parole. He obtained a score of 0.9
cumulative frequency for community offenders. This score means that if
100 men were released on parole, he would be expected to do better on
parole than 99 of them. This is a very low risk level. As a result, he poses
no more risk to society than the average citizen in the community.

C.  There are no significant risk factors in this case.

CALLOWAY, PAUL
H-92309
7/29/06
PAGE 4

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with
routine parole planning. Mr. Calloway has a supportive family in the community.
He has offers for residence as well as employment in the community. The
prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    7/29/06
T:    7/29/06

# EXHIBIT   "H"

4702

1   I SAW HIM.  IT WAS A MALE HISPANIC.  HE WAS SIX FEET

2   TALL."  YOU SAY SOMETHING DIFFERENT TO THROW THE POLICE

3   OFF.  THE LAST THING YOU DO IS SIGN ANY KIND OF

4   STATEMENT IF YOU ARE AFRAID.

5            EVERYTHING HE WANTS YOU TO EMBRACE IN

6   ORDER TO ACCEPT MR. TINSLEY'S TESTIMONY ABOUT WHAT

7   DONNELL JONES SAID IS COMPLETELY ILLOGICAL.

8            NOW, I SEE YOU GUYS ARE GETTING A LITTLE

9   RESTLESS.  WORK WITH ME.  WORK WITH ME JUST A LITTLE

10  WHILE LONGER.  I'LL EVEN THROW AWAY A FEW CARDS.

11           ON SEPTEMBER 11TH, WHAT HAPPENED?  THEY

12  SHOWED THE SIX-PACK PHOTO TO WHO?  MISS GALINDO, RIGHT?

13  YOU GOT A TENTATIVE I.D.  OF COURSE, ACCORDING TO

14  MISS GALINDO IT WAS JUST BECAUSE SHE WANTED TO SEE HIM

15  JUDGED IN COURT.  BUT THE POLICE HAVE A PROBLEM WITH

16  THIS I.D.  IT'S TENTATIVE, RIGHT?

17           ON SEPTEMBER 12TH, THE VERY NEXT DAY,

18  WHERE DO THEY WIND UP?  BAKERSFIELD.  TO SEE WHO?

19  DONNELL.  SOUNDS LIKE A PLAN TO ME.  RIGHT?

20           WHAT ARE THE -- WHAT ARE YOU GOING TO

21  TAKE, NOW, WHEN YOU GO TO SEE DONNELL UP IN BAKERSFIELD?

22  ALL OF THEM START WITH A "P".  A PEN TO WRITE DOWN WHAT

23  HE SAYS.  A PIECE OF PAPER TO PUT IT DOWN ON.  AND WHAT

24  ELSE?  THE PHOTOS.

25           SOUNDS LIKE A PLAN.  THEY WANT

26  PAGE 1 STUFF.  IT DOESN'T TAKE 25 YEARS OF POLICE

27  EXPERIENCE TO DO THAT.  I WOULD TAKE THE PHOTOS.

28           POOR COX GOT THROUGH AND SAID, "I REALLY

4703

1 | CAN'T REMEMBER.  I THINK WE DID."

2 |              THEY TOOK THE PHOTOS, DONNELL SAID.

3 |              "PAUL IS THIS ONE?"

4 |              HE SAID, "I CAN'T TELL YOU."

5 |              THAT'S WHAT HAPPENED.  DONNELL COULDN'T

6 | I.D. HIM WAY BACK THEN.  BUT OF COURSE, CONSISTENT WITH

7 | SELECTIVE PROSECUTION AND WITNESSES THEY ARE GOING TO

8 | USE, THEY WOULDN'T WRITE THAT OR REMEMBER THAT.  THAT'S

9 | WHY THEY WEREN'T ANXIOUS TO HAVE CLARETTA JONES COME

10 | DOWN HERE.

11 |              SELECTIVE PROSECUTION.  SELECTIVE.  WE

12 | WILL SELECT THIS WITNESS THAT ONLY HELPS OUR CASE.  WE

13 | WOULDN'T PRESENT THIS.  THAT'S WHAT'S GOING ON IN THIS

14 | CASE.  AND YOU CAN READ BETWEEN THE LINES, AND YOU CAN

15 | SEE, CAN'T YOU?  THEY ARE TRYING TO CONVICT A BOY OF

16 | SPECIAL CIRCUMSTANCE ON THIS, AND YOU CAN SEE IT, CAN'T

17 | YOU?  YOU DON'T HAVE TO BE A MENTAL GIANT.  IT'S RIGHT

18 | HERE IN FRONT OF YOU.

19 |              IF YOU HAD A TENTATIVE IDENTIFICATION ON

20 | SEPTEMBER 11TH FOR MISS GALINDO, YOU CERTAINLY ARE GOING

21 | TO TAKE THE PHOTOS TO GO SEE -- TO TAKE THEM UP TO

22 | DONNELL THE NEXT DAY, THE VERY NEXT DAY.  ALL RIGHT?

23 |              BUT WHEN DONNELL IS UNABLE TO IDENTIFY, WE

24 | FORGET ABOUT THAT.  SO DONNELL SAW THE PICTURES AND

25 | WASN'T ABLE TO IDENTIFY.  SO WHEN TINSLEY TELLS YOU

26 | THAT, LEONARD TINSLEY, CONSISTENT WITH WHAT HE IS, HAS

27 | LIED ONCE AGAIN.

28 |              OKAY?

4704

1              NOW, LET'S TALK ABOUT LEONARD A LITTLE BIT

2    MORE, OKAY?  WHEN YOU TALK ABOUT LEONARD, YOU GOT TO

3    REMEMBER SOMETHING.  LEONARD DIDN'T SEE ANYTHING.  ALL

4    RIGHT?

5              LEONARD DIDN'T SEE DENNIS GET SHOT.

6    LEONARD WAS NOT AROUND WHEN THE LITTLE GIRL GOT SHOT.

7    LEONARD WAS HALF DRUNK AND PASSED OUT ON THE NIGHT

8    DENNIS GOT SHOT.  AND BURTHA WOKE HIM UP AND SAID,

9    "LASHAWN" -- EXCUSE ME.  SHE SAID, "WEZO IS SHOOTING

10   SHAWN."

11             AND HE SAID, "SHUT UP.  GO BACK TO SLEEP."

12             OKAY?

13             LEONARD IS NOT PERCIPIENT TO ANYTHING.  HE

14   DID NOT SEE ANYTHING.  EVERYTHING THAT HE IS TRYING TO

15   GET YOU TO EMBRACE TO HELP CONVICT HIM COMES FROM

16   SECONDHAND SOURCES OF HEARSAY, AND HE SAID SHE SAID

17   THIS, THAT, AND THE OTHER, RIGHT?

18             ALL UNCORROBORATED.

19             HE DIDN'T SEE ANYTHING THAT NIGHT.  WHEN

20   HE WOKE UP, HE SAID -- WHAT DID HE SAY?  HE SAID, "WHEN

21   BURTHA SAID, 'PAUL IS SHOOTING,' I GOT UP."  BECAUSE

22   WHAT?  "I KNEW THAT PAUL HAD NO REASON TO BE OVER THERE

23   SHOOTING SHAWN."

24             THAT SAYS SOMETHING ABOUT THE WAY HE FELT

25   ABOUT PAUL WAY BACK THEN.  HE SAID, "I DON'T KNOW WHY

26   PAUL WOULD BE DOING THAT, SO HE GETS UP TO GO TAKE A

27   LOOK.

28             THAT'S SOMETHING ELSE YOU NEED TO ANALYZE

1  WHEN YOU ANALYZE THE ACCURACY OF HIS TESTIMONY OR THE

2  BELIEVABILITY.

3          WHEN HE CAME -- WHEN JOHN JOHNSON, MYSELF,

4  AND MY INVESTIGATOR WENT OUT THERE TO TALK TO HIM, HE

5  LIED.  HE LIED SO WELL THAT WE SUBPOENAED HIM TO COME TO

6  COURT.  WE WERE GOING TO HAVE HIM TESTIFY FOR THE

7  DEFENSE.

8          WHEN HE CAME WALTZING IN HERE BEFORE, ARM

9  IN ARM WITH DETECTIVE MANSKE AND MR. GRAY, WE WERE

10  SHOCKED.  SHOCKED AT THE PREVIOUS HEARING THAT OCCURRED

11  IN OCTOBER OF '92.  NOT THIS PARTICULAR TIME, BUT THE

12  PREVIOUS HEARING BACK IN OCTOBER OF '92, WHEN WE

13  SUBPOENAED HIM TO TESTIFY.

14          THAT'S HOW WELL HE LIED TO US, OKAY?

15          AND I STILL CAN'T FIGURE IT OUT, BUT I

16  NOTICE WHEN I WAS CROSS-EXAMINING HIM ON THIS, THERE

17  WERE CERTAIN JURORS IN THIS BOX WHO STARTED SHAKING

18  THEIR HEAD WHEN I STARTED TO ASK HIM ABOUT, "WELL, IF

19  YOU DIDN'T WANT TO COME TO COURT, HOW IN YOUR MIND WERE

20  YOU THINKING THAT BY UNDERMINING BURTHA'S CREDIBILITY

21  THAT WOULD NOT GET YOU TO COME TO COURT?" THAT DOESN'T

22  MAKE SENSE.

23          HE KNEW WHAT WAS GOING ON.  AND TO THIS

24  DAY, I CANNOT UNDERSTAND HIS CONVOLUTED REASONING,

25  KNOWING THAT I'M HERE TO HELP HIM, HOW UNDERMINING HIS

26  GIRLFRIEND'S CREDIBILITY IS GOING TO KEEP HIM FROM

27  COMING TO COURT.  I DON'T UNDERSTAND THAT.  I STILL

28  DON'T UNDERSTAND IT.  YOU GO FIGURE IT OUT.  YOU TELL

1  ME.  I WOULD LIKE TO KNOW.

2          NOW, THE NEXT THING IS THAT PAUL AND

3  LEONARD ARE IN JAIL TOGETHER, RIGHT?  AND REMEMBER

4  NOW -- REMEMBER, THE NIGHT OF THE SHOOTING, HE SAID, "I

5  GOT UP, AND I THOUGHT PAUL HAD NO REASON TO BE SHOOTING

6  AT LASHAWN."

7          ALL RIGHT?  REMEMBER THAT.  STICK THAT

8  BACK HERE FOR A SECOND.

9          HERE YOU ARE IN JAIL, ALL RIGHT?  YOU ARE

10  A MURDERER.  YOU HAVE KILLED TWO PEOPLE, RIGHT?  THIS IS

11  YOUR STATE OF MIND; THIS IS WHY YOU ARE IN HERE:  YOU

12  HAVE KILLED TWO PEOPLE.  AND YOU KNOW THAT THE ONLY

13  PERSON THAT STANDS BETWEEN YOU AND THE GAS CHAMBER IS

14  LEONARD TINSLEY'S GIRLFRIEND, RIGHT?  YOU HAVE ALREADY

15  KILLED TWO PEOPLE.

16          WHAT ARE YOU GOING TO SAY TO LEONARD?

17  WHAT DID LEONARD TELL YOU PAUL TOLD HIM?  "PLEASE DON'T

18  LET YOUR GIRLFRIEND COME TO COURT ON ME."  AND HE'S

19  SHAKING HIS HEAD.  DOES THAT SOUND LIKE SOMEBODY WHO

20  KNOWS THERE IS ONLY ONE WITNESS BETWEEN HIM AND THE GAS

21  CHAMBER, WHO HAS ALREADY KILLED TWO PEOPLE?

22          IF I HAVE KILLED TWO PEOPLE ALREADY, AND I

23  KNOW THAT YOU ARE ABOUT TO PUT ME AWAY, OR PUT ME UNDER,

24  I'M GOING TO USE SOME -- I'M GOING TO USE SOME REAL

25  CHOICE LANGUAGE WITH YOU AND LET YOU KNOW THAT YOU

26  BETTER NOT SHOW UP.

27          BUT I'M NOT GOING TO SIT THERE AND SAY,

28  "PLEASE DON'T LET YOUR GIRLFRIEND COME TO COURT."

1   THAT'S THE WAY HE CHARACTERIZED PAUL AS HE'S IN JAIL.

2   I'M GOING TO USE SOME MUCH BETTER LANGUAGE TO INSURE

3   THAT YOU BETTER NOT SHOW UP, IF I'M REALLY THREATENING

4   YOU.

5        LEONARD ACTUALLY -- MIND YOU, LEONARD WAS

6   AT THE BEACH WITH LASHAWN AND DENNIS THE DAY DENNIS GOT

7   KILLED.  AND AS HE SAT ON THIS WITNESS STAND, HE SAID,

8   AS PAUL WAS SITTING NEXT TO ME, "I FELT SORRY FOR HIM."

9        WOULD YOU EVER FEEL SORRY FOR SOMEBODY WHO

10  SHOT YOUR BUDDY, WHO YOU WENT TO THE BEACH WITH THAT

11  DAY, IF YOU REALLY BELIEVED HE DID IT?

12        WHAT LEONARD IS TELLING YOU IS NOT ADDING

13  UP.  HE'S BEEN CAUGHT IN TOO MANY LIES, AND THE PIECES

14  OF THE PUZZLE ARE NOT FITTING TOGETHER TO MAKE SENSE.

15  IT'S JUST NOT LOGICAL.

16        ON CROSS-EXAMINATION, I SPECIFICALLY ASKED

17  HIM, I SAID, "LOOK, LEONARD, DID PAUL SPECIFICALLY

18  THREATEN YOU?"

19        HE SAID, "NO.  PAUL NEVER THREATENED ME."

20        I PINNED HIM DOWN ON IT:  "GIVE ME NAMES

21  WHO THREATENED YOU, LEONARD."

22        AND YOU KNOW WHAT HE SAID?  HE SAID, "I

23  WASN'T AFRAID OF HIM IN JAIL THEN, AND I'M NOT AFRAID OF

24  HIM NOW."

25        BUT WHAT HE DID SAY WAS THE SOURCE OF

26  THREATS -- AND THIS IS IN THE TRANSCRIPT -- CAME FROM

27  BURTHA BURNETT'S SISTER'S BOYFRIEND, A GUY NAMED

28  DERRICK.  AND HE SAID DERRICK COMMUNICATED IT TO MULDOON

1   (PHONETIC), AND MULDOON IS WHO?  LEONARD'S FRIEND.

2   THAT'S LEONARD'S FRIEND.

3          AND ANOTHER THING HE SAID THAT WAS

4   INTERESTING, HE SAID, "MULDOON INTRODUCED ME TO PAUL IN

5   JAIL."

6          IF, ON THE NIGHT OF THE SHOOTING, YOU KNEW

7   WHO PAUL WAS, WHY WOULD YOU NEED MULDOON TO INTRODUCE TO

8   PAUL IN JAIL?  THE BOY IS LYING.  HE'S LYING ON TOO MANY

9   THINGS, AND IT'S OBVIOUS AS YOU SIT DOWN AND CRITICALLY

10   ANALYZE HIS TESTIMONY.  WHY?  I DON'T KNOW.  YOU GO

11   FIGURE, BUT HE'S LYING.

12          IF HE WAS SERIOUSLY THREATENED, REMEMBER

13   HE TOLD YOU, HE SAID, "WELL, THE PERSON WROTE ME

14   LETTERS.  SOMEBODY WROTE ME LETTERS, AND I HAD TWO OF

15   THEM.  I TORE ONE UP, BUT I GAVE ONE TO GERRY MANSKE."

16          DO YOU THINK THAT IF HE HAD ONE OF THOSE

17   LETTERS, IF ART GRAY OR MR. GERRY MANSKE HAD ONE OF

18   THOSE LETTERS, DON'T YOU THINK THAT THEY WOULD LEAP TO

19   TRY AND INTRODUCE IT INTO EVIDENCE?  DON'T YOU THINK

20   THAT GERRY MANSKE WOULD HAVE VOLUNTEERED IT IF IT HAD

21   REALLY HAPPENED?  HE JUST TORE IT UP.  HE TORE ONE UP.

22          WHAT DO YOU HAVE TO HAVE TO SEND LETTERS

23   TO SOMEBODY?  A POSTAGE STAMP AND AN ADDRESS, RIGHT?

24   THAT MEANS WHOEVER IS SENDING THESE LETTERS KNOWS WHERE

25   HE IS.

26   I'M GOING TO DEMAND POLICE PROTECTION,

27   AND GERRY MANSKE SHOULD HAVE KNOWN ABOUT IT, BUT IT'S A

28   CROCK,  AND IT'S NOT TRUE, AND IT DIDN'T HAPPEN, AND

1    I SAW HIM.  IT WAS A MALE HISPANIC.  HE WAS SIX FEET

2    TALL."  YOU SAY SOMETHING DIFFERENT TO THROW THE POLICE

3    OFF.  THE LAST THING YOU DO IS SIGN ANY KIND OF

4    STATEMENT IF YOU ARE AFRAID.

5             EVERYTHING HE WANTS YOU TO EMBRACE IN

6    ORDER TO ACCEPT MR. TINSLEY'S TESTIMONY ABOUT WHAT

7    DONNELL JONES SAID IS COMPLETELY ILLOGICAL.

8             NOW, I SEE YOU GUYS ARE GETTING A LITTLE

9    RESTLESS.  WORK WITH ME.  WORK WITH ME JUST A LITTLE

10   WHILE LONGER.  I'LL EVEN THROW AWAY A FEW CARDS.

11             ON SEPTEMBER 11TH, WHAT HAPPENED?  THEY

12   SHOWED THE SIX-PACK PHOTO TO WHO?  MISS GALINDO, RIGHT?

13   YOU GOT A TENTATIVE I.D.  OF COURSE, ACCORDING TO

14   MISS GALINDO IT WAS JUST BECAUSE SHE WANTED TO SEE HIM

15   JUDGED IN COURT.  BUT THE POLICE HAVE A PROBLEM WITH

16   THIS I.D.  IT'S TENTATIVE, RIGHT?

17             ON SEPTEMBER 12TH, THE VERY NEXT DAY,

18   WHERE DO THEY WIND UP?  BAKERSFIELD.  TO SEE WHO?

19   DONNELL.  SOUNDS LIKE A PLAN TO ME.  RIGHT?

20             WHAT ARE THE -- WHAT ARE YOU GOING TO

21   TAKE, NOW, WHEN YOU GO TO SEE DONNELL UP IN BAKERSFIELD?

22   ALL OF THEM START WITH A "P".  A PEN TO WRITE DOWN WHAT

23   HE SAYS.  A PIECE OF PAPER TO PUT IT DOWN ON.  AND WHAT

24   ELSE?  THE PHOTOS.

25             SOUNDS LIKE A PLAN.  THEY WANT

26   PAGE 1 STUFF.  IT DOESN'T TAKE 25 YEARS OF POLICE

27   EXPERIENCE TO DO THAT.  I WOULD TAKE THE PHOTOS.

28             POOR COX GOT THROUGH AND SAID, "I REALLY

1   CAN'T REMEMBER.  I THINK WE DID."

2                THEY TOOK THE PHOTOS, DONNELL SAID.

3                "PAUL IS THIS ONE?"

4                HE SAID, "I CAN'T TELL YOU."

5                THAT'S WHAT HAPPENED.  DONNELL COULDN'T

6   I.D. HIM WAY BACK THEN.  BUT OF COURSE, CONSISTENT WITH

7   SELECTIVE PROSECUTION AND WITNESSES THEY ARE GOING TO

8   USE, THEY WOULDN'T WRITE THAT OR REMEMBER THAT.  THAT'S

9   WHY THEY WEREN'T ANXIOUS TO HAVE CLARETTA JONES COME

10  DOWN HERE.

11               SELECTIVE PROSECUTION.  SELECTIVE.  WE

12  WILL SELECT THIS WITNESS THAT ONLY HELPS OUR CASE.  WE

13  WOULDN'T PRESENT THIS.  THAT'S WHAT'S GOING ON IN THIS

14  CASE.  AND YOU CAN READ BETWEEN THE LINES, AND YOU CAN

15  SEE, CAN'T YOU?  THEY ARE TRYING TO CONVICT A BOY OF

16  SPECIAL CIRCUMSTANCE ON THIS, AND YOU CAN SEE IT, CAN'T

17  YOU?  YOU DON'T HAVE TO BE A MENTAL GIANT.  IT'S RIGHT

18  HERE IN FRONT OF YOU.

19               IF YOU HAD A TENTATIVE IDENTIFICATION ON

20  SEPTEMBER 11TH FOR MISS GALINDO, YOU CERTAINLY ARE GOING

21  TO TAKE THE PHOTOS TO GO SEE -- TO TAKE THEM UP TO

22  DONNELL THE NEXT DAY, THE VERY NEXT DAY.  ALL RIGHT?

23               BUT WHEN DONNELL IS UNABLE TO IDENTIFY, WE

24  FORGET ABOUT THAT.  SO DONNELL SAW THE PICTURES AND

25  WASN'T ABLE TO IDENTIFY.  SO WHEN TINSLEY TELLS YOU

26  THAT, LEONARD TINSLEY, CONSISTENT WITH WHAT HE IS, HAS

27  LIED ONCE AGAIN.

28               OKAY?

1          NOW, LET'S TALK ABOUT LEONARD A LITTLE BIT

2    MORE, OKAY?  WHEN YOU TALK ABOUT LEONARD, YOU GOT TO

3    REMEMBER SOMETHING.  LEONARD DIDN'T SEE ANYTHING.  ALL

4    RIGHT?

5          LEONARD DIDN'T SEE DENNIS GET SHOT.

6    LEONARD WAS NOT AROUND WHEN THE LITTLE GIRL GOT SHOT.

7    LEONARD WAS HALF DRUNK AND PASSED OUT ON THE NIGHT

8    DENNIS GOT SHOT.  AND BURTHA WOKE HIM UP AND SAID,

9    "LASHAWN" -- EXCUSE ME.  SHE SAID, "WEZO IS SHOOTING

10   SHAWN."

11          AND HE SAID, "SHUT UP.  GO BACK TO SLEEP."

12          OKAY?

13          LEONARD IS NOT PERCIPIENT TO ANYTHING.  HE

14   DID NOT SEE ANYTHING.  EVERYTHING THAT HE IS TRYING TO

15   GET YOU TO EMBRACE TO HELP CONVICT HIM COMES FROM

16   SECONDHAND SOURCES OF HEARSAY, AND HE SAID SHE SAID

17   THIS, THAT, AND THE OTHER, RIGHT?

18          ALL UNCORROBORATED.

19          HE DIDN'T SEE ANYTHING THAT NIGHT.  WHEN

20   HE WOKE UP, HE SAID -- WHAT DID HE SAY?  HE SAID, "WHEN

21   BURTHA SAID, 'PAUL IS SHOOTING,' I GOT UP."  BECAUSE

22   WHAT?  "I KNEW THAT PAUL HAD NO REASON TO BE OVER THERE

23   SHOOTING SHAWN."

24          THAT SAYS SOMETHING ABOUT THE WAY HE FELT

25   ABOUT PAUL WAY BACK THEN.  HE SAID, "I DON'T KNOW WHY

26   PAUL WOULD BE DOING THAT."  SO HE GETS UP TO GO TAKE A

27   LOOK.

28          THAT'S SOMETHING ELSE YOU NEED TO ANALYZE

1    WHEN YOU ANALYZE THE ACCURACY OF HIS TESTIMONY OR THE

2    BELIEVABILITY.

3                    WHEN HE CAME -- WHEN JOHN JOHNSON, MYSELF,

4    AND MY INVESTIGATOR WENT OUT THERE TO TALK TO HIM, HE

5    LIED.  HE LIED SO WELL THAT WE SUBPOENAED HIM TO COME TO

6    COURT.  WE WERE GOING TO HAVE HIM TESTIFY FOR THE

7    DEFENSE.

8                    WHEN HE CAME WALTZING IN HERE BEFORE, ARM

9    IN ARM WITH DETECTIVE MANSKE AND MR. GRAY, WE WERE

10   SHOCKED.  SHOCKED AT THE PREVIOUS HEARING THAT OCCURRED

11   IN OCTOBER OF '92.  NOT THIS PARTICULAR TIME, BUT THE

12   PREVIOUS HEARING BACK IN OCTOBER OF '92, WHEN WE

13   SUBPOENAED HIM TO TESTIFY.

14                    THAT'S HOW WELL HE LIED TO US, OKAY?

15                    AND I STILL CAN'T FIGURE IT OUT, BUT I

16   NOTICE WHEN I WAS CROSS-EXAMINING HIM ON THIS, THERE

17   WERE CERTAIN JURORS IN THIS BOX WHO STARTED SHAKING

18   THEIR HEAD WHEN I STARTED TO ASK HIM ABOUT, "WELL, IF

19   YOU DIDN'T WANT TO COME TO COURT, HOW IN YOUR MIND WERE

20   YOU THINKING THAT BY UNDERMINING BURTHA'S CREDIBILITY

21   THAT WOULD NOT GET YOU TO COME TO COURT?" THAT DOESN'T

22   MAKE SENSE.

23                    HE KNEW WHAT WAS GOING ON.  AND TO THIS

24   DAY, I CANNOT UNDERSTAND HIS CONVOLUTED REASONING,

25   KNOWING THAT I'M HERE TO HELP HIM, HOW UNDERMINING HIS

26   GIRLFRIEND'S CREDIBILITY IS GOING TO KEEP HIM FROM

27   COMING TO COURT.  I DON'T UNDERSTAND THAT.  I STILL

28   DON'T UNDERSTAND IT.  YOU GO FIGURE IT OUT.  YOU TELL

1 | ME. I WOULD LIKE TO KNOW.

2 | NOW, THE NEXT THING IS THAT PAUL AND

3 | LEONARD ARE IN JAIL TOGETHER, RIGHT? AND REMEMBER

4 | NOW -- REMEMBER, THE NIGHT OF THE SHOOTING, HE SAID, "I

5 | GOT UP, AND I THOUGHT PAUL HAD NO REASON TO BE SHOOTING

6 | AT LASHAWN."

7 | ALL RIGHT? REMEMBER THAT. STICK THAT

8 | BACK HERE FOR A SECOND.

9 | HERE YOU ARE IN JAIL, ALL RIGHT? YOU ARE

10 | A MURDERER. YOU HAVE KILLED TWO PEOPLE, RIGHT? THIS IS

11 | YOUR STATE OF MIND; THIS IS WHY YOU ARE IN HERE: YOU

12 | HAVE KILLED TWO PEOPLE. AND YOU KNOW THAT THE ONLY

13 | PERSON THAT STANDS BETWEEN YOU AND THE GAS CHAMBER IS

14 | LEONARD TINSLEY'S GIRLFRIEND, RIGHT? YOU HAVE ALREADY

15 | KILLED TWO PEOPLE.

16 | WHAT ARE YOU GOING TO SAY TO LEONARD?

17 | WHAT DID LEONARD TELL YOU PAUL TOLD HIM? "PLEASE DON'T

18 | LET YOUR GIRLFRIEND COME TO COURT ON ME." AND HE'S

19 | SHAKING HIS HEAD. DOES THAT SOUND LIKE SOMEBODY WHO

20 | KNOWS THERE IS ONLY ONE WITNESS BETWEEN HIM AND THE GAS

21 | CHAMBER, WHO HAS ALREADY KILLED TWO PEOPLE?

22 | IF I HAVE KILLED TWO PEOPLE ALREADY, AND I

23 | KNOW THAT YOU ARE ABOUT TO PUT ME AWAY, OR PUT ME UNDER,

24 | I'M GOING TO USE SOME -- I'M GOING TO USE SOME REAL

25 | CHOICE LANGUAGE WITH YOU AND LET YOU KNOW THAT YOU

26 | BETTER NOT SHOW UP.

27 | BUT I'M NOT GOING TO SIT THERE AND SAY,

28 | "PLEASE DON'T LET YOUR GIRLFRIEND COME TO COURT."

4707

1   THAT'S THE WAY HE CHARACTERIZED PAUL AS HE'S IN JAIL.

2   I'M GOING TO USE SOME MUCH BETTER LANGUAGE TO INSURE

3   THAT YOU BETTER NOT SHOW UP, IF I'M REALLY THREATENING

4   YOU.

5         LEONARD ACTUALLY -- MIND YOU, LEONARD WAS

6   AT THE BEACH WITH LASHAWN AND DENNIS THE DAY DENNIS GOT

7   KILLED.  AND AS HE SAT ON THIS WITNESS STAND, HE SAID,

8   AS PAUL WAS SITTING NEXT TO ME, "I FELT SORRY FOR HIM."

9         WOULD YOU EVER FEEL SORRY FOR SOMEBODY WHO

10  SHOT YOUR BUDDY, WHO YOU WENT TO THE BEACH WITH THAT

11  DAY, IF YOU REALLY BELIEVED HE DID IT?

12        WHAT LEONARD IS TELLING YOU IS NOT ADDING

13  UP.  HE'S BEEN CAUGHT IN TOO MANY LIES, AND THE PIECES

14  OF THE PUZZLE ARE NOT FITTING TOGETHER TO MAKE SENSE.

15  IT'S JUST NOT LOGICAL.

16        ON CROSS-EXAMINATION, I SPECIFICALLY ASKED

17  HIM, I SAID, "LOOK, LEONARD, DID PAUL SPECIFICALLY

18  THREATEN YOU?"

19        HE SAID, "NO.  PAUL NEVER THREATENED ME."

20        I PINNED HIM DOWN ON IT:  "GIVE ME NAMES

21  WHO THREATENED YOU, LEONARD."

22        AND YOU KNOW WHAT HE SAID?  HE SAID, "I

23  WASN'T AFRAID OF HIM IN JAIL THEN, AND I'M NOT AFRAID OF

24  HIM NOW."

25        BUT WHAT HE DID SAY WAS THE SOURCE OF

26  THREATS -- AND THIS IS IN THE TRANSCRIPT -- CAME FROM

27  BURTHA BURNETT'S SISTER'S BOYFRIEND, A GUY NAMED

28  DERRICK.  AND HE SAID DERRICK COMMUNICATED IT TO MULDOON

1  (PHONETIC), AND MULDOON IS WHO?  LEONARD'S FRIEND.

2  THAT'S LEONARD'S FRIEND.

3                AND ANOTHER THING HE SAID THAT WAS

4  INTERESTING, HE SAID, "MULDOON INTRODUCED ME TO PAUL IN

5  JAIL."

6                IF, ON THE NIGHT OF THE SHOOTING, YOU KNEW

7  WHO PAUL WAS, WHY WOULD YOU NEED MULDOON TO INTRODUCE TO

8  PAUL IN JAIL?  THE BOY IS LYING.  HE'S LYING ON TOO MANY

9  THINGS, AND IT'S OBVIOUS AS YOU SIT DOWN AND CRITICALLY

10 ANALYZE HIS TESTIMONY.  WHY?  I DON'T KNOW.  YOU GO

11 FIGURE, BUT HE'S LYING.

12                IF HE WAS SERIOUSLY THREATENED, REMEMBER

13 HE TOLD YOU, HE SAID, "WELL, THE PERSON WROTE ME

14 LETTERS.  SOMEBODY WROTE ME LETTERS, AND I HAD TWO OF

15 THEM.  I TORE ONE UP, BUT I GAVE ONE TO GERRY MANSKE."

16                DO YOU THINK THAT IF HE HAD ONE OF THOSE

17 LETTERS, IF ART GRAY OR MR. GERRY MANSKE HAD ONE OF

18 THOSE LETTERS, DON'T YOU THINK THAT THEY WOULD LEAP TO

19 TRY AND INTRODUCE IT INTO EVIDENCE?  DON'T YOU THINK

20 THAT GERRY MANSKE WOULD HAVE VOLUNTEERED IT IF IT HAD

21 REALLY HAPPENED?  HE JUST TORE IT UP.  HE TORE ONE UP.

22                WHAT DO YOU HAVE TO HAVE TO SEND LETTERS

23 TO SOMEBODY?  A POSTAGE STAMP AND AN ADDRESS, RIGHT?

24 THAT MEANS WHOEVER IS SENDING THESE LETTERS KNOWS WHERE

25 HE IS.

26                "I'M GOING TO DEMAND POLICE PROTECTION."

27 AND GERRY MANSKE SHOULD HAVE KNOWN ABOUT IT, BUT IT'S A

28 CROCK,  AND IT'S NOT TRUE, AND IT DIDN'T HAPPEN, AND

Book #16
page 4547 - 4576

4547

1  WITNESS?

2          MR. GRAY:  NO.

3          THE COURT:  MAYBE THIS TIME IT WILL STICK.

4                  DETECTIVE, YOU ARE EXCUSED.

5                  YOU READY WITH YOUR NEXT WITNESS,

6  MR. GRAY?

7          MR. GRAY:  YES, YOUR HONOR.

8                  PEOPLE CALL DONNELL JONES.

9          THE COURT:  WOULD YOU COME UP AND TAKE THE

10  WITNESS STAND, PLEASE.

11                  RAISE YOUR RIGHT HAND AND FACE THE CLERK.

12          THE CLERK:  WILL YOU PLEASE STAND.

13

14                  DONNELL JONES,

15  CALLED AS A WITNESS BY THE PEOPLE, WAS SWORN AND

16  TESTIFIED AS FOLLOWS:

17          THE CLERK:  YOU DO SOLEMNLY SWEAR THE TESTIMONY

18  YOU MAY GIVE IN THE CAUSE NOW PENDING BEFORE THIS COURT

19  SHALL BE THE TRUTH, THE WHOLE TRUTH, AND NOTHING BUT THE

20  TRUTH, SO HELP YOU GOD.

21          THE WITNESS:  I DO.

22          THE COURT:  IF YOU WOULD STATE AND SPELL YOUR

23  FULL NAME, PLEASE.

24          THE WITNESS:  DONNELL JONES, D-O-N-N-E-L-L,

25  J-O-N-E-S.

26          MR. GRAY:  MAY I INQUIRE, YOUR HONOR?

27          THE COURT:  PLEASE.

28

4548

<pre>
 1                    DIRECT EXAMINATION
 2   BY MR. GRAY:
 3         Q      GOOD AFTERNOON, MR. JONES.
 4         A      GOOD AFTERNOON.
 5         Q      I WOULD LIKE TO DIRECT YOUR ATTENTION TO
 6   AUGUST OF 1989.  DO YOU REMEMBER THAT TIME PERIOD, SIR?
 7         A      AUGUST 8TH, 1989?
 8         Q      YES, SIR.
 9         A      NAW.
10         THE COURT:  DID YOU SAY "AUGUST 8TH, 1989" OR
11   "AUGUST OF 1989"?
12         Q      BY MR. GRAY:  AUGUST OF 1989?
13         A      NO.
14         Q      DID YOU KNOW A LITTLE GIRL BY THE NAME OF
15   KANITA HAILEY, SIR?
16         A      YEAH.  SHE STAYED IN THE BACK OF ME.
17         Q      AND SHE WAS SHOT AND KILLED ONE DAY?
18         A      YES, SHE WAS SHOT.
19         Q      DO YOU REMEMBER WHEN THAT HAPPENED, SIR?
20         A      IT HAPPENED ABOUT '89, BUT I DON'T KNOW
21   WHAT DATE.
22         Q      OKAY.  THAT'S FINE.
23                THE DAY IT HAPPENED, SIR, WERE YOU OUT
24   THERE IN THE YARD AREA WHERE IT HAPPENED?
25         A      I WASN'T IN THE YARD AREA.  I WAS AT THE
26   GATE.
27         Q      YOU WERE AT THE GATE, AND THE GATE IS
28   RIGHT IN FRONT OF THE AREA WHERE KANITA WAS PLAYING?
</pre>

1          A       NO.

2          Q       WHERE IS THE GATE?

3          A       IT'S FAR AWAY FROM THE AREA SHE WAS

4   PLAYING.  SHE WAS PLAYING IN MY YARD.

5          Q       OKAY.

6          MR. GRAY:  I HAVE A PHOTOGRAPH, PEOPLE'S 61.

7                MAY I APPROACH?

8          THE COURT:  YES.

9          Q       BY MR. GRAY:  SHOWING YOU PEOPLE'S 61

10  HERE, THE PHOTOGRAPH, DOES THAT LOOK LIKE THE AREA, SIR,

11  WHERE YOU LIVED ON -- EXCUSE ME.

12                DOES THAT LOOK LIKE THE AREA YOU LIVED

13  WHEN KANITA WAS SHOT?

14         A       I STILL LIVE THERE.  YEAH.

15         Q       AND THE GATE THAT YOU ARE TALKING ABOUT

16  THAT YOU ARE WERE STANDING NEXT TO, IS THAT THE GATE

17  SHOWN HERE BY THE LARGE TREE?

18         A       YEAH.

19         Q       IS THAT WHERE YOU WERE STANDING WHEN THE

20  SHOOTING STARTED, SIR?

21         A       YEAH.

22         MR. GRAY:  IF I CAN, YOUR HONOR, ON PEOPLE'S 61 I

23  WOULD LIKE TO WRITE THE LETTERS *- EXCUSE ME.

24         Q       SIR, WELL, POINT EXACTLY WHERE YOU WERE

25  WHEN THE SHOOTING STARTED, SIR.

26         A       I WAS ON THIS SIDE, THE LEFT-HAND SIDE OF

27  THE GATE.

28         Q       WERE YOU RIGHT ON THE WALKWAY IN FRONT OF

4550

1    THE GATE?

2         A    NO.  I WAS RIGHT HERE BETWEEN THE GATE.

3         Q    BUT WERE YOU STANDING ON CONCRETE IS WHAT

4    I'M TRYING TO FIND OUT?

5         A    ON CONCRETE.

6         Q    SO RIGHT HERE?

7         A    ON THE LEFT SIDE LEFT.  ON THAT SIDE RIGHT

8    HERE.

9         Q    SO IF I PUT THE "D.J." HERE, WOULD THAT BE

10   RIGHT?

11        A    YEAH, BETWEEN THE GATE.

12        Q    THAT WOULD BE CLOSER TO THE LEFT-HAND

13   SIDE?

14        A    TURNED THIS WAY.  THIS IS THE LEFT-HAND

15   SIDE OVER HERE.

16        Q    OKAY.

17             SO IT'S CLOSER TO THE OTHER SIDE OVER

18   HERE?

19        THE COURT:  THE STREET SIDE?

20        MR. GRAY:  WELL, IT'S HARD --

21        THE WITNESS:  FACE GOING TOWARDS STOP SIGN.

22        MR. GRAY:  OPPOSITE THIS SIDE OF THE PICTURE,

23   YOUR HONOR.

24        Q    IF I CAN -- WHEN YOU ARE TALKING ABOUT THE

25   LEFT SIDE, THE PART I'M POINTING --

26        A    THE LEFT SIDE, LIKE THIS.  FACING THIS WAY

27   (INDICATING).

28        Q    FACING --

4551

```
 1            A        YEAH.

 2            Q        -- ALONG THIS SIDE RIGHT HERE?

 3            A        YEAH.  I WAS STANDING THERE.

 4            MR. GRAY:  I'M GOING TO MARK A BLACK LINE, YOUR

 5   HONOR, ALONG THE SIDE THE FENCE THAT MR. JONES WAS

 6   STANDING AT.

 7            Q        IS THAT CORRECT, SIR?

 8            A        THAT'S CORRECT.

 9            Q        AND THE LITTLE GIRL, SHE WAS PLAYING IN

10   THE INSIDE AREA HERE INSIDE THE GATE AREA?

11            A        SHE WAS PLAYING RIGHT HERE BY THIS -- BY

12   THE WHITE LINE ON THE BRICK WALL.

13            Q        SO IF I PUT A "K.H." HERE, THAT'S THE

14   AREA?

15            A        THAT'S WHERE IT WAS.

16            Q        I'M PUTTING A "K.H." FOR THE AREA WHERE

17   KANITA WAS PLAYING WHEN THE SHOOTING STARTED.

18                     SIR, WHEN THE SHOOTING STARTED, WHAT

19   HAPPENED?

20            A        HOW COULD I TELL YOU WHAT HAPPENED?  I'M

21   LAYING DOWN.

22            Q        SOMEONE STARTED SHOOTING IN YOUR

23   DIRECTION, SIR?

24            A        YEAH.

25            Q        OKAY.

26                     AS A RESULT OF THAT, YOU DUCKED DOWN ON

27   THE GROUND?

28            A        THAT'S CORRECT.
```

```
 1          Q       NOW, THE PEOPLE THAT WERE -- THE

 2   SHOOTER -- WAS THE SHOOTER IN THE STREET, SIR?

 3          A       HE'S BEHIND THE CAR.

 4          Q       AND THAT CAR WAS IN THE STREET --

 5          A       UM-HUM.

 6          Q       -- IS THAT CORRECT?

 7          A       YEAH.

 8          Q       HOW MANY SHOOTERS WERE THERE, SIR?

 9          A       THERE'S ONE.

10          Q       CAN YOU SHOW US, SIR, ON THIS PHOTOGRAPH

11   WITH THIS RED PEN --

12          THE COURT:  "PHOTOGRAPH" BEING EXHIBIT 61?

13          MR. GRAY:  AGAIN, YES, YOUR HONOR.

14          Q       WHERE THE SHOOTER WAS -- OR LET ME

15   REPHRASE THIS.

16                  YOU SAID THE SHOOTER WAS STANDING BEHIND A

17   CAR?

18          A       YEAH.

19          Q       AND THE CAR WAS IN THE STREET?

20          A       YEAH.

21          Q       WHAT COLOR WAS THE CAR, SIR?

22          A       I CAN'T REMEMBER.

23          Q       OKAY.

24          A       IT WAS DARK.

25          Q       CAN YOU USE THIS RED MARKER TO SHOW US

26   ROUGHLY WHERE THE CAR WAS?  JUST DRAW A LINE TO SHOW US

27   ROUGHLY WHERE THE CAR WAS.

28          A       (MARKING DIAGRAM.)
```

```
 1          MR. GRAY:  HE HAS USED A RED MARKER TO MAKE A RED
 2   LINE IN THE STREET, YOUR HONOR, ON PEOPLE'S 61.
 3          THE COURT:  THANK YOU!
 4          Q     BY MR. GRAY:  NOW, YOU REMEMBER, SIR, HOW
 5   THIS PERSON -- SHOOTER WAS DRESSED?
 6          A     HOW ARE YOU GOING TO REMEMBER HOW THE
 7   SHOOTER WAS DRESSED WHEN HE WAS BEHIND THE CAR?  ALL I
 8   REMEMBER IS HE HAD ON A TANK TOP T-SHIRT.  TANK TOP
 9   T-SHIRT.
10          Q     NO SLEEVES IN IT?
11          A     NO SLEEVES.
12          Q     AND WHAT COLOR WAS IT?
13          A     WHITE.
14          Q     THE HAIRSTYLE?
15          A     HE HAD A CURL.
16          Q     JHERI CURL?
17          A     YEAH.
18          Q     YOU DUCKED DOWN ON THE GROUND, AND THE
19   PERSON STARTED SHOOTING?
20          A     THAT'S CORRECT.
21          Q     AND YOU STAYED ON THE GROUND UNTIL THE
22   SHOOTER STOPPED SHOOTING?
23          A     ALL I REMEMBER LOOKING AT WAS -- WHEN I
24   WAS LOOKING TO SEE WHO WAS THAT PULLED UP ON US, ALL I
25   COULD SEE, HE HAD LONG HAIR, AND I COULD SEE THE
26   T-SHIRT.  AND IT WAS DARK.
27          SO WHEN HE TURNED AROUND AND SHOT, I LAID
28   ON THE GROUND, BUT AS THE MOMENT WAS -- I WAS LOOKING AT
```

```
 1  THE POLICE THAT WAS AT THE STOP SIGN.  WASN'T MOVING.

 2        Q     SO YOU ARE SAYING THERE WAS A POLICE CAR

 3  THERE?

 4        A     IT WAS AN L.A.P.D. POLICE OFFICER.

 5        Q     WHERE WAS THE POLICE OFFICER, SIR?

 6        A     HE WAS AT THE STOP SIGN.

 7        Q     WHICH STOP SIGN, SIR?  WHAT CORNER?

 8        A     THE ONE ON 115TH STREET, RIGHT HERE IN THE

 9  PROJECTS.

10        THE COURT:  INDICATING THE RIGHT SIDE?

11             IF YOU ARE LOOKING BACK AT EXHIBIT 51?

12        THE WITNESS:  HE WAS TURNING TO THE LEFT.

13        Q     BY MR. GRAY:  WOULD YOU SAY 115TH AND

14  MONA?

15        A     YOU CAN'T SEE IT RIGHT THERE.

16        THE COURT:  WOULD IT -- IF YOU ARE LOOKING AT

17  THAT PICTURE, WOULD IT BE TO THE RIGHT OR LEFT?

18        THE WITNESS:  TO THE RIGHT.

19        THE COURT:  THANK YOU.

20        Q     BY MR. GRAY:  NOW, SIR, YOU KNEW A YOUNG

21  MAN BY THE NAME OF DENNIS ROGERS, CORRECT?

22        A     DENNIS ROGERS.

23        Q     WEZO?

24        A     YEAH.

25        Q     GOOD FRIEND OF YOURS?

26        A     WE KIN TO EACH OTHER.

27        Q     YOU ALSO KNOW LEONARD TINSLEY?

28        A     YEAH, I KNOW HIM, TOO.
```

4555

1          Q        GOOD FRIEND OF YOURS?

2          A        YEAH.

3          Q        DO YOU REMEMBER TALKING TO LEONARD TINSLEY

4    SHORTLY AFTER THIS SHOOTING HAPPENED?

5          A        NO.   AFTER THE SHOOTING HAPPENED, I LEFT.

6          Q        YOU LEFT AND WENT WHERE, SIR?

7          A        I WENT TO BAKERSFIELD.

8          Q        REFERRING TO THE GENTLEMAN SEATED HERE IN

9    THE PINK SHIRT, YOU KNOW HIM, SIR?

10         A        I KNOW HIM FROM THE STREETS.   I SEEN HIM

11   AROUND.

12         Q        YOU KNOW HIM BY NAME, SIR?

13         MR. JOHNSON:  OBJECTION, YOUR HONOR.  MAY WE

14   APPROACH?

15         THE COURT:  YES.

16               (THE FOLLOWING PROCEEDINGS WERE

17                HELD AT THE BENCH:)

18         MR. JOHNSON:  CONCERNING THAT GANG MONIKER MIGHT

19   COME OUT, IT WOULD BE PREJUDICIAL.

20         MR. GRAY:  I'LL ASK HIM IF HE KNOWS HIM BY THE

21   NAME OF PAUL.

22         MR. JOHNSON:  YOU DIDN'T SAY THAT.

23         MR. GRAY:  I SAID I WILL ASK.

24         MR. DOYLE:  MAY I BE HEARD?

25               THERE ARE A LOT OF THINGS THAT ARE IN HIS

26   STATEMENT THAT ARE OBJECTIONABLE.  THEY GET INTO THE

27   CONTRACT THEORY MOTIVE, THE THEFT OF THE CAR.

28         THE COURT:  DON'T TOUCH ANY OF THIS.

4556

1        MR. DOYLE:  WELL, HE'S REAL SQUIRRELLY AND

2   DANGEROUS.  NO TELLING WHAT HE WILL SAY.

3        THE COURT:  HOW MUCH MORE ARE YOU GOING TO ASK

4   HIM?

5        MR. GRAY:  NOT MUCH MORE.  DID HE KNOW THE

6   DEFENDANT, AND DID HE TELL SOMEONE IT WAS PAUL.

7        THE COURT:  WELL, YOU LEAD HIM.

8             (THE FOLLOWING PROCEEDINGS WERE

9              HELD IN OPEN COURT IN THE

10             PRESENCE OF THE JURY:)

11        THE COURT:  DO YOU WANT TO RESTATE YOUR QUESTION,

12   MR. GRAY?

13        Q     BY MR. GRAY:  SIR, DON'T YOU KNOW THE

14   GENTLEMAN SEATED HERE BY THE NAME OF PAUL?

15        A     I HEARD HIS NAME BEFORE.

16        Q     AND DIDN'T YOU TELL LEONARD TINSLEY,

17   SHORTLY AFTER THE SHOOTING HAPPENED, THAT PAUL SHOT AT

18   YOU?

19        A     WHAT DID I TELL YOU?  I SAID I WENT TO

20   BAKERSFIELD.

21        Q     SO ARE YOU TELLING US YOU DIDN'T HAVE A

22   CONVERSATION SHORTLY -- WITH LEONARD TINSLEY -- AFTER

23   THE SHOOTING?

24        A     I NEVER HAD A CONVERSATION WITH LEONARD

25   TINSLEY.

26        Q     AND YOU DIDN'T TELL LEONARD TINSLEY THAT

27   IT WAS PAUL THAT SHOT AT YOU?

28        A     NO.

4557

1          Q      SIR, YOU ARE IN CUSTODY RIGHT NOW?

2          A      I'M IN CUSTODY.

3          Q      AND YOU'RE IN CUSTODY FOR ROBBERY; IS THAT

4   CORRECT?

5          A      NO.  I'M IN CUSTODY FOR PETTY THEFT,

6   RECEIVING STOLEN PROPERTY.

7          MR. DOYLE:  OBJECTION.  IMPROPER IMPEACHMENT.

8   PRESENT FELONY STATUS IS NOT GERMANE.

9          THE COURT:  SUSTAINED.

10         MR. DOYLE:  MOTION TO STRIKE.

11         THE COURT:  STRICKEN.

12              LADIES AND GENTLEMEN, YOU ARE INSTRUCTED

13   TO DISREGARD.

14         MR. GRAY:  MAY WE APPROACH BRIEFLY, YOUR HONOR?

15              (THE FOLLOWING PROCEEDINGS

16              HELD AT THE BENCH:)

17         MR. GRAY:  EXCUSE ME.  IS THE COURT TELLING ME I

18   CAN'T IMPEACH HIM WITH THE FACT THAT HE HAS A FELONY

19   CONVICTION?

20         THE COURT:  ABSOLUTELY NOT.

21         MR. GRAY:  HE'S SITTING ON THE WITNESS STAND --

22         THE COURT:  THE OBJECTION THAT MR. DOYLE MADE WAS

23   THAT YOU'RE ASKING HIM HIS STATUS OF HIS CUSTODY STATUS.

24   THAT'S NOT PROPER.  IT'S JUST THE FORM OF THE QUESTION,

25   "HAVE YOU BEEN CONVICTED OF A FELONY?"  THAT'S ALL.

26         MR. GRAY:  I'M SORRY.  I MISUNDERSTOOD YOUR

27   RULING.

28              (THE FOLLOWING PROCEEDINGS WERE

1                    HELD IN OPEN COURT IN THE

2                    PRESENCE OF THE JURY:)

3        THE COURT:   MR. GRAY.'

4        MR. GRAY:   YOUR HONOR, I'M SORRY.   I NEED TO

5   APPROACH AGAIN.

6                   (THE FOLLOWING PROCEEDINGS WERE

7                    HELD AT THE BENCH:)

8        MR. GRAY:   YOUR HONOR, I JUST WANT TO BRING UP A

9   POINT.   I BELIEVE IT IS RELEVANT THAT I GO INTO THE FACT

10  THAT HE IS IN CUSTODY.

11       THE COURT:   YEAH, BUT WHY HE'S IN CUSTODY -- IF

12  HE'S IN ON PAROLE VIOLATION AND ALL THAT KIND OF STUFF,

13  THAT'S NOT.   BUT "HAVE YOU BEEN CONVICTED OF A FELONY?

14  ARE YOU NOW IN CUSTODY?"

15       MR. GRAY:   SO I'M NOT PRECLUDED FROM GOING INTO

16  THE FACT THAT HE'S IN CUSTODY?

17       THE COURT:   HE ALREADY SAID HE WAS, AND HE'S

18  WEARING BLUES WITH A SHERIFF ESCORT.

19                  (THE FOLLOWING PROCEEDINGS WERE

20                   HELD IN OPEN COURT IN THE

21                   PRESENCE OF THE JURY:)

22       THE COURT:   READY NOW, MR. GRAY?

23       MR. GRAY:   YES, YOUR HONOR.

24       THE COURT:   PLEASE.

25       Q       BY MR. GRAY:   MR. JONES, IT IS CORRECT

26  THAT YOU HAVE BEEN CONVICTED OF A FELONY; IS THAT

27  CORRECT?

28       A       YEAH.

```
 1           Q      OKAY.

 2                  AND YOU ARE CURRENTLY IN CUSTODY; IS THAT

 3    CORRECT?

 4           A      FOR A VIOLATION.

 5           Q      OKAY.

 6                  SIR, ISN'T IT -- DO YOU KNOW WHAT THE TERM

 7    "SNITCH" MEANS, SIR?

 8           A      NAW.

 9           Q      YOU DON'T KNOW WHAT THE TERM "SNITCH"

10    MEANS?

11           A      NAW.

12           Q      HOW OLD ARE YOU, SIR?

13           A      I'M 23.

14           Q      HOW LONG HAVE YOU LIVED IN IMPERIAL COURTS

15    HOUSING PROJECTS, SIR?

16           A      SINCE I WAS 12 -- 11.

17           Q      AND YOU DON'T KNOW WHAT THE TERM "SNITCH"

18    MEANS?

19           A      NO.

20           Q      WHAT HAPPENS -- WHAT DO YOU CALL A PERSON

21    THAT COMES INTO COURT OR GOES TO THE POLICE AND TELLS ON

22    SOMEONE ELSE?

23           A      IF HE TELL, HE TELL.

24           Q      WHAT DO YOU -- WHAT NAME DO YOU GIVE THAT

25    PERSON?  WHAT DO YOU CALL THAT?

26           A      I DON'T CALL THEM NOTHIN'.

27           Q      HAVE YOU EVER HEARD OF ANYONE BEING CALLED

28    A NAME SUCH AS "STOOL PIGEON" OR "SNITCH" WHEN THEY GO
```

1    IN COURT AND TELL ON SOMEONE OR TELL THE POLICE?

2          A      I HEARD THEM ON TV SAY THAT.  IS THAT WHAT

3    YOU ARE TALKING ABOUT?

4          Q      HAVE YOU HEARD IT ANYWHERE?

5          A      I AIN'T HEARD FROM NOBODY.

6          Q      YOU HEARD IT ON TELEVISION?

7          A      THAT'S IT.  A MOVIE.

8          Q      WHAT TERM IS IT THAT YOU HEARD ON THE

9    MOVIE, SIR?

10         A      WHEN SOMEBODY TALK TO THE POLICE, THEY A

11   SNITCH.

12         Q      SO YOU KNOW WHAT A SNITCH IS?

13         A      WHAT FROM A MOVIE, YEAH.

14         Q      SO YOU KNOW WHAT IT IS.

15                AND YOU ARE TELLING ME, SIR, YOU NEVER

16   HEARD OF THIS TERM BEFORE OUTSIDE OF A MOVIE?

17         A      NAW.

18         Q      ISN'T IT TRUE, SIR, THAT IF YOU ARE IN

19   CUSTODY AND YOU COME INTO COURT AND TESTIFY ON SOMEBODY,

20   YOU GET LABELED A "SNITCH"?

21         A      NAW.

22         Q      ISN'T IT ALSO CORRECT, SIR, THAT IF YOU

23   ARE LABELED A "SNITCH", YOUR LIFE CAN BE IN DANGER WHILE

24   YOU ARE IN CUSTODY?

25         A      NAW.

26                MR. GRAY:  I HAVE NOTHING FURTHER.

27                THE COURT:  CROSS-EXAMINATION ON BEHALF OF THE

28   DEFENDANT?

```
 1                        CROSS-EXAMINATION

 2   BY MR. DOYLE:

 3           Q      HI, MR. JONES. HOW YOU DOING?

 4           A      I'M DOING ALL RIGHT.

 5           Q      YOU SAID THAT THE PERSON WHO SHOT AT YOU

 6   HAD A CURL?

 7           A      YEAH.

 8           Q      I THINK YOU SAID A LONG CURL?

 9           A      YEAH.

10           Q      HOW LONG?

11           A      IT WAS LONG TO THE BACK.

12           Q      SHOW ME NOW.  COME ON, SHOW ME.  HOW LONG

13   WAS THE CURL?

14           A      ABOUT THE SAME LENGTH AS THIS LADY

15   STANDING IN FRONT OF ME.

16           Q      THIS --

17           A      HERE.

18           THE COURT:  THE COURT REPORTER.

19           MR. DOYLE:  IT'S NOT A CURL.

20           THE WITNESS:  IT'S LONG.

21           MR. DOYLE:  FOR THE RECORD --

22           THE COURT:  IT'S TWO, THREE INCHES BELOW THE

23   SHOULDER.

24           Q      BY MR. DOYLE:  THAT'S PRETTY LONG.

25           A      YEAH.

26           Q      DID YOU NOTICE THE LENGTH OF THE HAIR

27   COULD YOU TELL ABOUT THE LENGTH OF THE HAIR OF THE

28   PERSON IN FRONT OF THEIR FACE?
```

1    A    IT WAS RIGHT HERE TOWARDS THE FOREHEAD.

2    THE COURT:  INDICATING THE EYEBROW LEVEL.

3    Q    BY MR. DOYLE:  I'M SHOWING YOU NOW WHAT'S

4  BEEN PREVIOUSLY MARKED PEOPLE'S 21.  I WANT YOU TO LOOK

5  AT THE HAIRSTYLE OF THAT PERSON.

6          IS THE HAIRSTYLE OF THE PERSON IN

7  PEOPLE'S 21 ANYTHING LIKE THE HAIRSTYLE OF THE PERSON

8  WHO SHOT AT YOU?

9    A    NO.

10    Q    WHAT'S THE DIFFERENCE?

11    A    IT'S SHORTER.

12    Q    OKAY.

13    MR. DOYLE:  MAY I PASS OUT PEOPLE'S 21?

14    THE COURT:  CERTAINLY.

15    Q    BY MR. DOYLE:  NOW, WHAT YOU ARE TELLING

16  ME IS, YOU REMEMBER THE HAIRSTYLE OF THE PERSON THAT

17  SHOT AT YOU HAD A CURL SUBSTANTIALLY LONGER THAN IS

18  DEPICTED IN PEOPLE'S 21?

19    A    YES.

20    Q    DO YOU KNOW LEONARD TINSLEY?

21    A    YEAH, I KNOW HIM.

22    Q    YOU SAY YOU LEFT AND WENT TO BAKERSFIELD

23  AFTER --

24    A    RIGHT AFTER THE SHOOTIN'.  MY MOTHER TOOK

25  ME TO MY PEOPLE'S HOUSE IN NICKERSON.  MY UNCLE CAME AND

26  PICKED ME UP, AND THAT WAS, LIKE, THE NEXT DAY.

27    Q    OKAY.

28          SO THE -- OKAY.

4563

```
 1              THE SHOOTING OCCURRED ON DAY ONE, BUT WE
 2   WILL CALL THIS THE FIRST DAY.
 3              WHEN DID YOU WIND UP AT YOUR UNCLE'S
 4   HOUSE?
 5        A     NEXT DAY.
 6        Q     DAY TWO.
 7              HOW LONG DID YOU STAY THERE?
 8        A     ABOUT A DAY.
 9        Q     BY DAY THREE, WERE YOU IN BAKERSFIELD?
10        A     YEAH.
11        Q     SO TWO DAYS AFTER THE SHOOTING, YOU WERE
12   OUT OF THE COUNTY?
13        A     OUT OF IT.
14        Q     DID YOU SUBSEQUENTLY GET LOCKED UP AFTER
15   THAT FOR ANY REASON --
16        A     YES.
17        Q     -- IN BAKERSFIELD?
18        A     THE DETECTIVES PUT A WARRANT OUT FOR MY
19   ARREST.
20        MR. GRAY:  OBJECTION, YOUR HONOR.  CALLS FOR
21   HEARSAY.
22        THE COURT:  SUSTAINED.
23        MR. GRAY:  MOTION TO STRIKE.
24        THE COURT:  IT WILL BE STRICKEN.
25        Q     BY MR. DOYLE:  DID YOU EVENTUALLY WIND UP
26   IN CUSTODY IN BAKERSFIELD?
27        A     YEAH.
28        Q     HOW SOON?
```

```
 1          A       I CAN'T REMEMBER HOW SOON.  IT WAS -- I
 2    WAS ARRESTED, THOUGH, FOR --
 3          Q       I WANTED TO KNOW, HOW LONG WERE YOU IN
 4    BAKERSFIELD BEFORE YOU GOT ARRESTED?
 5          A       SOME OF THE SUMMER.
 6          Q       SOME OF THE SUMMER.
 7                  DID YOU HAVE ANY CONTACT WITH LEONARD
 8    TINSLEY DURING THAT PERIOD?
 9          A       NO.  HE'S NOT GOING TO COME TO NO
10    BAKERSFIELD.
11          MR. GRAY:  OBJECTION, YOUR HONOR.  CALLS FOR
12    SPECULATION.
13          THE COURT:  SUSTAINED.
14                  YOU DIDN'T HAVE ANY CONTACT WITH HIM?
15          THE WITNESS:  NO CONTACT WITH HIM.
16          Q       BY MR. DOYLE:  SO IF LEONARD WERE TO SAY
17    THAT YOU TOLD HIM THAT YOU SAW WHO DID IT AND TOLD HIM
18    WHO DID IT, HE WOULD BE LYING?
19          A       HUH?
20          Q       WOULD HE BE LYING?
21          A       NO.
22          Q       HE WOULDN'T BE LYING?
23          A       ABOUT WHAT?
24          Q       OKAY.
25                  IF LEONARD CAME IN HERE AND SAID, YOU
26    KNOW, THAT "DONNELL SAW IT.  DONNELL KNOWS WHO DID IT;
27    HE SAW HIM.  DONNELL TOLD ME HE DID IT," WOULD THAT BE
28    THE TRUTH OR A LIE?
```

4565

1          A      IT WOULD BE A LIE.

2          Q      NOW, YOU ARE IN CUSTODY RIGHT NOW?

3          A      YEAH.

4          Q      HOW LONG HAVE YOU BEEN IN CUSTODY?

5          A      SEVEN MONTHS NOW.

6          Q      SO SEVEN MONTHS AGO, YOU WERE OUT ON THE

7     STREET, RIGHT?

8          A      I GOT OUT AUGUST 12TH.

9          Q      AND HOW LONG WERE YOU ON THE STREET AFTER

10    YOUR LAST LITTLE PERIOD OF CUSTODY?

11         A      A MONTH AND A HALF.

12         Q      NOW, WHEN THE DETECTIVES CAME OUT AND

13    TALKED TO YOU, YOU GAVE THEM A DESCRIPTION OF THE

14    PERSON, RIGHT?  AS BEST YOU COULD, RIGHT?

15         THE COURT:  DO YOU KNOW WHAT HE'S TALKING ABOUT?

16         THE WITNESS:  I DON'T REMEMBER.

17         Q      BY MR. DOYLE:  WELL, YOU JUST GOT FINISHED

18    SAYING SOMETHING ABOUT A JHERI CURL, RIGHT?

19         A      YEAH.

20         Q      AND HE HAD ON A TANK TOP RIGHT?

21         A      YEAH.  I GAVE THEM THAT DESCRIPTION.

22         Q      YOU GAVE THEM THAT DESCRIPTION.

23                DID THEY SHOW YOU ANY PICTURE SO YOU COULD

24    POINT SOMEBODY OUT?

25         A      YEAH.  THEY KEPT SHOWING ME PAUL CALLOWAY

26    PICTURE, SAYING, "IS THIS HIM?"

27                AND I KEPT SAYING, "I DON'T KNOW WHO SHOT

28    AT ME."

```
 1        Q        YOU REMEMBER THAT?

 2        A        I REMEMBER THAT.

 3        Q        YOU REMEMBER THAT.

 4                 ARE YOU LYING ON PURPOSE BECAUSE YOU KNOW

 5   PAUL DID IT, AND YOU KNOW IF YOU SAY THAT HE DID IT, YOU

 6   ARE GOING TO GET STUCK IN THE BACK WITH A KNIFE IN JAIL?

 7   ARE YOU SCARED?

 8        A        NO, I AIN'T SCARED.

 9        Q        ALL RIGHT.

10                 ARE YOU TELLING US THE TRUTH AS BEST AS

11   YOU CAN TODAY?

12        A        AS BEST AS I CAN.

13        MR. DOYLE:  ALL RIGHT.  THANKS.

14                 I DON'T HAVE ANYTHING ELSE.

15        THE COURT:  MR. GRAY?

16        MR. GRAY:  BRIEFLY.

17

18                        REDIRECT EXAMINATION

19   BY MR. GRAY:

20        Q        SIR, HERE, WHERE THE SHOOTING HAPPENED,

21   YOU SAY YOU STILL LIVE HERE?

22        A        YEAH.

23        Q        I GUESS YOU MEAN YOUR FAMILY STILL LIVES

24   THERE.

25        A        MY MOTHER'S FAMILY.  MY CLOTHES AND

26   EVERYTHING IS STILL THERE.

27        Q        SO YOU STILL HAVE FAMILY THAT LIVE WHERE

28   THIS SHOOTING HAPPENED, ISN'T IT?
```

```
 1        A      YEAH.

 2        Q      WHO ELSE LIVES THERE BESIDES YOUR MOTHER?

 3        A      MY LITTLE BROTHER, AND MY TWO SISTERS, AND

 4   HER HUSBAND, AND MY OTHER SISTER.

 5        Q      AND YOU WOULDN'T WANT ANYTHING TO HAPPEN

 6   TO THEM, WOULD YOU, SIR?

 7        A      WHAT THAT SUPPOSED TO MEAN?

 8        Q      YOU WOULDN'T WANT ANYTHING TO HAPPEN TO

 9   THEM WOULD YOU, SIR?

10        A      SO WHAT YOU SAYING IS, IF I SAY, "YOU DID

11   IT, YOU DID IT," IF -- YOU KNOW I'M LYING?

12        Q      THAT'S BASICALLY A "YES" OR "NO" QUESTION.

13        MR. JOHNSON:  YOUR HONOR, I OBJECT.

14        Q      BY MR. GRAY:  YOU WOULDN'T WANT --

15        A      WOULDN'T WANT ANYTHING TO HAPPEN TO THEM?

16        THE COURT:  SUSTAINED.

17             MR. GRAY, STEP BACK AND REPHRASE YOUR

18   QUESTION, PLEASE.

19        Q      BY MR. GRAY:  YOU WOULDN'T WANT ANYTHING

20   TO HAPPEN TO YOUR FAMILY AS A RESULT OF SOMETHING THAT

21   YOU DID; IS THAT CORRECT, SIR?

22        A      WOULDN'T NOTHIN' HAPPEN TO THEM, THOUGH.

23        Q      BUT YOU WOULDN'T WANT ANYTHING TO HAPPEN

24   TO THEM, THOUGH; IS THAT CORRECT?

25        A      REPHRASE THAT.

26        THE COURT:  ARE YOU ASKING TO HAVE HIM SAY IT

27   AGAIN?

28        THE WITNESS:  YEAH.
```

4568

1          THE COURT:  PLEASE.

2          Q       BY MR. GRAY:  YOU WOULDN'T WANT ANYTHING

3    TO HAPPEN TO YOUR MOTHER OR THE REST OF YOUR FAMILY THAT

4    STILL LIVES HERE IN IMPERIAL COURTS HOUSING PROJECTS AS

5    A RESULT OF YOUR COMING TO COURT AND TESTIFYING AGAINST

6    THE DEFENDANT, WOULD YOU?

7          MR. DOYLE:  OBJECTION.  ASSUMES A FACT NOT IN

8    EVIDENCE, THAT IT WOULD.

9          Q       BY MR. GRAY:  IS THAT FUNNY TO YOU, SIR?

10         THE COURT:  THERE IS AN OBJECTION ON THE TABLE.

11              SUSTAINED.

12              REPHRASE, PLEASE.

13         Q       BY MR. GRAY:  YOU WOULDN'T WANT ANYTHING

14   TO HAPPEN TO YOUR FAMILY AS A RESULT OF SOMETHING THAT

15   YOU DID; IS THAT CORRECT, SIR?

16         A       SOMETHING THAT I DID?

17         Q       YES.

18         A       I AIN'T DID NOTHIN'.

19         Q       OKAY.

20              LET'S ASSUME HYPOTHETICALLY, OKAY, FOR

21   EXAMPLE, YOU WOULDN'T WANT ANYTHING TO HAPPEN TO YOUR

22   FAMILY THAT STILL LIVES IN IMPERIAL COURTS HOUSING

23   PROJECTS AS A RESULT OF SOMETHING YOU DID?

24         A       I'M NOT GOING TO ANSWER THAT, BECAUSE

25   THAT'S --

26         MR. GRAY:  WOULD THE COURT DIRECT HIM TO ANSWER

27   HIS QUESTION?

28         THE COURT:  HE WAS RESPONDING.  I DIDN'T HEAR THE

4569

1  LAST PART.

2              WHAT WERE YOU SAYING?

3         THE WITNESS:  I TOLD HIM I WASN'T GOING TO ANSWER

4  THAT.

5         THE COURT:  YOU WERE SAYING SOMETHING ELSE.

6         THE WITNESS:  HE SAID -- THE WAY HE SAYING IT,

7  HE'S TRYING TO SAY THAT THEY PULLING A THREAT ON MY

8  PEOPLES, BUT THEY NOT.

9         THE COURT:  DON'T READ MORE INTO THE QUESTION

10 THAN IS BEING ASKED.

11              WHAT I WOULD LIKE FOR YOU TO ANSWER IS THE

12 QUESTION, JUST TAKEN AT FACE VALUE.  WOULD YOU OR WOULD

13 YOU NOT WANT SOMETHING TO HAPPEN TO YOUR FAMILY AS A

14 RESULT OF ANYTHING THAT YOU MAY HAVE DONE?

15        THE WITNESS:  IF SOMETHIN' HAPPEN, IT JUST

16 HAPPENED.

17        MR. GRAY:  THANK YOU FOR THAT DIRECT ANSWER, SIR.

18        Q      NOW, YOU SAID YOU ARE NOT AFRAID OF

19 ANYTHING HAPPENING TO YOU, SIR?

20        A      NAW.  AIN'T NOTHIN' GOING TO HAPPEN TO ME.

21        Q      AND YOU ARE SURE THAT NOTHIN' WOULD HAPPEN

22 TO YOUR FAMILY?

23        A      NOTHIN' HAPPEN TO THEM.

24        Q      YOU POSITIVE ABOUT THAT?

25        A      I'M POSITIVE.

26        Q      NO ONE IS GOING TO COME AND TRY AND SHOOT

27 AT THEM?

28        A      I'M POSITIVE.

1          Q       EVEN THOUGH SOMEONE CAME AND SHOT AT YOU?

2          MR. DOYLE:  OBJECTION.  THIS IS ARGUMENTATIVE.

3     IT'S OPEN-ENDED.

4          MR. GRAY:  I HAVE NOTHING FURTHER.

5          THE COURT:  OVERRULED.

6               RECROSS?

7

8                    RECROSS-EXAMINATION

9     BY MR. DOYLE:

10         Q       YOU CAME TO COURT AND TESTIFIED BEFORE IN

11    THIS CASE, DIDN'T YOU?

12         A       YES.

13         Q       AND HE ASKED THE SAME QUESTION BEFORE

14    THAT --

15         A       YES.

16         Q       -- THAT DIDN'T YOU TELL LEONARD TINSLEY

17    THAT PAUL DID IT?

18         MR. GRAY:  YOUR HONOR, WE WOULD OBJECT TO THE

19    FORM OF THE QUESTION.

20         THE COURT:  SUSTAINED.

21         Q     BY MR. DOYLE:  DID HE ASK YOU THE SAME

22    QUESTION BEFORE --

23         MR. GRAY:  YOUR HONOR, WE WOULD OBJECT TO THIS

24    LINE OF QUESTIONING.

25         THE COURT:  SUSTAINED.  SUSTAINED.

26         Q       BY MR. DOYLE:  THIS IS THE NOT THE FIRST

27    TIME YOU TOLD US THIS?

28         MR. GRAY:  OBJECTION, YOUR HONOR.

```
 1            THE COURT:  SIDE BAR, PLEASE.

 2                  (THE FOLLOWING PROCEEDINGS WERE

 3                  HELD AT THE BENCH:)

 4            THE COURT:  IT LOOKS LIKE YOU ARE TRYING TO USE A

 5   CONSISTENT STATEMENT WITHOUT AN INCONSISTENT STATEMENT

 6   IN BETWEEN, AND I THINK THERE NEEDS TO BE ONE.  SO

 7   UNLESS THERE IS SOMETHING I'M MISSING THAT YOU ARE

 8   DOING --

 9            MR. DOYLE:  IT WILL ALL BE STRICKEN UNLESS

10   TINSLEY COMES IN AND IMPEACHES HIM.

11            THE COURT:  I'M SORRY?

12            MR. DOYLE:  WELL, TINSLEY IS GOING TO COME IN,

13   AND IMPEACH HIM AND SAY, "YOU DID IN FACT TELL ME THAT?"

14            THE COURT:  RIGHT.

15            MR. DOYLE:  THEN THE PRIOR CONSISTENT STATEMENT

16   COMES IN.

17            THE COURT:  AND YOU CAN READ IT IN THEN.

18            MR. DOYLE:  OKAY.

19            THE COURT:  YOU CAN'T -- I TAKE THAT BACK.

20                  NO.  THAT'S WRONG.

21                  THE STATEMENT IN TERMS OF TIME, IT WAS

22   MADE, THE ORDER WAS THE STATEMENT THAT TINSLEY

23   PRESUMABLY IS GOING TO TESTIFY TO, JONES SAYS TO

24   TINSLEY, "IT WAS PAUL," THEN JONES COMES TO COURT IN

25   OCTOBER OF '92 AND SAYS, "I NEVER SAID THAT."  HE COMES

26   INTO COURT AGAIN IN APRIL OF '93 AND SAYS, "I NEVER SAID

27   THAT."

28                  HOW DO YOU GET IN THE SECOND STATEMENT IN
```

4572

1    THAT CHRONOLOGY WHICH IS CONSISTENT WITH THE STATEMENT

2    HERE TODAY?  THERE HAS NOT BEEN AN INTERVENING

3    INCONSISTENT STATEMENT.

4         MR. DOYLE:  OKAY.  ALL RIGHT.

5              (THE FOLLOWING PROCEEDINGS WERE

6               HELD IN OPEN COURT IN THE

7               PRESENCE OF THE JURY:)

8         THE COURT:  WHENEVER YOU ARE READY, MR. DOYLE.

9         Q     BY MR. DOYLE:  THE POLICE CAME OUT AND

10   TALKED TO YOU ABOUT WHAT HAPPENED A LONG TIME AGO?

11        A     THE DETECTIVE?

12        Q     YES, SIR.

13        A     THEY DIDN'T COME AND SEE ME UNTIL I WAS IN

14   BAKERSFIELD.

15        Q     OKAY.  ALL RIGHT.

16              YOU WERE IN BAKERSFIELD AT THE TIME?

17        A     UH-HUH.

18        Q     OKAY.

19              AND YOU GAVE THEM A FAIRLY LONG STATEMENT?

20        A     I GAVE THEM WHAT I THOUGHT I KNEW.

21        Q     OKAY.

22              YOU REALIZE THE DISTRICT ATTORNEY IS

23   TRYING TO -- HE'S SAYING THAT, YOU KNOW, YOU'RE NOT

24   TELLING US THAT YOU KNOW PAUL DID IT BECAUSE --

25        A     YEAH, I KNOW.

26        Q     YOU ARE SCARED, RIGHT?

27        A     I KNOW -- I KNOW WHAT HE'S TRYING TO DO.

28        MR. GRAY:  YOUR HONOR, I OBJECT TO THIS QUESTION.

4573

```
 1          THE COURT:  OVERRULED.

 2          Q     BY MR. DOYLE:  IF THAT WAS THE CASE AND

 3   YOU WERE SCARED TO SAY ANYTHING, THEN YOU WOULDN'T HAVE

 4   GIVEN HIM THIS STATEMENT AT ALL, WOULD YOU, RIGHT?

 5          A     I WOULDN'T.

 6          MR. DOYLE:  THANK YOU.

 7          THE COURT:  INDICATING THE STATEMENT --

 8   INDICATING THE STATEMENT OBTAINED FROM THE WITNESS,

 9   PRESUMABLY.

10          MR. DOYLE:  ON 9-12.

11          THE COURT:  IN BAKERSFIELD?

12          MR. DOYLE:  RIGHT.

13          Q     AND YOU EVEN SIGNED THIS STATEMENT, DIDN'T

14   YOU?

15          A     YES, I DID.

16          Q     SO IF YOU WERE SCARED THAT SOMEBODY WAS

17   GOING TO DO SOMETHING TO YOUR PEOPLE, OR STICK YOU IN

18   JAIL, OR DO SOMETHING TO YOU, YOU WOULDN'T HAVE SAID

19   ANYTHING TO ANYBODY, WOULD YOU?

20          A     UH-UH.

21          Q     LET ALONE SIGN A STATEMENT, WOULD YOU?

22          A     UH-HUH.

23          MR. DOYLE:  THANK YOU.

24          THE COURT:  THOSE LAST "UH-UH'S", "NO", SIR?

25          THE WITNESS:  UH-HUH.

26          THE COURT:  "YES"?

27          THE WITNESS:  YES.

28          THE COURT:  YOU HAVE TO SAY IT OUT LOUD SO THE
```

1  REPORTER CAN TAKE IT DOWN.

2        THE WITNESS:  ALL RIGHT.

3        THE COURT:  ANYTHING ELSE, MR. GRAY?

4        MR. GRAY:  NO, YOUR HONOR.

5        THE COURT:  ANY OBJECTION TO THIS WITNESS BEING

6  EXCUSED?

7        MR. DOYLE:  I HAVE NO OBJECTION.

8        THE COURT:  YOU ARE EXCUSED.  THANK YOU FOR

9  COMING IN.

10       MR. GRAY:  RECALLING MR. LEONARD TINSLEY.

11       THE COURT:  TAKE THE WITNESS STAND AGAIN,

12  MR. TINSLEY.

13

14                 LEONARD TINSLEY,

15  RECALLED AS A WITNESS BY THE PEOPLE, HAVING BEEN

16  PREVIOUSLY SWORN, RESUMED THE STAND AND TESTIFIED

17  FURTHER AS FOLLOWS:

18       THE COURT:  WOULD YOU STATE YOUR NAME ONCE AGAIN,

19  PLEASE?

20       THE WITNESS:  LEONARD TINSLEY.

21       THE COURT:  MR. TINSLEY, YOU UNDERSTAND THAT THE

22  OATH YOU WERE GIVEN WHEN YOU ORIGINALLY WERE CALLED TO

23  TESTIFY IS STILL IN FULL FORCE AND EFFECT?

24       THE WITNESS:  YES, I DO.

25       THE COURT:  MR. GRAY, PROCEED, PLEASE.

26       MR. GRAY:  THANK YOU,

27

28

4575

```
 1                    DIRECT EXAMINATION
 2   BY MR. GRAY:
 3        Q      MR. TINSLEY, DO YOU KNOW A GENTLEMAN BY
 4   THE NAME OF DONNELL JONES?
 5        A      YES, I DO.
 6        Q      AND WHAT NICKNAME, IF ANY, DO YOU KNOW HIM
 7   BY?
 8        A      DUKE.
 9        Q      IS DUKE A FRIEND OF YOURS?
10        A      YEAH, AT THE TIME -- DURING THE TIME THAT
11   I KNEW HIM.
12        Q      IN 1989?
13        A      YES.
14        Q      NOW, YOU REMEMBER WHEN THE YOUNG LADY --
15   THE LITTLE GIRL, KANITA HAILEY, WAS SHOT?
16        A      YES.
17        Q      THAT WAS ALSO AT IMPERIAL COURTS HOUSING
18   PROJECTS?
19        A      YES.
20        Q      THAT'S WHERE YOU LIVED ALSO?
21        A      YES.
22        Q      SHORTLY AFTER THAT SHOOTING HAPPENED, DID
23   YOU HAVE ANY KIND OF CONVERSATION WITH DUKE?
24        A      YES, I DID.
25        Q      DID YOU -- DID MR. JONES, OR DUKE, TELL
26   YOU OR GIVE YOU A NAME AS TO THE PERSON THAT HE SAW
27   SHOOTING AT HIM?
28        A      WELL, HE STATED THAT -- I ASKED HIM, AND
```

1 | HE SAID, "IT WAS THAT SAME NIGGER."

2 |        Q      DID HE GIVE YOU A NAME?

3 |        A      AND I SAID, "WHO?"

4 |               AND HE SAID, "THE SAME NIGGER, PAUL."

5 |        MR. GRAY:   THANK YOU.

6 |               NOTHING FURTHER, YOUR HONOR.

7 |        THE COURT:   CROSS?

8 |

9 |               ·  CROSS-EXAMINATION ·

10 | BY MR. DOYLE:

11 |        Q      DO YOU REALIZE THAT YOU ARE THE ONLY

12 | WITNESS IN THE ENTIRE TRIAL WHO HAS ADMITTED HE LIED?

13 |        MR. GRAY:   OBJECTION, YOUR HONOR.

14 |        THE COURT:   SUSTAINED.

15 |        Q      BY MR. DOYLE:   MR. TINSLEY, LET ME ASK YOU

16 | SOMETHING.   WHEN DID YOU HAVE THIS CONVERSATION?

17 |        A      I DON'T KNOW HOW LONG AGO, HOW LONG AFTER

18 | THE SHOOTING HAD TOOK PLACE, BUT IT WAS -- I DON'T KNOW.

19 | I HAD MOVED OUT, AND IT WAS ABOUT A MONTH AFTER I MOVED

20 | OUT.  A MONTH OR TWO.

21 |        Q      A MONTH OR TWO.

22 |               WHERE?

23 |        A      IN THE PROJECTS.

24 |        Q      HE WAS IN THE PROJECTS THEN?

25 |        A      YES.

26 |        Q      WHO ELSE WAS WITH YOU?

27 |        A      IT WAS JUST ME AND HIM.

28 |        Q      WHAT TIME OF THE DAY WAS IT?